[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

Cornel Dawson, Teron Odum, Clifton Lemon

Ulysses Polk, Antwan Davis, Duavon Spears
Gwendolyn Lemon, Delores Lemon, Janice Lemon
Patricia Lemon, Sharon Lemon, Cornesha Dawson
Camyrn Dawson, Sheronda Odum, Trequan Odum

Nya Lewis,Ulisha Polk, Kalisha Polk,Ivory Griffin
Nyana Polk, Unylah Polk, Antwan Q Davis, Anira Spears
Duavon Spears Jr, Armani Johnson-Spears, Shanela Aaron

(Enter above the full name
of the plaintiff or plaintiffs in
this action)

vs.

Michael B McHale, Patrick Quinn, Kimberly Foxx
Thomas Dart, Timothy Evans, Anita Alvarez
Lisa Madigan, Michael Madigan, John R Blakey
G Robert Blakey, Michael Lipsey, Leroy K Martin
Dennis J Porter, Thomas Darman, John Maher
Erica Dillion, Yvette Loizon, Reibana Sachs
Margaret Flisk, Corey Nelson, Bradley Scott Schneider
Marcus C Evans, Paul Evans, Toni Preckwinkle
Jason Ervin, Garry McCarthy, Kathryn Lisco
Mark Kirk, Mike Zalewski, J.R. Davis,
Bill Mitchell, Jerry Mitchell, Eddie Lee Jackson
Patricia R Bellock, Jason Barickman, Luis Arroyo

(Enter above the full name of ALL
defendants in this action. Do not
use "et al.")

1:18-cv-07172
Judge Sara L. Ellis
Magistrate Judge Young B. Kim

Case No:_____
(To be supplied by the Clerk of this Court)



OCT 2 5 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## CHECK ONE ONLY:

_____ **COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTION 1983 U.S. Code** (state, county, or municipal defendants)

_____ **COMPLAINT UNDER THE CONSTITUTION ("BIVENS" ACTION), TITLE 28 SECTION 1331 U.S. Code** (federal defendants)

_____ **OTHER** (cite statute, if known)

*BEFORE FILLING OUT THIS COMPLAINT, PLEASE REFER TO "INSTRUCTIONS FOR FILING." FOLLOW THESE INSTRUCTIONS CAREFULLY.*

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**I.     Plaintiff(s):**

   A.     Name:   Cornel Dawson

   B.     List all aliases:   N/A

   C.     Prisoner identification number:   Y29858

   D.     Place of present confinement:   Menard Correctional Center

   E.     Address:   711 East Kaskaskia St    Menard, Illinois 62259


**II.    Defendant(s):**


   A.     Defendant:   Patrick Quinn

          Title:   Former Illinois Governor

          Place of Employment:   James R Thompson Center 100 West Randolph Ste. 16-100

   B.     Defendant:   Michael B McHale

          Title:   Cook County Circuit Judge

          Place of Employment:   2600 South California  Chicago, Illinois, 60608

   C.     Defendant:   Kimberly M Foxx

          Title:   Cook County State's Attorney

          Place of Employment:   69 West Washington   Chicago, Illinois 60602

Revised 9/2007

Teron Odum
R24888
711 E. Kaskaskia St
Menard, Illinois 62259

Antwan Davis
R20613
711 E. Kaskaskia St
Menard, Illinois 62259

Clifton Lemon
Y29859
16830 IL-53
Crest Hill, Illinois 60403

Ulysses Polk
R21899
16830 IL-53
Crest Hill, Illinois 60403

Duavon Spears
M01089
16830 IL-53
Crest Hill, Illinois 60403

Gwendolyn Lemon
PO Box 241225
Chicago, Illinois 60624

Delores Lemon
PO Box 241225
Chicago, Illinois 60624

Janice Lemon
PO Box 241225
Chicago, Illinois 60624

Patricia Lemon
PO Box 241225
Chicago, Illinois 60624

Sharon Lemon
PO Box 241225
Chicago, Illinois 60624

Cornesha Dawson
PO Box 241225
Chicago, Illinois 60624

Camyrn Dawson
PO Box 241225
Chicago, Illinois 60624

Sheronda Odum
PO Box 241225
Chicago, Illinois 60624

Shanela Aaron
PO Box 241225
Chicago, Illinois 60624

Trequan Odum
PO Box 241225
Chicago, Illinois 60624

Nya Lewis
PO Box 241225
Chicago, Illinois 60624

Antwan Q Davis Jr
PO Box 241225
Chicago, Illinois 60624

Ulisha Polk
PO Box 241225
Chicago, Illinois 60624

Kalisha Polk
PO Box 241225
Chicago, Illinois 60624

Ivory Griffin
PO Box 241225
Chicago, Illinois 60624

Nyana Polk
PO Box 241225
Chicago, Illinois 60624

Unylah Polk
PO Box 241225
Chicago, Illinois 60624

Natosha Benbow
PO Box 241225
Chicago, Illinois 60624

Duavon Spears Jr
PO Box 241225
Chicago, Illinois 60624

Anira Spears
PO Box 241225
Chicago, Illinois 60624

Armani Johnson-Spears
PO Box 241225
Chicago, Illinois 60624

Corey Nelson
2111 Roosevelt Rd
Chicago, Illinois 60608

Toni Preckwinkle
118 N Clark St
Chicago, Illinois 60602

Jason Ervin
2622 W Jackson Blvd Ste 200A
Chicago, Illinois 60612

Mike Zalewski
231-E Stratton Office Bldg
Springfield, Illinois 62706

Garry McCarthy
434 W Ontario St Ste 310
Chicago, Illinois 60654

J.R. Davis
PO Box 8021
Chicago, Illinois 60680

Kathryn Lisco
2650 S California 8th flr
Chicago, Illinois 60608

Mark Kirk
230 S Dearborn St
Chicago, Illinois 60604

John R Blakey
219 S Dearborn St
Chicago, Illinois 60604

Anita Alvarez
69 W Washington
Chicago, Illinois 60602

Timothy Evans
50 W Washington St Rm-2600
Chicago, Illinois 60602

Luis Arroyo
5001 W Fullerton Ave
Chicago, Illinois 60639

Jason Barickman
309L State House
Springfield, Illinois 62706

Patricia R Bellock
215-N Stratton Office Bldg
Springfield, Illinois 62706

Bradley Scott Schneider
1432 Longworth House Office Bldg
Washington, DC 20515

Daniel J Burke
2650 W 51st
Chicago, Illinois 60632

Kelly M Burke
266-S Stratton Office Bldg
Springfield, Illinois 62706

Marcus C Evans
272-S Stratton Office Bldg
Springfield, Illinois 62706

Paul Evans
1320 Edgewater St. NW Ste 120
Salem, OR 97304

Eddie Lee Jackson
200-7S Stratton Office Bldg
Springfield, Illinois 62706

Bill Mitchell
632 Capitol Bldg
Springfield, Illinois 62706

Jerry Mitchell
630 Capitol Bldg
Springfield, Illinois 62706

Michael Madigan
6500 S Pulaski
Chicago, Illinois 60629

Thomas J Dart
50 W washington
Chicago, Illinois 60602

Lisa Madigan
100 W Randolph
Chicago, Illinois 60601

Robert Blakey
7575 Northcliff Ave Ste 205
Cleveland, Ohio 44144-3265

Leroy K Martin
2600 S California Rm 101
Chicago, Illinois 60608

Dennis J Porter
2600 S California Rm 400
Chicago, Illinois 60608

Michael Lipsey
3510 S Michigan Ave
Chicago, Illinois 60653

Thomas Darman
69 E Washington
Chicago, Illinois 60602

Erica Dillion
69 E Washington
Chicago, Illinois 60602

Yvette Loizon
69 E Washington
Chicago, Illinois 60602

John Maher
69 E Washington
Chicago, Illinois 60602

Reibana Sachs
69 E Washington
Chicago, Illinois 60602

Margaret Flisk
69 E Washington
Chicago, Illinois 60602

**III.** **List ALL lawsuits you (and your co-plaintiffs, if any) have filed in any state or federal court in the United States:**

A.  Name of case and docket number: _____ N/A _____
_____

B.  Approximate date of filing lawsuit: _____ N/A _____

C.  List all plaintiffs (if you had co-plaintiffs), including any aliases: _____
_____
_____ N/A _____
_____

D.  List all defendants: _____ N/A _____
_____
_____
_____

E.  Court in which the lawsuit was filed (if federal court, name the district; if state court, name the county): _____ N/A _____

F.  Name of judge to whom case was assigned: _____ N/A _____
_____

G.  Basic claim made:_____ N/A _____
_____
_____

H.  Disposition of this case (for example:  Was the case dismissed?  Was it appealed? Is it still pending?): _____
_____ N/A _____
_____

I.  Approximate date of disposition: _____ N/A _____

## IV.    Statement of Claim:

Now comes Plaintiffs Cornel Dawson, Teron Odum, Clifton Lemon, Ulysses Polk, Antwan Davis, Duavon Spears, Gwendolyn Lemon, Delores Lemon, Janice Lemon, Patricia Lemon, Sharon Lemon, Cornesha Dawson, Camyrn Dawson, Sheronda Odum, Shanela Aaron, Trequan Odum, Nya Lewis, Ulisha Polk, Kalisha Polk, Ivory Griffin, Nyana Polk, Unylah Polk, Antwan Davis Jr, Natosha Benbow, Armani Johnson-Spears, Anira Spears, Duavon Spears Jr. Indivdually, hereby file this claim against the above named defendants and in support thereof states as follows: During a criminal conviction case, the named defendants each played a viable role in violation of constitutional rights, judicial misconduct, failure to acknowledge and address racial bias, impartial jurors; which led to malicious prosecution by Cook County Circuit court. As stated by Chief Justice John Roberts, cited in Washington Post, "Judges are supposed to be impartial-as boring as umpires." However, in Illinois case NO. 13 CR 13349, Judge Michael B McHale continuously inserted his personal biases and failed to uphold the integrity and independence of judiciary (Ethics of judicial conduct). Based on transcripts dated November 30, 2017; Judge McHale was quoted on several occasions interjecting comments like " I think it's obvious to this court that what they are saying is we can't follow the law. And they're off " (CSR No. 84-3386). Referring to two minority jurors who questioned unfair jury instructions. Judge McHale failed to allow either juror to clarify their concerns and removed them in protest. In addition to the removal of black juror for being dishonest on the juror questionnaire; McHale allowed 2 male jurors not of color to remain after one confessed to "wanting to send a message." As documented by U.S Supreme Court case Pena-Rodriguez v. Colorado in which the "no impeachment rule" must give way when it is alleged that a juror made explicit state-ments indicating ethnic or racial animus was a motivating factor to convict ( Pena-Rodriguez, 2017). In this case, juror No.215 who later became the foreperson and juror No. 44 were not stricken for making such comments under oath, undermining

4                                                           Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

the rights of impartiality. While McHale disagreed with the above findings, the U.S Supreme Court and Appellate courts ruling set precedent for cases heard in lower courts, thus he has violated the Judicial code of conduct and should be reprimanded similar to his improper handling of the other 12 cases currently being overturned. One of the jurors that were responsible for alerting the judge of all the racist and bias comments being made by jurors during deliberations, came forward to testify at a hearing after trial, and was then "deemed incredible by the courts." Another point of inconsistency and contradiction by the Courts, because previous evidence shows that this same juror brought forth concerns that removed other bias jurors. Judge McHale allowed jurors to spew racial slurs and throw chairs at black jurors; but failed to bring forth criminal assault or hate crime charges. On the date in question, June 11, 2012 Former Governor Patrick Quinn signed the first Illinois statue bill HB1907 (Illinois Street Gang Racketeer Influenced Corrupt Organizations Law) which holds Pat Quinn responsible for the negative downpour such unconstitutional law created. Former Cook County State's Attorney Anita Alvarez failed to sign and request authorization to obtain recordings that were used in a criminal conviction of six of the named plaintiffs; although similar recordings were deemed inadmissible by the Second District Appellate Court. Six of the above named plaintiffs are victims of a wrongful conviction case in Cook County Circuit court and suffered lost of freedom, years apart from families, housed in dilapidated prisons with deplorable conditions, and targeted by Cook County as " Test Subjects" for the newly drafted Illinois RICO law. All named defendants are being named in this complaint for their direct or foreseen participation in the construct of lawful practices that negatively affect the Black Communities of Illinois. It is a violation of due process to subject a defendant to trial in an atmosphere of mob action or racial motivation. Newspaper articles from 2013 until current day has depicted plaintiffs in a negative light, caused pain and suffering over a long length of time, and hindered the upward mobility of those parties and their respective families. The extensive cost of legal counsel for each individual listed, in addition to the irreplaceable moments that will never be given back; the exact same constitutional rights granted to us as citizens has been the catalyst to destroy the democracy for Blacks. The demanded relief of damages are for those victims and families in need of justice reform; to ensure the system in which this country was built upon, works for all mankind.

5

Revised 9/2007

## V.    Relief:

Based on the trauma and harsh sentence of cruel and usual punishment in which some plaintiffs were sentenced 888 years without the potential of parole, along with the separation of families; plaintiffs are entitled to relief for a number of reasons. Private communications, jury tampering, or the creation of imminent danger is not to be condoned, per the Sixth Amendment. The number of individuals affected by the Cook County Judicial System, and named defendants have caused financial hardships that will outweigh time lost, memories unforeseen, broken families, generational destitution, lost wages, medical expenses, and humiliation. Thus the plaintiffs named above, are seeking $600 million dollars to compensate for the defamation of character, attorney fees and legal costs, pain and suffering, and judicial reform.

VI.    The plaintiff demands that the case be tried by a jury.   ☐ YES    ☒ NO

### CERTIFICATION

By signing this Complaint, I certify that the facts stated in this Complaint are true to the best of my knowledge, information and belief. I understand that if this certification is not correct, I may be subject to sanctions by the Court.

Signed this __26__ day of __10__; 20__18__

_Patricia Lemon_
(Signature of plaintiff or plaintiffs)

_Patricia Lemon_
(Print name)

_____
(I.D. Number)

_1455 S. Kedvale 2nd fle._
_Chicago, IL 60623_
(Address)

Revised 9/2007

Gwendolyn Lemon

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Gwendolyn Lemon and I am the mother of Cornel Dawson and Ulysses Polk, sister of Clifton Lemon, aunt of Antwan Davis, and Teron Odum; and close friend to Duavon Spears. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled mother, sister, aunt and friend

Delores Lemon

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Delores Lemon and I am the mother of Teron Odum, sister of Clifton Lemon, aunt of Antwan Davis, Cornel Dawson, Ulysses Polk; and close friend to Duavon Spears. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled mother, sister, aunt and friend

Janice Lemon

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Janice Lemon and I'am the sister of Clifton Lemon, aunt of Antwan Davis, Cornel Dawson, Ulysses Polk Teron Odum; and close friend to Duavon Spears. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.


A troubled sister, aunt and friend

Patricia Lemon

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Patricia Lemon and I am the mother of Antwan Davis, sister of Clifton Lemon, aunt of Cornel Dawson, Teron Odum, and Ulysses Polk; and close friend to Duavon Spears. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled mother, sister, and aunt

Sharon Lemon

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Sharon Lemon and I'am the sister of Clifton Lemon, aunt of Antwan Davis, Cornel Dawson, Ulysses Polk Teron Odum; and close friend to Duavon Spears. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled sister, aunt and friend

Nya Lewis

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Nya Lewis and I' am the daughter of Clifton Lemon, cousin of Cornel Dawson, Ulysses Polk, Antwan Davis and Teron Odum. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled daughter and cousin

Sheronda Odum

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Sheronda Odum and I' am the daughter of Teron Odum, niece of Clifton Lemon, cousin of Cornel Dawson, Ulysses Polk, Antwan Davis. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled daughter, niece and cousin

Cornesha Dawson

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Cornesha Dawson and I' am the daughter of Cornel Dawson, niece of Ulysses Polk, Clifton Lemon, cousin of Antwan Davis and Teron Odum. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled daughter, niece and cousin

Shanela Aaron

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Shanela Aaron and I' am the daughter of Teron Odum, niece of Clifton Lemon, cousin of Antwan Davis, Cornel Dawson, and Ulysses Polk. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.


A troubled daughter, niece and cousin

Trequan Odum

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Trequan Odum and I' am the son of Teron Odum, nephew of Clifton Lemon, cousin of Antwan Davis, Cornel Dawson, and Ulysses Polk. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled son, nephew and cousin

Antwan Davis Jr

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Antwan Davis Jr and I' am the son of Antwan Davis, nephew of Clifton Lemon, cousin of Teron Odum, Cornel Dawson, and Ulysses Polk. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled son, nephew and cousin

Nyana Polk

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Nyana Polk and I' am the daughter of Ulysses Polk, niece of Cornel Dawson, Clifton Lemon, cousin of Teron Odum and Antwan Davis. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.


A troubled daughter, niece and cousin

Unylah Polk

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Unylah Polk and I' am the daughter of Ulysses Polk, niece of Cornel Dawson, Clifton Lemon, and cousin of Antwan Davis and Teron Odum. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled daughter, niece and cousin

Ivory Griffin
P.O. Box 241225
Chicago, IL 60624

To whom it may concern:

My name is Ivory Griffin and I' am the daughter of Ulysses Polk, niece of Cornel Dawson, Clifton Lemon, and cousin of Antwan Davis and Teron Odum. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled daughter, niece and cousin

Kalisha Polk

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Kalisha Polk and I' am the daughter of Ulysses Polk, niece of Cornel Dawson, Clifton Lemon, and cousin of Antwan Davis and Teron Odum. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled daughter, niece and cousin

Ulisha Polk

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Ulisha Polk and I' am the daughter of Ulysses Polk, niece of Cornel Dawson, Clifton Lemon, and cousin of Antwan Davis. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled daughter, niece and cousin

Duavon Spears Jr

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Duavon Spears Jr and I' am the son of Duavon Spears. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.


A troubled son

Anira Spears

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Anira Spears and I' am the daughter of Duavon Spears. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled daughter

Armani Johnson-Spears

P.O. Box 241225

Chicago, IL 60624

To whom it may concern:

My name is Armani Johnson-Spears and I' am the son of Duavon Spears. After dealing with the turmoil and heartbreak of the Illinois State RICO case, in which my family was wrongfully convicted after five long years, my life has changed tremendously. This case has turned my life upside down and haunted me with the same negative effects of the Jim Crow era. Seeing as though the presiding judge on the case, Michael B. McHale, along with the Cook County State's Attorney Kim Foxx and associates, Former Governor Patrick Quinn, and Former Attorney Anita Alvarez, have all made an asserted effort to deny civil liberties and address racial bias. At a time when our country should be making stride to undo the corruption and misconduct Illinois is known for, we have gone back to destroying families of color and disproportionately marginalizing our inner city communities. Since Judge McHale along with others mentioned, have created and enforced unconstitutional laws that target men of color, I have felt a loss of hope for our city and state. Racial tension and confusion has segregated our trusted leaders from the communities in which they were appointed to serve; and now we have a dangerous justice system with authorities who abuse their power and reach. We have spoken on these issues that have been brought to the forefront for over five years, and to no avail we have yet to see real change. The torment my family, and I have faced after seeing our boys sprawled on the news and caricatures of them as if they are not human was humiliating. Being followed and harassed based on the glamorized accusations of others, and the audacity of a judge with ulterior motive. The position McHale and other politicians have played as they target my family as "Test subjects" for an unlawful statute that violates American civil liberties, can be reckoned with the effects of Modern Day lynching. It has been difficult to afford the necessities and support for each of them, all the while maintain my own livelihood. Not only is it inhumane, but extremely cruel for a judge to declare 888 years of solitude for an individual who has never been convicted of any crime. The basis in which harsh sentencing was founded does not even coincide with the alleged crime; thus proving an abuse of power. Our hearts are heavy and filled with disbelief, but we shall continue to seek justice and let God prevail.

A troubled son

**Antwan Davis**
**P.O. Box 241225**
**Chicago, IL 60624**

**Date: 04/16/2018**

**Justice Anthony Kennedy**
Supreme Court of the United States
1 First Street, NE
Washington, DC 20543

Dear Justice Anthony Kennedy:

Re: **(*Racial Bias concerns ignored by Judge Michael B McHale*)**

On **April 6, 2018**, In the Cook County Leighton courthouse, Judge Michael B McHale denied defense attorneys motion to interview jurors who reported claims of racism and violence during deliberations. Judge Michael McHale vaguely ignored the complaints made to him in a number of letters given to him on December 1, 2017 while jurors deliberated. The foreperson and several other jurors gave insight to McHale and warned of jurors who made statements about "sending a message to the defendants," verbally attacked jurors with racial slurs, and just recently, after a guilty verdict was unlawfully rendered; they also made note of physical assaults from jurors who threw chairs at jurors of color. All of the above accounts of racism and discrimination in the court of law, should be and are grounds for a mistrial or new trial according to U.S. Supreme Court ruling in the case of Miguel Pena-Rodriguez (2017).

The U.S. Supreme court ruled when clear evidence emerges after a jury verdict that there was racial bias during deliberations, the trial judge Must make an exception and question or investigate the misconduct in order to determine whether the defendant was denied a fair trial. Failure to do so, is a clear violation of the Fourteenth amendment that guarantees equal protection of the law, and Sixth amendment that guarantees the right to a fair and impartial jury trial as noted by Justice Anthony Kennedy. Jurors who made statements of "wanting to send a message" and boldly jump atop tables to assault other jurors are not only forms of racism, but also hate crimes. One juror in particular was so afraid and overwhelmed by the attacks, that she panicked and passed out during deliberations, at which time Judge McHale removed her from the juror. The other jurors, who wrote the notes and shed light on the injustices that were occurring in the jury chambers, were also removed. However, Judge McHale did not remove jurors who acknowledged that they did make said statements, nor did he remove jurors who assaulted other jurors or bring forth criminal charges. Which now shows evidence, the Judge in order to push his agenda of rendering a guilty verdict has now engaged in willful misconduct. Judge Michael B McHale on several occasions, went on record proclaiming a guilty verdict and stating that higher courts will not overturn his decision, persistently failed to perform his duties, blatantly disrespect defense lawyers, allowed

unauthorized evidence, and removed qualified jurors who exposed the unlawful practices of discrimination (Rule 63: Canon 1 and 3; Article VI Section 15). His behavior and activities of prejudicial disrepute are violations of judicial conduct. McHale's behavior, in addition to the racist misconduct by several jurors, are Constitutional violations and grounds for impeachment of Judge Michael McHale and mistrial for defendants. The above accusations can be proved via court records, transcripts, news coverage, and subpoena statements or testimonials from juror members associated with the case. The factual evidence of racial prejudice not only damages the jury system, but also reincarnate many of the human rights violated prior to the inclusion of Civil Rights Acts and Statutes. Laws that were created and codified into law to prevent institutionalized practices that negatively affect people of color and deny due process are now being mishandled and reinforced in Cook County's failing Judicial system.

To resolve the problem, I would appreciate your Justice Department review case (13CR13349) United States (People) V. Cornel Dawson, Teron Odum, Ullyses Polk, Clifton Lemon, Antwan Davis, and Duavon Spears. Enclosed are copies of my records **(include transcripts, media coverage, and affidavits) other documentation would have to be requested from Cook County State's attorney office, including confidential informant Alex Williams record of misconduct.**

I look forward to your reply and a resolution to my problem and will wait until **April 30,2018** before seeking help from Department of Justice Civil Rights Division, United States Supreme Court, and response from Judiciary Board Commission. Please contact me at the above address or by phone at **(773-816-3122)**.

Sincerely,

**Antwan Davis**

# Lawyers of Now-Convicted Chicago Gang Leaders File Affidavit Accusing Jury of Racist Intentions

By **Tanasia Kenney** - April 6, 2018

*Judge Michael McHale was previously forced to dismiss five jurors after on of them made racial remarks and another passed out. (Image courtesy of Alamy Stock Photos)*

The lawyers for six Black Souls gang leaders convicted on racketeering and drug conspiracy charges last year are now seeking a judge's approval to speak a with a juror who reportedly made explosive claims about racist behaviour during the jury's chaotic closed-door deliberations.

According to the Chicago Tribune, lawyers filed an affidavit from the sister of defendant Antwan Davis, in which she alleged that a Black juror told her that other jurors shouted insults, used the N-word and even threw chairs and jumped on tables as they struggled to reach a verdict in December.

"Yes, they were calling us every name but the child of God," the affidavit quoted the unnamed juror as telling Davis' sister, Shira Davis, 28. Davis claims she talked to the juror on the phone on March 5 after first reaching out to her on social media.

Though historically it's been difficult to get a judge to alter a verdict based on later complaints by a juror, the lawyers, in their filing, cited a 2017 U.S. Supreme Court decision allowing a judge weighing a new trial to review whether jurors acted with racist intentions in order to reach a verdict. The lawyers are now awaiting the green light from Judge Michael McHale to interview the juror.

Deliberations in the nearly two-month trial came to a complete stop last year after jurors passed a note to the judge alleging racism and chauvinism in the jury room, the Chicago Tribune reported. McHale was forced to remove fire jurors from the panel after one allegedly made racist remarks, another lied on her jury questionnaire and a third passed out and had to be treated by paramedics. The remaining two were ousted for protesting the fairness of jury's legal instructions, according to the newspaper.

McHale replaced the jurors with five alternates who would go on to convict the six gang leaders of racketeering and drug conspiracy. Each is facing life behind bars.

## Comments: Get Heard

# Officials: Murder, intimidation kept $11 million-a-year gang going



Alleged gang members arrested in a recent crackdown include (clockwise starting at top left) Antwan Davis, Cornel Dawson, Clifton Lemon, Teron Odum, Ulysses Polk, and Jeff Thompson. (Cook County State's Attorney's Office)

By **Annie Sweeney and Jason Meisner**

JUNE 13, 2013

T he top leaders of one of Chicago's most violent street gangs have been charged in a sweeping racketeering case that alleges they controlled their West Side drug empire through pattern of intimidation, kidnappings, shootings and murder dating back to the mid-1990s, according to an affidavit unsealed today in Cook County Criminal Court.

Before sunrise today, police armed with "no knock" search warrants fanned out across the Chicago area surprising dozens of leaders of the Black Souls, including Cornel Dawson, known as the gang's chief, and Teron Odum, described as Dawson's second-in-command. Also arrested were a number of "top runners" and "supervisors" who authorities say control the gang's street operations.

**ONLY $1 FOR 3 MONTHS!**
Midterms Sale ends 11/7

**SAVE NOW ›**

The 78-page affidavit alleges the Black Souls ran an $11 million-a-year drug operation and protected the enterprise with violence that included at least seven murders from 1994 to 2012. In all, 23 members of the gang have been charged with racketeering conspiracy, while 18 more face state drug or weapons charges, authorities said.

Among the charges was the slaying last October of Claude Snulligan, whom authorities said was fatally shot after he worked undercover and agreed to testify against the gang's leaders about a robbery and attempted kidnapping months earlier.

The case, dubbed "Operation 40 Cal," marks the first prosecution under the state's new anti-racketeering law designed to hold gang leaders accountable for violence their organizations wreak on city streets.

"The new street gang RICO law has enabled us to launch an unprecedented attack on the leadership of this violent and notorious gang," Cook County State's Attorney Anita Alvarez said at a news conference today at the Leighton Criminal Court Building. "It is a game-changer for law enforcement in our war against Chicago street gangs."

Chicago police Supt. Garry McCarthy said similar measures were used to great effect during his tenure in New York and allow police to "permeate the veil of secrecy" in which gang leaders surround themselves.

"We're going to use this a lot," McCarthy said.

Court appearances for the defendants are expected to begin Friday.

The arrests mark the first prosecution by the Cook County state's attorney's office under the gang RICO law, which took effect in June 2012 and was modeled after the 1970 federal RICO statute originally designed to go after mobsters. By classifying a gang as a criminal enterprise, the law allows authorities to hold leaders responsible for the gang's actions even if they are insulated from a particular crime such as a murder or drug deal.

The law carries stiff penalties for those convicted of participating in a criminal enterprise -- from a mandatory 7- to 30-year prison term for racketeering conspiracy up to life in prison without parole for those convicted of murder under the statute.

The Black Souls gang was founded on the city's West Side and is thought to have a half-dozen factions with more than 750 members, according to law enforcement reports.

ONLY $1 FOR 3 MONTHS!
Midterms Sale ends 11/7      SAVE NOW >

In 2010, the gang was targeted by then-Chicago police Supt. Jody Weis under a new strategy to crack down on an entire gang if one of its members was involved in a fatal shooting. The effort, which began with the August 2010 murder of high school senior Anthony Carter, netted more than 60 arrests, according to a Tribune report that year.

Over the past decade, the federal RICO statute has been used against two Chicago-area gangs: the Latin Kings in Chicago and the Insane Deuces in Aurora.

In the Latin Kings case, prosecutors emphasized that the case provided them with a rare opportunity to hold the highest ranking Latin King in the country accountable for the violence that supported the gang's drug enterprise.

*asweeney@tribune.com*

*jmeisner@tribune.com*

Copyright © 2018, Chicago Tribune

**This 'attr(data-c-typename)' is related to:** Homicide, Drug Trafficking, Crime, Anthony Carter (basketball), Jody Weis

**ONLY $1 FOR 3 MONTHS!**
Midterms Sale ends 11/7

SAVE NOW ›

# ATF sting operation accused of using racial bias in finding targets, with majority being minorities



University of Chicago law students are working on a legal effort to have a dozen Chicago "Stash House Sting" cases dismissed that involve more than 40 defendants. In support of that effort, a recently unsealed study concluded the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives showed a clear pattern of racial bias. (Abel Uribe / Chicago Tribune)

By **Jason Meisner and Annie Sweeney**
Chicago Tribune

MARCH 3, 2017, 7:22 AM

**L**eslie Mayfield was handcuffed in the back of a police wagon when he realized the plan to rob a drug stash house was a setup.

For four years, Mayfield had been struggling to turn his life around after more than a decade in prison. To escape the street life, he moved to Naperville with his fiancee's family and managed to find a full-time job at a suburban electronics facility that paid 12 bucks an hour. It was there that a co-worker lured him into the robbery after weeks of effort, promising a big score.

Midterms Sale ends 11/7    SAVE NOW ›

This portion of the requested page has been blocked.
Click here for details.

Now, inside the police vehicle, the sounds of flash-bang grenades still ringing in his ears, Mayfield started to piece it all together. There was no stash house, no cartel drugs or associates to rob. It was a crime dreamed up by federal authorities and carried out with the help of Mayfield's co-worker to reel him in when he was at his most vulnerable.

Eight years later, Mayfield, 48, and dozens of others are at the center of a brewing legal battle in Chicago's federal court over whether the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives' signature sting operation used racial bias in finding its many targets.

A team of lawyers led by the University of Chicago Law School is seeking to dismiss charges against more than 40 defendants in Chicago. The undercover probes, a staple of the ATF since the mid-1990s, have ensnared hundreds of defendants across the country.

A recently unsealed study by a nationally renowned expert concluded that ATF showed a clear pattern of racial bias in picking its targets for the drug stings. The disparity between minority and white defendants was so large that there was "a zero percent likelihood" it happened by chance, the study found.

The vast majority of those swept up in the stings in Chicago were minorities, and a close examination of the criminal backgrounds of some of those targeted raises questions about whether they were truly the most dangerous gun offenders whom ATF was aiming to remove from the street.

Some had trouble even coming up with guns to do the job — including one crew that after months of preparation managed to find only one World War I-era pistol with a broken handle that could barely fire a round. Others had no history of carrying out high-risk armed robberies — a key provision in the

ONLY $1 FOR 3 MONTHS!
SAVE NOW >

ATF playbook designed to make sure targets were legitimate, defense lawyers argued in recent court filings.

Mayfield, for one, talked on undercover recordings about his experience robbing stash houses, but in reality he had no arrests for robbing drug dealers. The fact that he was lured into the sting while working a full-time job has also been heavily criticized by the appellate courts.

"Criminals do sometimes change and get their lives back on track, and we don't want the government pushing them back into a life of crime," Judge Richard Posner of the 7th Circuit U.S. Court of Appeals in Chicago wrote in an opinion supporting Mayfield's argument that he had been entrapped by authorities.

The controversy comes amid a national debate over the treatment of minorities by law enforcement and a scathing report by the U.S. Department of Justice just weeks ago that found that Chicago police routinely violate the civil rights of citizens, particularly African-Americans and Hispanics living on the city's impoverished South and West sides.

It could put the Justice Department in the uncomfortable position of defending its own stash house prosecutions against allegations of racist practices while at the same time pushing Chicago police for reforms of similar accusations.

Earlier this month, federal prosecutors filed a lengthy motion vehemently disputing that minorities were unfairly targeted in the stash house cases, saying the expert report filed by the defense was "riddled with false assumptions that were designed to manufacture a racial disparity where none exists."

The dispute sets up what could be an unprecedented hearing at the Dirksen U.S. Courthouse in the coming months involving a panel of district judges hearing the multiple criminal cases at once.

"It's almost like a criminal class action," said Alison Siegler, director of the Federal Criminal Justice Clinic at the University of Chicago Law School, which represents most of the defendants in the dozen cases they are seeking to be dismissed. "Judges are seeing this as a coordinated litigation. It's a very unusual situation."

**Out of answers**

When Mayfield landed a job in May 2009 at LG Electronics, a sprawling, warehouse-like facility just off 115th Street in Bolingbrook, it seemed to be a stroke of luck. Still on parole for an attempted murder conviction, he checked for defects in cellphones imported from Asia.

ONLY $1 FOR 3 MONTHS!
Midterms Sale ends 11/7

Several weeks into his employment, Mayfield was approached by a woman who was one of the only other African-Americans who worked in his group, he said. She flirted with him, he said, on lunch breaks, confiding in him that she wasn't happy in her marriage.

It wasn't long before she introduced him to her husband, Jeffrey Potts, a burly ex-con who worked in another group at LG. Mayfield said he tried to keep his distance, uneasy that Potts' wife was so flirtatious around him, especially since Potts was white. But Potts persisted, and soon they were talking regularly, he said.

"Obviously, he had an objective," Mayfield, who is serving a 27-year sentence, said in an interview at the Metropolitan Correctional Center in the Loop. "When I think back about it now, he immediately started trying to find out about me, about my background."

Potts, who had done prison time for drug distribution and robbery, was secretly working as a federal informant, helping an ATF agent search for possible targets for sting operations, court records show. He was paid for the effort, but not much. Potts later told a private investigator working for Mayfield's defense team that he earned just $200 from ATF for bringing the agency Mayfield's case, according to court records.

A man who claimed to be Potts returned a recent call from a Tribune reporter but said he was too busy to talk and never called back.

Mayfield said that as the weeks wore on, Potts began dropping references to drugs into their conversations. He told Mayfield he had a new drug connection and was making a lot of money and would often ask him if he was looking to get out of the day-to-day drudgery of working at LG, Mayfield said.

"Every day at work he began to make comments such as, 'Cuz, I know you tired of working for this chump change,'" Mayfield wrote in a letter filed in federal court. "'I know you need this money.'"

Mayfield said he told Potts he didn't sell drugs, but Potts "kept on me on a daily basis, saying, 'You're missing out.'"

After awhile, Potts' talk turned to robberies. One day, the two were having a smoke by the parking lot when Potts pointed to his new pickup truck — a red Dodge Ram 1500 with fancy rims, Mayfield said. He told Mayfield he'd made tens of thousands of dollars robbing drug dealers and could bring Mayfield in on an upcoming score.

ONLY $1 FOR 3 MONTHS!
Midterms Sale ends 11/7    SAVE NOW >

"He said, 'Man, I hit this lick — 40K and two kilos of cocaine. That's how I got this truck,'" Mayfield said. "I kept saying I wasn't interested. Believe me, there was nothing I wanted less than to go back to jail."

In mid-June 2009, Mayfield suffered a setback that left him desperate. The van he depended on to get to work died on a Chicago-area expressway, leaving him with a huge bill for towing and repairs that he couldn't afford. He missed several days of work before he was able to arrange a ride. When Potts asked him where he had been, Mayfield told him about his car troubles. The next day, Potts walked up to him in the bathroom at LG and slipped him $180 in cash.

"I tried not to take it, but I did need it," Mayfield said. "I felt at the time like he was genuine."

Later, Mayfield said, Potts offered to forgive the debt if he went along with the robbery plan. Flat broke and out of answers, Mayfield finally caved. He told Potts to set up the meeting with his contact, records show.

Potts called his ATF handler, who approved Mayfield as a target, according to court records.

**Race and law enforcement**

According to the ATF, stash house stings are a key part of the agency's national effort to target people who "show a propensity of doing harm to the public through violent behavior."

Launched in Miami during the cocaine-war days of the early 1990s, the stings have been honed over the years and are run by experienced agents who use a tightly controlled playbook.

They typically begin when an informant provides the ATF information about a potential target who has expressed interest in taking part in a robbery. The informant then introduces the target to an undercover agent who poses as a disgruntled courier for a drug cartel and offers an opportunity to steal large quantities of drugs from a stash house guarded by men with guns.

In a series of conversations captured on undercover wire, the target is told if he is interested he must assemble an armed team to commit the robbery. The target and his crew are arrested after they show up on the day of the supposed crime.

"At the time of arrest, the home invasion defendants are poised, at any moment, to invade a stash house, steal kilograms of cocaine guarded by armed cartel members, and in the process, kill or be killed," prosecutors wrote in their recent court filing.

ONLY $1 FOR 3 MONTHS!
Midterms Sale ends 11/7          SAVE NOW ›

In order to avoid arguments of entrapment in court, the stings are supposed to target only established robbery groups. ATF criteria also require that at least two of the participants have violent backgrounds and that all must be criminally active at the time the investigation is launched.

Not only were the operations a boon for the ATF but the resulting prosecutions also netted eye-popping sentences — sometimes up to life in prison — in part because defendants were criminally liable for the amount of imaginary drugs they believed they were stealing. It didn't matter that the robbery was fake or that no drugs actually existed.

"The reason this scenario exists is because it's realistic," Assistant U.S. Attorney Jeffrey Perconte argued at Mayfield's sentencing in 2011 while seeking up to 37 years in prison. "It certainly was real to Mr. Mayfield."

Spokesmen for both the ATF and the U.S. attorney's office declined to comment for this story, citing the ongoing litigation.

The lengthy sentences were just one pattern that raised red flags for the criminal defense bar. In case after case, the ATF stings seemed to be targeting only minorities.

In early 2013, a handful of private attorneys and assistant federal defenders, all veterans at the Dirksen U.S. Courthouse, were so troubled by a stash house case they were defending that they asked the U.S. attorney's office for a complete list of all the defendants in similar cases sorted by race. Prosecutors rebuffed this admittedly unorthodox request.

"ATF does not maintain statistics on the nature in question at either the local or national level," Assistant U.S. Attorney Philip Fluhr wrote in response, court records show.

The defense lawyers then asked the judge overseeing the case to order prosecutors to turn over detailed information on how the stash house stings are run and the race of the defendants who had been charged so far. They included their own research showing more minorities were targeted.

Prosecutors strenuously objected. But a few months later, U.S. District Chief Judge Ruben Castillo allowed the discovery to go forward.

"History has shown a continuing difficult intersection between the issue of race and the enforcement of our nation's criminal laws," wrote Castillo, concluding that the defense team had "made a strong showing of potential bias."

ONLY $1 FOR 3 MONTHS!
Midterms Sale ends 11/7

SAVE NOW ›

Similar motions in other stash house cases soon followed, but the effort to prove racial bias was being made case-by-case with no coordination. Then in 2014, the University of Chicago's Federal Criminal Justice Clinic agreed to focus all its efforts on the 12 stash house cases and their 43 defendants.

This allowed the defense attorneys to address the alleged racial bias in a coordinated effort, a critical undertaking given the government's massive resources, the attorneys said.

"It's a giant power imbalance if one person decides to go against the government," said Adam Davidson, one of seven U. of C. law students who helped the clinic's three law professors coordinate the cases.

### 'The real Leslie Mayfield'

On July 23, 2009, Mayfield climbed into a black Cadillac Escalade parked in a Naperville lot to meet with Potts and a purportedly disgruntled cartel drug courier. In a conversation captured on undercover recording, the courier, an undercover ATF agent, laid out the robbery plot, warning that up to 30 kilograms of cocaine would be protected by as many as four armed guards.

When the undercover agent asked if he had ever done a stash house robbery before, Mayfield replied, "Yes, sir," according to a transcript of the recording in court records. Later in the conversation, Mayfield talked about other home invasions he had committed, noting his preference to scout out locations in advance and hit them under the cover of darkness.

Mayfield also told the agent the people he would recruit were experienced and would be excited about the plan once they knew the quantity of drugs involved. It would be enough for everyone to make "a nice li'l piece o' change," Mayfield said, according to the transcript.

Two weeks later, Mayfield brought the crew he'd assembled to meet with the undercover agent and go over the plan. The crew assured the agent that they were up for the danger of the operation and talked about what to do with the armed guards, including killing everyone inside if necessary, according to transcripts of the conversation. Mayfield stressed that their biggest advantage was "the element of surprise."

The next night, Mayfield got the call that the robbery was on. He and his crew drove to Aurora in a brown van to meet with the undercover agent, who took them to a nearby storage facility where they would supposedly hide the drugs after the heist, court records show. In a conversation outside the storage facility that was caught on undercover video, the agent gave the crew one more chance to back out, asking them if they felt they were up for the job.

ONLY $1 FOR 3 MONTHS!
Midterms Sale ends 11/7          SAVE NOW ›

"Yeah, bro!" exclaimed Montreece Kindle, Mayfield's cousin, who stuck out an arm to shake the agent's hand.

As the crew got ready, the video showed Mayfield throw a loaded .357 Magnum handgun into a rear cargo area of the vehicle. Seconds later, the boom of flash-bang grenades and shouting could be heard as a special operations team of agents stormed out of the storage facility to make the arrest.

Records show Mayfield's crew had brought an arsenal to the scene. In addition to the .357, agents found a loaded sawed-off shotgun, a .44-caliber revolver, a semi-automatic pistol, ski masks, bulletproof vests and latex gloves.

Mayfield and all three of his accomplices were convicted at trial. At Mayfield's sentencing hearing in 2011, prosecutors highlighted his previous convictions for burglary and unlawful restraint and incorrectly told the judge that he had been the shooter in the 1994 attempted murder that had landed him in prison for 11 years.

After his release in 2005, Mayfield had picked up a new charge in Lake County after state police stopped a car he was riding in and found him with a loaded gun, prosecutors said.

"That's the real Leslie Mayfield," Perconte told U.S. District Judge Harry Leinenweber, who imposed a 27-year prison sentence. "From the time he was 18 ... he has added nothing to society but danger."

**Exaggerated capabilities**

Born and raised in Zion, Mayfield had an unstable childhood. He never knew his father, and his mother struggled to make ends meet. In court statements, Mayfield recalled being homeless for long stretches. He spoke of memories of his mother making them bologna sandwiches in the front seat of their car and washing him up in gas station bathrooms because they had nowhere else to go.

Mayfield graduated from eighth grade but never attended high school. In 1994, when he was 26, Mayfield and several others were arrested after the carjacking and shooting of a motorist in Waukegan.

Lake County prosecutors conceded that Mayfield wasn't the gunman, but under the state's "accountability" law, a jury convicted him at trial of attempted murder, armed robbery, armed violence and aggravated battery with a firearm. He was sentenced to 40 years in prison.

An appeals court later reversed the attempted murder conviction, ruling in 1997 that the jury was improperly barred from hearing Mayfield's statement to police that he was angry that his co-defendant had opened fire because he had "no good reason to shoot" the victim.

Midterms Sale ends 11/7    SAVE NOW?

After his case was sent back to Lake County Circuit Court, Mayfield pleaded guilty to attempted murder in exchange for a seven-year sentence to run consecutive to a 15-year term for the armed violence count, records show. With good behavior, he wound up serving 11 years.

In his interview with the Tribune, Mayfield said he decided to use his time in prison to turn his life around. He earned his high school equivalency certificate and later an associate degree in general college studies. He got a cosmetology license and became a certified tutor. Although he said he never affiliated with a gang on the street, he joined the Gangster Disciples to avoid conflicts in prison. "I did everything I could to remain positive," he said.

After he was released on parole in 2005, Mayfield went back home to Waukegan, but staying away from the violence of the streets proved difficult. A couple years after his release, Mayfield was in a home when a shooting occurred and a family member was wounded in the head, he said.

To protect himself, he started carrying a gun, but that, he acknowledged, turned out to be a huge mistake. That August, state police stopped the car Mayfield was riding in, and he took off running before they could pat him down. After a foot chase, he was ordered to the ground at gunpoint. Police found a loaded .40-caliber pistol in his waistband.

Despite that setback, Mayfield said he was determined to stay on course. He moved with his girlfriend to Naperville, where they lived in a tiny, two-bedroom house with her four teenage children and one grandchild.

Struggling at LG Electronics on $12 an hour, Mayfield described in court records how the family relied on one car and had no money for cellphones or other luxuries. Every Tuesday, Mayfield would stand in line at a local food pantry to make sure the kids had enough to eat.

In his interview with the Tribune, Mayfield said he was coached by Potts to boast to the purported drug courier about past stickups and robberies. At his sentencing six years ago, he denied ever selling or stealing drugs and said he had never shot anyone in his life. Mayfield owned up to his role in the stash house robbery but insisted in a long and emotional plea to the court that the government had exaggerated his capabilities.

"They say I had a drug crew? We couldn't even afford a cellphone," Mayfield told the judge, according to a transcript. "We didn't even have a car when the agent came across me. I tried everything I could to be a better person."

**'Absurdly overbroad'**
ONLY $1 FOR 3 MONTHS!
Midterms Sale ends 11/7    SAVE NOW ›

As the movement to fight the stash house cases gathered steam among defense attorneys, the judiciary also weighed in with some key decisions.

In November 2014, the full 7th Circuit U.S. Court of Appeals granted Mayfield a new trial in a rare decision that concluded Potts had "targeted Mayfield at a moment of acute financial need and against a backdrop of prolonged difficulty finding permanent, family-supporting work."

In a 2012 dissenting opinion as the case was winding through the court, appellate Judge Richard Posner had put an even finer point on it, referring to the stings as a "disreputable tactic" that used government informants to target people at a vulnerable time in their lives.

Meanwhile, another ruling in July 2015 by the appellate court in Chicago resulted in the government turning over more data on the stash house stings sought by the defense. The ruling allowed the defendants to move ahead with what is believed to be the most thorough analysis of the stings anywhere in the country.

To examine the data, the University of Chicago team hired Jeffrey Fagan, a nationally known specialist in police practices who also examined the New York Police Department's stop-and-frisk program.

Fagan examined 94 defendants in 24 separate stings conducted between 2006 and 2013 and found that 74 of the defendants were black. Fagan also ran three statistical analyses to figure out the likelihood that the proportion of stash house defendants would, by chance, be African-American.

To do that, Fagan created a control group by using ATF criteria for their defendants — having one or more convictions for specific violent offenses identified by the ATF or for narcotics or firearms offenses. The offenses also had to occur in the same geographic area and around the same time the stash house plan arose.

When Fagan compared the two groups, he concluded that minorities were "substantially more likely" than similarly situated whites to be targeted by ATF in the stash house stings, according court filings.

"Each test showed the same pattern: Being black significantly increased a person's chance of being targeted by the ATF," lawyers for the defendants wrote in their filing.

But an expert hired by the U.S. attorney's office concluded that Fagan had used an "absurdly overbroad" group to compare to stash house defendants, including people with only minor criminal convictions such as simple drug possession and misdemeanor assault, according to the recent court filing by prosecutors. In all, Fagan's "eligible list" included nearly 300,000 people — a number that equals 10 percent of all males ages 14-49 in the Chicago area, their filing said.

ONLY $1 FOR 3 MONTHS!
Midterms Sale ends 11/7

Using such a broad swath of the public in a statistical analysis ignores the realities of how the stash house stings work, prosecutors said.

"ATF agents do not compile a list of citizens with criminal records throughout the district, select people from the list at random, and then cold-call those people and offer them a chance to rob a stash house," prosecutors wrote. "There is no reason the home invasion defendants should resemble Professor Fagan's fantasy home invasion lottery."

Echoing an argument sometimes made by Chicago police, federal prosecutors also said Fagan's report failed to account for the fact that many of the stash house investigations took place in neighborhoods that are more than 90 percent black, naturally leading to targets who are black as well.

The debate is now potentially headed for a court hearing involving all defendants. The outcome could set precedent for judges in other states.

"Courts tend to give law enforcement a lot of leeway," said University of California-Irvine law professor Katharine Tinto, a criminal law expert who has written extensively about the stash house stings. "... The fact that an expert is saying a federal law enforcement agency is discriminating on the basis of race is something everybody should be watching."

### 'Sentenced with him'

Sharonnette Sholaja first met Mayfield in 2006 when he was doing odd jobs for his cousin after his release from prison. Despite Mayfield's background, she fell for him in part because of his efforts to put his past behind him.

"He was really trying to get himself together," Sholaja said in a recent interview. "I was getting up at 4 or 5 a.m. driving him for all kinds of job interviews because he was determined. He didn't let anything stop him."

Within two years they had moved to Naperville, crammed into a small apartment with her kids and a grandchild, so Sholoja could be close to her work in Woodridge. Mayfield found the job at LG, but money was still tight, she said. For their first holiday in Naperville, they couldn't afford a Christmas tree. With their money going to rent and food, they relied on a food pantry to get by, she said.

When the family car broke down — the event that ultimately drew Mayfield into the stash house sting — they had to borrow $300 from her mom to cover the tow, Sholaja said.

ONLY $1 FOR 3 MONTHS!
Midterms Sale ends 11/7          SAVE NOW >

Despite the financial hardships, Mayfield never spoke of violence, carried guns or kept one in the house, Sholaja said. The news that he had agreed to rob a drug stash house shocked and angered her. She lost the apartment after he was locked up, and eventually the stress ripped them apart.

Sholoja, 44, said they still consider each other friends and remain in touch. But she's moved to Arizona to start over.

"I told him I felt like l was sentenced with him," she said. "You know, we would be married had this not happened."

*jmeisner@chicagotribune.com*

*asweeney@chicagotribune.com*

*Twitter @jmetr22b*

*Twitter @annie1221*

Copyright © 2018, Chicago Tribune

**This 'attr(data-c-typename)' is related to:** Crime, Theft, Drug Trafficking, Homicide, University of Chicago, U.S. Department of Justice

ONLY $1 FOR 3 MONTHS!
Midterms Sale ends 11/7

SAVE NOW ›

Case: 1:18-cv-07172 Document #: 1 Filed: 10/25/18 Page 51 of 186 PageID #:51

BREAKING    Rasmussen resigns as Bloomington's assistant city manager

https://www.pantagraph.com/news/state-and-regional/illinois/gov-quinn-signs-street-gang-rico-act/article_4a65a04a-b400-11e1-9b26-001a4bcf887a.html

# Gov. Quinn signs Street Gang RICO Act

By SOPHIA TAREEN | Associated Press    Jun 11, 2012

TRY 1 MONTH FOR 99¢

CHICAGO — An Illinois law giving local authorities the power to go after street gangs as criminal organizations took effect Monday, a move prosecutors and police said bolsters efforts at reducing crime in the nation's third largest city.

Gov. Pat Quinn signed the Illinois Street Gang RICO Act into law Monday. The legislation is modeled after the federal Racketeer Influenced and Corrupt Organizations Act, which provides stiff penalties for illegal acts performed as part of a criminal enterprise like the Mafia.

The Illinois law lists dozens of crimes, including murder for hire, kidnapping and sex trafficking, and allows prosecutors to connect single crimes to the larger group. It also stiffens penalties.

Case: 1:18-cv-07172 Document #: 1 Filed: 10/25/18 Page 52 of 186 PageID #:52

The goal is to dismantle gangs.

"We want to go after these mobsters and gangsters who are killing people and hurting the public safety of our state,'' Quinn said.

Cook County State's Attorney Anita Alvarez pushed the measure, with support from Chicago Police Superintendent Garry McCarthy.

McCarthy said 75 to 80 percent of the shootings and homicides in Chicago are gang-related and estimated that the city has 100,000 gang members.

His comments followed another uptick in city violence; during the weekend eight people were killed and at least 40 wounded in shootings citywide. This year, Chicago reported 203 homicides through late May, a 51 percent increase from the same time period last year when it was 134 homicides.

Neither Alvarez nor McCarthy could say how long it would take for the first case to be prosecuted under the new law. Alvarez said her office had created a new unit to handle the cases and will train police on how to spot them.

"Instead of looking at the individual acts of one or two gang members, we are going to be looking at the entire enterprise ... somehow really make a dent into the gang problems and get to the guys who are calling the shots,'' she said. "They are the ones that are usually nowhere to be found. We may convict the soldier but we never get the general.''

More than two dozen states have their own version of anti-racketeering laws.

The Illinois law takes effect immediately and expires in five years. Lawmakers say that's when they'll study how it's been working, according to state Rep. Mike Zalewski, a Riverside Democrat who sponsored the bill.

However, opponents argue the law gives Illinois' 102 county state attorneys too much power and leaves potential for abuse.

"The fear is that politically elected people can use it politically,'' said state Sen. Kwame Raoul, a Chicago Democrat, who voted present on the bill. He also said low-level gang members could get swept up in investigations and charged with harsher crimes.

Federal prosecutors in Chicago have used RICO in high-profile cases involving mobsters.

Illinois has flirted with getting its own RICO law before. But a wide-ranging attempt three years ago, which also focused on political corruption, did not get far with lawmakers.

The new law applies only to gangs, explicitly excluding racketeering investigations of state government and unions.

The Chicago Crime Commission, a nonprofit organization that studies city crime, applauded the law and said it was long overdue. Arthur Bilek, the commission's executive vice president, said there had been little evidence in other states of abuse of power on the part of prosecutors.

"The dangers are insignificant compared to the good that bill can bring by finally beginning to put away these vicious violent drug gangs that are really the new mafia of the United States,'' he said.

The bill is HB1907.

# After 5 jurors are replaced, deliberations to start over at Black Souls gang trial



Deliberations are scheduled to start over Friday morning in a trial of reputed West Side gang leaders at the Leighton Criminal Court Building, after five jurors were replaced Thursday. (Antonio Perez / Chicago Tribune)

By **Megan Crepeau**
Chicago Tribune

DECEMBER 1, 2017, 7:20 AM

I n a bizarre twist in the midst of deliberations, nearly half the members of a Cook County jury were removed Thursday from deciding the fate of reputed West Side gang leaders on trial after sitting through nearly two months of testimony.

The five removals came in waves — one juror allegedly made racist remarks in the jury room. Another was found to have lied on her jury questionnaire. A third lost consciousness and had to be taken away by paramedics. And the final two were bounced after protesting that the jury's legal instructions were unfair.

Support Quality Journalism
Subscribe for only 99¢              START NOW ›

After a long day of twists and turns, the five alternates had all arrived at the Leighton Criminal Court Building and Judge Michael McHale swore in the reconstituted 12-member jury shortly after 6 p.m. Deliberations are scheduled to start anew Friday morning.

Only one alternate remains if further difficulties arise.

The six reputed leaders of the Black Souls street gang are on trial in a case being closely watched because it marks Cook County's first test of a tough state anti-racketeering law.

The jury had begun deliberating late Tuesday afternoon.

The forewoman and a second juror sent a note to McHale about noon Thursday hinting at turmoil in the jury room.

The note — read aloud in court by the judge — complained of "unfairness" and warned of a hung jury if certain issues were not addressed.

The note also alleged that one juror had admitted that her father and brother were members of the Black Souls gang.

That juror — known only as Juror 28 because the identity of the jurors was kept secret for apparent safety reasons — was called to the jury box in the courtroom to address the controversy. She testified under oath that she made a reference to Black Souls family members in the jury room only while raising a hypothetical point during deliberations.

"I was like, 'For example, if my father is a Black Soul, it doesn't make me a Black Soul,'" she said.

But when questioned further, she acknowledged her brother belonged to the Vice Lords street gang.

After excusing her from the courtroom, McHale reviewed the woman's jury questionnaire from the bench and discovered she had answered no to a question asking if any member of her immediate family was in a gang.

"She's off," McHale said.

Just before 1 p.m., the judge let the jury know that one of its members had been dismissed and instructed them to halt the deliberations.

The same note from the forewoman and the second juror also accused Juror 143 of "racial bullying" and "chauvinism."

Support Quality Journalism
Subscribe for only 99¢          START NOW ›

McHale called the forewoman to the jury box for clarification. The woman, referred to in the courtroom only as Juror 120, said she couldn't recall her fellow juror's exact words. But his offensive remarks had been occurring "over the course of yesterday and this morning," she said. "It has not gotten better."

The forewoman told McHale that the juror's comments had been directed at both the defendants and his fellow jurors.

The judge dismissed the juror without questioning him in court. McHale hinted that he had presented problems before.

"He has been a terribly high-maintenance juror," the judge said. "It's clear he doesn't want to be here."

But McHale declined to bounce two other jurors who were accused of saying during deliberations that they were "only here to send a message." One said he could still be fair, while the other denied making the statement.

About 3 p.m., as attorneys awaited the arrival of the two alternates, another juror passed out and was taken away by paramedics.

"She lost consciousness, her eyes rolled back in her head, she appears to be having a hard time breathing," McHale said before announcing he would dismiss her as well.

Moments later, McHale received a second note from the same two jurors who had earlier complained.

"We personally feel the instructions are structured in a style to come to one verdict, and we can't complete our civic duty," said the note from the forewoman and Juror 40.

"They cannot follow the law," McHale said after reading the note aloud in the courtroom. "They're off."

Both prosecutors and defense attorneys, shocked at the turn of events, loudly protested the last two jurors' dismissal without first questioning them. McHale denied the request.

Richard Dvorak, one of the defense lawyers, then moved for a mistrial — one of many such requests over the course of the afternoon.

"Denied," McHale said. "We'll see you when the alternate jurors get here."

Support Quality Journalism
Subscribe for only 99¢          START NOW >

The five alternates had been excused from service after the trial wrapped up on Tuesday. Summoned by the judge Thursday afternoon to quickly return to the courthouse, they arrived individually over the next several hours. Under questioning by McHale, they all swore they had followed his instructions and had not watched media coverage or discussed the trial with anyone.

But after the new jury had been sworn in, Michelle Truesdale, another defense lawyer, told the judge that he had dismissed four African-American jurors since the start of the trial. That leaves only two blacks on the panel.

McHale acknowledged her point but said his decisions "didn't have anything to do with race."

*mcrepeau@chicagotribune.com*

*Twitter @crepeau*

Copyright © 2018, Chicago Tribune

Support Quality Journalism
Subscribe for only 99¢        START NOW >

# Six Black Souls gang leaders convicted in Cook County's first test of state RICO law

A jury convicted six reputed leaders of a West Side street gang on Dec. 2, 2017, in Cook County's first test of a tough state anti-racketeering law. (Chris Sweda / Chicago Tribune)

By **Megan Crepeau**
Chicago Tribune

DECEMBER 2, 2017, 8:00 PM

**A**fter a dramatic trial that included a bizarre upheaval among jurors mid-deliberations, a reconstituted jury on Saturday convicted half a dozen leaders of a West Side street gang in Cook County's first test of a tough state anti-racketeering law.

Moments before the verdict was disclosed in Judge Michael McHale's courtroom, the six Black Souls bosses — all but one of them related — held hands as they stood behind their attorneys. None showed emotion as McHale announced that each had been found guilty of racketeering conspiracy and drug conspiracy.

Support Quality Journalism
Subscribe for only 99¢          START NOW ›

The seven-man, five-woman jury, which deliberated about 13 hours, also found the gang's leader, Cornel Dawson, and gang "vice president" Teron Odum responsible for four murders between 2002 and 2013.

Also convicted were gang enforcer Duavon Spears and Antwan Davis, Clifton Lemon and Ulysses Polk, all identified as top-level managers. All six face a maximum sentence of life in prison.

All the defendants but Spears are related, according to prosecutors.

State's Attorney Kim Foxx hailed the unusual Saturday verdict — the jury was sequestered at night at a hotel — at a news conference Saturday evening at the Leighton Criminal Court Building, where the trial took place.

"For over a decade, the Black Souls terrorized their West Side neighborhood through violent crimes to protect their illegal trade," she told reporters. "This case demonstrates what we can do when we work together."

RELATED: After 5 jurors are replaced, deliberations to start over at Black Souls gang trial

The trial marked the county's first test of the Street Gang RICO Act, passed by the state legislature in 2012 and modeled after the federal Racketeer Influenced and Corrupt Organization statute. It is designed to give police and prosecutors a powerful tool to uproot violent street gangs.

Testifying during nearly two months of the trial were more than 100 witnesses, including police, gang members and a lifelong drug dealer who secretly recorded hundreds of hours of conversations with the defendants. Prosecutors said the Black Souls operated its drug empire near Monroe Street and Pulaski Road in the West Garfield Park neighborhood in a fashion similar to a legitimate business, with marketing schemes and employees working in shifts.

"It's right out of a movie," Assistant State's Attorney John Maher told the jury Tuesday in closing arguments.

Jurors heard evidence of gruesome murders. In one slaying crucial to the prosecution, the Black Souls were accused of killing a man in retaliation for telling police that Odum had beat and robbed him. In another, the leaders allegedly ordered the killing of a lower-level drug dealer accused of stealing from them, then buried him upside-down in a West Side gangway. His body was not found for months.

Support Quality Journalism
Subscribe for only 99¢          START NOW >

The case centered in large part on a series of recordings made by drug dealer Alex Williams, who cooperated extensively with police in their investigation of the Black Souls.

Many of the recordings, played for jurors, captured the defendants discussing day-to-day drug-dealing matters and bragging about their violent exploits, prosecutors alleged.

But defense attorneys raised concerns about the recordings' often poor quality and what they considered unreliable interpretations by prosecution witnesses on the meaning of what was said.

About 20 people were charged under the state RICO statute in 2013 after a predawn raid. All but the six defendants on trial this fall ended up pleading guilty.

Armed with the state anti-racketeering law, prosecutors urged jurors to consider the Black Souls as a criminal enterprise and hold the six defendants accountable for the actions of the gang as a whole.

Defense attorneys, in turn, cautioned jurors to consider their clients on an individual basis and called the evidence of a sophisticated criminal conspiracy weak.

The case took a bizarre turn Thursday, about 1 ½ days into deliberations, when two jurors sent McHale a note complaining of "unfairness" and warned of a hung jury if certain issues were not addressed.

One juror allegedly made racist remarks in the jury room. Another was found to have lied on her jury questionnaire. A third lost consciousness and had to be taken away by paramedics. And two were bounced after protesting that the jury's legal instructions were unfair.

McHale halted deliberations, summoned five alternates to return to the courthouse and swore in the new jury. The reconstituted jury started deliberations anew Friday morning.

After the verdict came in Saturday, McHale ordered attorneys not to reach out to any of the jurors without permission.

Defense attorneys are sure to bring up Thursday's peculiar events on appeal.

Attorney Lawrence Wolf Levin, who represents Odum, said he believes "substantial error" occurred during the trial, including some of the judge's actions during the jury upheaval. Both prosecutors and defense attorneys had protested Thursday when the jurors who had problems with the legal instructions were dismissed without being questioned.

Support Quality Journalism          START NOW )

"I'll bring it up on post-trial motions, I'll bring it up on the appeal, and hopefully Teron Odum will be vindicated," he said Saturday afternoon.

Attorneys for the other defendants declined to comment.

Relatives of the defendants expressed anger about the verdict and the handling of Thursday's jury turmoil.

"We will not let this go quietly," Antwan Davis' sister, Shira, told the Tribune. "They're trying to tear us apart, and they won't."

*mcrepeau@chicagotribune.com*

*Twitter @crepeau*

Copyright © 2018, Chicago Tribune

**This article is related to:** Trials and Arbitration, Drug Trafficking, Homicide, Crime

Support Quality Journalism
Subscribe for only 99¢        START NOW ›

# Lawyers for convicted Black Souls gang leaders allege jury bias

A jury convicted six reputed leaders of a West Side street gang on Dec. 2, 2017, in Cook County's first test of a tough state anti-racketeering law. (Chris Sweda / Chicago Tribune)

By **Megan Crepeau**
Chicago Tribune

APRIL 5, 2018, 7:05 PM

**A**ttorneys for six reputed Black Souls gang leaders convicted of racketeering want to interview a juror who they believe has made explosive allegations about racist conduct amid chaos during the jury's closed-door deliberations.

The lawyers filed an affidavit from a sister of defendant Antwan Davis in which she alleged that the African-American juror told her that other jurors had screamed insults, used the N-word, and thrown chairs and jumped on tables during the deliberations.

"Yes, they were calling us every name but the child of God," the affidavit quoted the undisclosed juror as telling Davis' sister, Shira, 28.

Support Quality Journalism.
Subscribe for only 99¢    START NOW ›

It has been difficult over the years to change a verdict based on the later complaints of a juror, but in Thursday's filing, the attorneys cited a U.S. Supreme Court decision in 2017 that a judge weighing a new trial can consider if jurors acted with racist motivations to reach a verdict.

The lawyers are seeking approval to talk to the juror from Judge Michael McHale, who had barred contact with the jury after six leaders of the West Side street gang were convicted last December following a nearly two-month trial in Cook County's first test of a tough state anti-racketeering law.

The deliberations came to an abrupt halt after two jurors handed up a note to the judge complaining of racism and chauvinism in the jury room.

On the same afternoon, McHale removed five jurors from the panel — one for allegedly making racist remarks in the jury room, another for lying on her jury questionnaire, a third who lost consciousness and had to be taken away by paramedics, and the final two for protesting the fairness of the jury's legal instructions.

Five alternates took their places and convicted the six defendants on charges of racketeering conspiracy and drug conspiracy. They face sentences of up to life in prison.

According to Davis' affidavit, she talked to the juror by phone on March 5 after first reaching out to her on Facebook.

Davis said the juror told her a male juror screamed at another female juror and called her ugly. The juror said she then spoke up, telling the man he was ugly and that he need to "back off before she knocked his ass out," the affidavit said.

The other female juror then had an anxiety attack, the juror allegedly said.

*mcrepeau@chicagotribune.com*

**RELATED**

Six Black Souls gang leaders convicted in Cook County's first test of state RICO law »

After 5 jurors are replaced, deliberations to start over at Black Souls gang trial »

Black Souls gang trial goes to jury in Cook County's first test of state racketeering law »

Copyright © 2018, Chicago Tribune

Support Quality Journalism    START NOW ›
Subscribe for only 99¢
**This article is related to:** Trials and Arbitration

# Judge blocks contact with juror over allegedly racist tone of deliberations during gang trial

 

Cornel Dawson, the alleged ringleader of the Black Souls street gang, left, and Teron Odum, his reputed second-in-command, were among six people convicted in December under a state racketeering law. (Cook County state's attorney's office)

By **Megan Crepeau**
Chicago Tribune

APRIL 6, 2018, 5:00 PM

**T**ensions ran high in a Cook County courtroom Friday after a judge rejected attorneys' bid to interview a juror who reportedly has made claims of racism and violence during deliberations in a high-stakes gang racketeering trial.

Judge Michael McHale then prohibited the defendants' families from reaching out to the juror as well.

Lawyers for six reputed Black Souls gang leaders convicted in December under a state RICO law filed an affidavit this week from a sister of defendant Antwan Davis in which she alleged the African-

START NOW ›

Subscribe for only 99¢

American juror told her other jurors had screamed insults, used the N-word, and thrown chairs and jumped on tables during the deliberations.

The lawyers sought McHale's permission to interview the woman juror, identified in court only as Juror 40, to try to determine if racism played a part in the jury's verdict, all in a bid to seek a new trial.

In denying the request, McHale noted that a reconstituted jury convicted the six defendants after Juror 40 and four others had been booted off the panel in the midst of deliberations in the Leighton Criminal Court Building.

Juror 40, along with the forewoman, kicked off a chaotic afternoon when they sent McHale a note during deliberations that alleged racism and sexism in the jury room. The juror whom they accused of racial bias was kicked off the panel, McHale said Friday.

Juror 40 and the forewoman were removed from the jury that afternoon as well after they sent a note to McHale complaining that legal instructions for the jury were unfair and that they could not "complete (their) civic duty."

McHale said that stand violated the vows made by Juror 40 at the trial's outset that she would follow the law.

"Any further information that would come from Juror 40 would be deemed incredible by this court," the judge said.

McHale barred not just attorneys — including the defendants' family members — from contacting anyone on the jury. A crowd of supporters attending the hearing on behalf of the defendants murmured in protest.

When McHale adjourned court a short time later, a woman leaving the courtroom turned around and pointed at the judge.

"It may be over here, but it ain't over," she shouted out. "You're gonna get yours. You're gonna get yours."

McHale ordered sheriff deputies to bring the woman back into the courtroom. A deputy identified her as the mother of defendant Teron Odum, the Black Souls' alleged second-in-command.

After a break, McHale calmly addressed the woman, telling her that it's a felony to threaten a judge.

Support quality journalism
Subscribe for only 99¢

START NOW >

"You're a mom. I get that. But I have a job to do," he said. "I have nothing personal against you and nothing personal against your son."

McHale said he wouldn't punish the woman if she agreed not to do it again. She quietly agreed and left the courtroom surrounded by supporters.

*mcrepeau@chicagotribune.com*

*Twitter @crepeau*

### RELATED

Lawyers for convicted Black Souls gang leaders allege jury bias »

Six Black Souls gang leaders convicted in Cook County's first test of state RICO law »

After 5 jurors are replaced, deliberations to start over at Black Souls gang trial »

Copyright © 2018, Chicago Tribune

**This article is related to:** Trials and Arbitration, Crime, Racism

Support Quality Journalism
Subscribe for only 99¢          START NOW ›



NATION    LA TIMES

# Supreme Court rules race bias among jurors may require a new trial

**By DAVID G. SAVAGE**
MAR 06, 2017 | WASHINGTON



The Supreme Court took a strong new stand against racial bias in jury rooms, ruling for the first time that reports of racist comments by jurors may require setting aside a verdict and holding a new trial.

Justice Anthony M. Kennedy, announcing the court's decision Monday, wrote that the "imperative to purge racial prejudice from the administration of justice" requires setting aside the traditional rule that bars judges from second-guessing what went on in the jury room.

FREE TRIAL    **TRY 10 FREE WEEKS!**
Hurry, offer ends 5/1

START TRIAL

ADVERTISEMENT

🔳 TOPICS

**START TRIAL**
10 FREE weeks

FREE TRIAL | **TRY 10 FREE WEEKS!**

A TV critic on watching
Beyoncé's Coachella
performance at home

Kung Fu Kenny, King Kunta,
K-Dot. Whatever you call him,
Kendrick Lamar is a Pulitzer

Dana White
for life, so w
happen to C

‹                                                                              ›

The 5-3 decision announced a limited exception to that rule against second-guessing juries. The new rule covers cases in which "one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict."

⌃

Kennedy did not say exactly what should happen in such cases, other than that the trial judge should look into the matter, question the former jurors and then decide whether a new trial is called for.

⌄

The dissenters, led by Justice Samuel A. Alito, called the decision "well intentioned" but unwise.

⌃

"Today, with the admirable intention of providing justice for one criminal defendant, the court not only pries open the door; it rules that respecting the privacy of the jury room, as our legal system has done for centuries, violates the Constitution," Alito said. "This is a startling development."

FREE TRIAL

**TRY 10 FREE WEEKS!**
Hurry, offer ends 5/1

START TRIAL

The majority ruled in favor of a Mexican American man who was convicted
of sexually assaulting two teenage girls in the bathroom of a horse-race track
in Colorado.          FREE TRIAL | TRY 10 FREE WEEKS!

The identity of the assailant was in doubt, but jurors convicted Miguel Angel
Pena-Rodriguez, a track worker, of unlawful sexual contact and harassment.

After the trial, two jurors told an attorney that a third juror was formerly in
law enforcement had said that "Mexican men had a bravado that caused
them to believe" they could get away with sexually assaulting women.

"I think he did it because he's Mexican, and Mexican men take whatever they
want," the juror said, according to the other jurors' reports.

The judge reviewed their sworn statements, but said Colorado law prohibited
reopening a trial based on what was said in the jury room. The Colorado
Supreme Court agreed and upheld the so-called "no impeachment rule."

The Supreme Court overturned that decision in _Pena-Rodriguez v.
Colorado._

"In this case, the alleged statements by a juror were egregious and
unmistakable in their reliance on racial bias," Kennedy wrote. The one juror
"deployed a dangerous racial stereotype to conclude the (defendant) was
guilty and his alibi witnesses should not be believed, but he also encouraged
other jurors to join him in convicting on that basis."

The court sent the case back to the Colorado courts to decide how to proceed.

Justices Ruth Bader Ginsburg, Stephen G. Breyer, Sonia Sotomayor and
Elena Kagan agreed with Kennedy. Joining Alito in dissent were Chief
Justice John Roberts and Justice Clarence Thomas.



TOPICS
David.Savage@latimes.com

**START TRIAL**
10 FREE weeks

⌄

FREE TRIAL | **TRY 10 FREE WEEKS!**

A TV critic on watching
Beyoncé's Coachella
performance at home

Kung Fu Kenny, King Kunta,
ADK-Dot. Whatever you call him,
Kendrick Lamar is a Pulitzer

Dana White
for life, so w
happen to C

⟨                                                                                    ⟩

**On Twitter:** @DavidGSavage

⌃

**ALSO**

Supreme Court puts off ruling on rights of transgender students

Trump administration announces new version of its travel ban

House Republicans ready an ambitious legislative push to repeal Obamacare

Today's Headlines Newsletter
Weekdays

A digest of essential news, insight and analysis from L.A. Times editors.

ENTER YOUR EMAIL ADDRESS                                                             ⟩

FREE TRIAL        **TRY 10 FREE WEEKS!**
                  Hurry, offer ends 5/1

                                        CTADT TDIAI



ADVERTISEMENT

TOPICS

START TRIAL
10 FREE weeks

FREE TRIAL | **TRY 10 FREE WEEKS!**

**A TV critic on watching Beyoncé's Coachella performance at home**

**Kung Fu Kenny, King Kunta, K-Dot. Whatever you call him, Kendrick Lamar is a Pulitzer**

**Dana White for life, so w happen to C**

BE THE FIRST TO COMMENT

**LATEST NEWS**

CALIFORNIA

Los Alamitos gives final approval to exempt itself from state's sanctuary laws

24m

ENTERTAINMENT

'Hannity Insanity': Late night makes the most of Michael Cohen's client reveal

47m

POLITICS

Oops. Haley's office 'recalls' headline summary on embarrassing White House walk-back

53m

FROM FREE TRIAL

**TRY 10 FREE WEEKS!**
Hurry, offer ends 5/1

Harry Anderson: Bringing magic to the Big Easy

START TRIAL



54m
TOPICS

START TRIAL
10 FREE weeks

POLITICS

FREE TRIAL | **TRY 10 FREE WEEKS!**

Stormy Daniels releases sketch of man she alleges threatened her in
A TV critic on watching
Beyoncé's Coachella
performance at home

Kung Fu Kenny, King Kunta,
K-Dot. Whatever you call him,
Kendrick Lamar is a Pulitzer

Dana White
for life, so w
happen to C

<

>

FREE TRIAL

**TRY 10 FREE WEEKS!**
Hurry, offer ends 5/1

START TRIAL

⊞ TOPICS

START TRIAL
10 FREE weeks

**LATEST NATION**         FREE TRIAL | TRY 10 FREE WEEKS!

A TV critic on watching
Beyoncé's Coachella
performance at home

Kung Fu Kenny, King Kunta,
K-Dot. Whatever you call him,
Kendrick Lamar is a Pulitzer

Dana White
for life, so w
happen to C

Some Republican lawmakers, once critical of marijuana, now think highly of it.

⟨                                                                             ⟩

3:00 AM

NATION

**7 inmates killed, 17 injured in riot at notorious South Carolina prison**

APR 16, 2018

NATION

**Syrians and Russians stop international inspectors from visiting site of suspected chemical attack**

APR 16, 2018

NATION

**Accuser denies framing Bill Cosby for a big payday**

APR 16, 2018

NATION

**Contamination from a nuclear cleanup forced a shutdown. Investigators want to know who is responsible**

APR 16, 2018

ADVERTISEMENT

Sign up for our
newsletters  TRY 10 FREE WEEKS!
FREE TRIAL    Hurry, offer ends 5/1

| | |
|---|---|
| About us | Corrections |
| Contact us | Archives |
| Privacy policy | Classifieds |
| Terms | Find a job |
| Site map | Shop |

START TRIAL

Subscribe for

E-Newspaper

Advertise START TRIAL
10 FREE weeks

unlimited access FREE TRIAL | TRY 10 FREE WEEKS!

A TV critic on watching
Beyoncé's Coachella
performance at home



Kung Fu Kenny, King Kunta,
K-Dot. Whatever you call him,
Kendrick Lamar is a Pulitzer

Dana White
for life, so w
happen to C.

〈

〉

Copyright © 2018, Los Angeles Times

FREE TRIAL

TRY 10 FREE WEEKS!
Hurry, offer ends 5/1

START TRIAL

# Code of Judicial Conduct

Preamble

Terminology

Rule 61: Canon 1. A Judge Should Uphold the Integrity and Independence of the Judiciary

Rule 62: Canon 2. A Judge Should Avoid Impropriety and the Appearance of Impropriety in All of the Judge's Activities

Rule 63: Canon 3. A Should Perform the Duties of Judicial Office Impartially and Diligently

Rule 64: Canon 4. A Judge May Engage in Activities to Improve the Law, the Legal System and the Administration of Justice

Rule 65: Canon 5. A Judge Should Regulate His or Her Extrajudicial Activities to Minimize the Risk of Conflict With the Judge's Judicial Duties

Rule 66: Canon 6. Nonjudicial Compensation and Annual Statement of Economic Interests

Rule 67: Canon 7. A Judge or Judicial Candidate Shall Refrain from Inappropriate Political Activity

Rule 68: Declaration of Economic Interests

RULE 69-70 - Reserved.

RULE 71 - Violation of Rules.

## Preamble

Our legal system is based on the principle that an independent, fair and competent judiciary will interpret and apply the laws that govern us. The role of the judiciary is central to American concepts of justice and the rule of law. Intrinsic to all provisions of this code are precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system. The judge is an arbiter of facts and law for the resolution of disputes and a highly visible symbol of government under the rule of law.

The Code of Judicial Conduct is intended to establish standards for ethical conduct of judges. It consists of broad statements called canons, specific rules set forth in lettered subsections under each canon, and Committee Commentary. The text of the canons and the rules is authoritative. The Committee Commentary, by explanation, and example, provides guidance with respect to the purpose and meaning of the canons and rules. The Commentary is not intended as a statement of additional rules.

The canons and rules are rules of reason. They should be applied consistent with constitutional requirements, statutes, other court rules and decisional law and in the context of all relevant circumstances. The Code is to be construed so as not to impinge on the essential independence of judges in making judicial decisions.

The Code is designed to provide guidance to judges and candidates for judicial office and to provide a structure for regulating conduct through disciplinary agencies. It is not designed or intended as a basis for civil liability or criminal prosecution. Furthermore, the purpose of the Code would be subverted if the Code were invoked by lawyers for mere tactical advantage in a proceeding.

The canons are not standards of discipline in themselves, but express the policy consideration underlying the rules contained within the canons. The text of the rules is intended to govern conduct of judges and to be binding upon them. It is not intended, however, that every transgression will result in disciplinary action. Whether disciplinary action is appropriate, and the degree of discipline to be imposed, should be determined through a reasonable and reasoned application of the text of the rules and should depend on such factors as the seriousness of the transgression, whether there is a pattern of improper activity and the effect of the improper activity on others or on the judicial system.

The Code of Judicial Conduct is not intended as an exhaustive guide for the conduct of judges. They should also be governed in their judicial and personal conduct by general ethical standards. The Code is intended, however, to state basic standards which should govern the conduct of all judges and to provide guidance to assist judges in establishing and maintaining high standards of judicial and personal conduct.

Adopted eff. Aug. 6, 1993.

## Terminology

"Candidate." A candidate is a person seeking public election for or public retention in judicial office. A person becomes a candidate for judicial office as soon as he or she makes a public announcement of candidacy, declares or files as a candidate with the election authority, or authorizes solicitation or acceptance of contributions or support.

"Court personnel" does not include the lawyers in a proceeding before a judge.

"De minimis" denotes an insignificant interest that could not raise reasonable question as to a judge's impartiality.

"Economic interest" denotes ownership of a more than de minimis legal or equitable interest, or a relationship as officer, director, advisor or other active participant in the affairs of a party, except that:

(i) ownership of an interest in a mutual or common investment fund that holds securities is not an economic interest in such securities unless the judge participates in the management of the fund or a proceeding pending or impending before the judge could substantially affect the value of the interest;

(ii) service by a judge as an officer, director, advisor or other active participant in an educational, religious, charitable, fraternal or civic organization, or service by a judge's spouse, parent or child as an officer, director, advisor or other active participant in any organization does not create an economic interest in securities held by that organization;

(iii) a deposit in a financial institution, the proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association or of a member in a credit union, or a similar proprietary interest, is not an economic interest in the organization unless a proceeding pending or impending before the judge could substantially affect the value of the interest;

(iv) ownership of government securities is not an economic interest in the issuer unless a proceeding pending or impending before the judge could substantially affect the value of the securities.

"Fiduciary" includes such relationships as executor, administrator, trustee, and guardian.

"He." Whenever this pronoun is used it includes the feminine as well as the masculine form.

"Judge" includes circuit and associate judges and judges of the appellate and supreme court.

"Knowingly," "knowledge," "known" or "knows" denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances.

"Law" denotes court rules as well as statutes, constitutional provisions and decisional law.

"Member of a candidate's/judge's family" denotes a spouse, child, grandchild, parent, grandparent or other relative or person with whom the candidate maintains a close familial relationship.

"Member of the judge's family residing in the judge's household" denotes any relative of a judge by blood or marriage, or a person treated by a judge as a member of the judge's family, who resides in the judge's household.

"Political organization" denotes a political party or other group, the principal purpose of which is to further the election or appointment of candidates to political office.

"Public election." This term includes primary and general elections; it includes partisan elections, non-partisan elections and retention elections.

"Require." The rules prescribing that a judge "require" certain conduct of others are, like all of the rules in this Code, rules of reason. The use of the term "require" in that context means a judge is to exercise reasonable direction and control over the conduct of those persons subject to the judge's direction and control.

"Third degree of relationship." The following persons are relatives within the third degree or relationship: great-grandparent, grandparent, parent, uncle, aunt, brother, sister, child, grandchild, great-grandchild, nephew or niece.

Adopted eff. Aug. 6, 1993.

## Rule 61: Canon 1. A Judge Should Uphold the Integrity and Independence of the Judiciary

### A Judge Should Uphold the Integrity and Independence of the Judiciary

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

Adopted Dec. 2, 1986, eff. Jan. 1, 1987. Amended eff. Aug. 6, 1993; Oct. 15, 1993.

## Rule 62: Canon 2. A Judge Should Avoid Impropriety and the Appearance of Impropriety in All of the Judge's Activities

A. A judge should respect and comply with the law and should conduct himself or herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow the judge's family, social or other relationships to influence the judge's judicial conduct or judgment. A judge should not lend the prestige of judicial office to advance the private interests of others; nor should a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge should not testify voluntarily as a character witness.

Adopted Dec. 2, 1986, eff. Jan. 1, 1987. Amended eff. Oct. 15, 1993.

## Rule 63: Canon 3. A Should Perform the Duties of Judicial Office Impartially and Diligently

The judicial duties of a judge take precedence over all the judge's other activities. The judge's judicial duties include all the duties of the judge's office prescribed by law. In the performance of these duties, the following standards apply:

A. Adjudicative Responsibilities.

(1) A judge should be faithful to the law and maintain professional competence in it. A judge should be unswayed by partisan interests, public clamor, or fear of criticism.
(2) A judge should maintain order and decorum in proceedings before the judge.
(3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and should require similar

conduct of lawyers, and of staff, court officials, and others subject to the judge's direction and control.

(4) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge may make reasonable efforts, consistent with the law and court rules, to facilitate the ability of self-represented litigants to be fairly heard.

(5) A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:

(a) Where circumstances require, ex parte communications for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized; provided:

(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and

(ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.

(b) A judge may consult with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities or with other judges. (c) A judge may, with the consent of the parties, confer separately with the parties and their lawyers in an effort to mediate or settle matters pending before the judge.

(d) A judge may initiate or consider any ex parte communications when expressly authorized by law to do so.

(6) A judge shall devote full time to his or her judicial duties; and should dispose promptly of the business of the court.

(7) A judge should abstain from public comment about a pending, or impending proceeding in any court, and should require similar abstention on the part of court personnel subject to the judge's direction and control. This paragraph does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court.

(8) Proceedings in court should be conducted with fitting dignity, decorum, and without distraction. The taking of photographs in the courtroom during sessions of the court or recesses between proceedings, and the broadcasting or televising of court proceedings is permitted only to the extent authorized by order of the supreme court. This rule is not intended to prohibit local circuit courts from using security cameras to monitor courtrooms, provided that cameras are controlled by designated court personnel. For the purposes of this rule, the use of the terms "photographs," "broadcasting," and "televising" include the audio or video transmissions or recordings made by telephones, personal data assistants, laptop computers, and other wired or wireless data transmission and recording devices.

(9) A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not permit staff, court officials and others subject to the judge's direction and control to do so.

(10) Proceedings before a judge shall be conducted without any manifestation, by words or conduct, of prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, by parties, jurors, witnesses, counsel, or others. This section does not preclude legitimate advocacy when these or similar factors are issues in the proceedings.

B. Administrative Responsibilities.

(1) A judge should diligently discharge the judge's administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials.

(2) A judge should require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge.

(3)

(a) A judge having knowledge of a violation of these canons on the part of a judge or a violation of Rule 8.4 of the Rules of Professional Conduct on the part of a lawyer shall take or initiate appropriate disciplinary measures.

(b) Acts of a judge in mentoring a new judge pursuant to M.R. 14618 (Administrative Order of February 6, 1998, as amended June 5, 2000) and in the discharge of disciplinary responsibilities required or permitted by canon 3 or Article VIII of the Rules of Professional Conduct are part of a judge's judicial duties and shall be absolutely privileged.

(c) Except as otherwise required by the supreme court rules, information pertaining to the new judge's performance which is obtained by the mentor in the course of the formal mentoring relationship shall be held in confidence by the mentor.

(4) A judge should not make unnecessary appointments. A judge should exercise the power of appointment on the basis of merit, avoiding nepotism and favoritism. A judge should not approve compensation of appointees beyond the fair value of services rendered.

(5) A judge should refrain from casting a vote for the appointment or reappointment to the office of associate judge, of the judge's spouse or of any person known by the judge to be within the third degree of relationship to the judge or the judge's spouse (or the spouse of such a person).

C. Disqualification.

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it;

(c) the judge was, within the preceding three years, associated in the private practice of law with any law firm or lawyer currently representing any party in the controversy (provided that referral of cases when no monetary interest was retained shall not be deemed an association within the meaning of this subparagraph) or, for a period of seven years following the last date on which the judge represented any party to the controversy while the judge

(Here insert any economic interest or relationship which might or could create a substantial conflict of interest.)

VERIFICATION

Pursuant to Supreme Court Rule 68, I declare that this statement of economic interest, including any accompanying schedules and statements, as it relates to me and members of my immediate family, has been examined by me and to the best of my knowledge and belief is true, correct and complete.

_____

Judge's Signature

_____

Date

Order adopted April 1, 1986. Order amended April 20 1987, eff. August 1, 1987; order amended Dec. 30, 1993, eff. Jan.1, 1994; order amended Dec.1, 1995, effective immediately; order amended September 23, 2005, effective immediately.


## RULE 69-70 - Reserved.

## RULE 71 - Violation of Rules.

A judge who violates Rules 61 through 68 may be subject to discipline by the Illinois Courts Commission.

Adopted Jan. 30, 1970, eff. March 15, 1970; amended eff. Oct.1, 1971; amended June 24, 1976, eff. July 15, 1976; Dec. 2, 1986, eff. Jan. 1, 1987.

TOP


**Rules of Procedure of the Judicial Inquiry Board**
(Established Pursuant to Article VI, Section 15 (d), Constitution of the State of Illinois )


## Stay Informed

Amber Alerts (http://www.amberillinois.org/)
Emergencies & Disasters (https://www.illinois.gov/ready)
Flag Honors (/Pages/News/flag-honors.aspx)
Road Conditions (http://www.gettingaroundillinois.com/)
Traffic Alerts (http://www.iltrafficalert.com/)

WIKIPEDIA

# Due process

**Due process** is the legal requirement that the state must respect all legal rights that are owed to a person. Due process balances the power of law of the land and protects the individual person from it. When a government harms a person without following the exact course of the law, this constitutes a due process violation, which offends the rule of law.

Due process has also been frequently interpreted as limiting laws and legal proceedings (see substantive due process) so that judges, instead of legislators, may define and guarantee fundamental fairness, justice, and liberty. That interpretation has proven controversial. Analogous to the concepts of natural justice, and procedural justice used in various other jurisdictions, the interpretation of due process is sometimes expressed as a command that the government must not be unfair to the people or abuse them physically. The term is not used in contemporary English law, but two similar concepts are natural justice, which generally applies only to decisions of administrative agencies and some types of private bodies like trade unions, and the British constitutional concept of the rule of law as articulated by A. V. Dicey and others.[1] However, neither concept lines up perfectly with the American theory of due process, which, as explained below, presently contains many implied rights not found in either ancient or modern concepts of due process in England.[2]

Due process developed from clause 39 of Magna Carta in England. Reference to due process first appeared in a statutory rendition of clause 39 in 1354 thus: "No man of what state or condition he be, shall be put out of his lands or tenements nor taken, nor disinherited, nor put to death, without he be brought to answer by due process of law."[3] When English and American law gradually diverged, due process was not upheld in England but became incorporated in the US Constitution.

# Contents

**By jurisdiction**
    Magna Carta
    English law and American law diverge
    United States
    Others
**See also**
**Notes**
**Further reading**
**External links**

# By jurisdiction

## Magna Carta

In clause 39 of Magna Carta, issued in 1215, John of England promised: "No free man shall be seized or imprisoned, or stripped of his rights or possessions, or outlawed or exiled, or deprived of his standing in any other way, nor will we proceed with force against him, or send others to do so, except by the lawful judgment of his equals or by the law of the land."[4] Magna Carta itself immediately became part of the "law of the land", and Clause 61 of that charter authorized an elected body of 25 barons to determine by majority vote what redress the King must provide when the King offends "in any respect against any man."[4] Thus, Magna Carta established the rule of law in England by not only requiring the monarchy to obey the law of the land but also limiting how the monarchy could change the law of the land. However, in the 13th century, the provisions may have been referring only to the rights of landowners, and not to ordinary peasantry or villagers.[5]

Shorter versions of Magna Carta were subsequently issued by British monarchs, and Clause 39 of Magna Carta was renumbered "29."[6] The phrase *due process of law* first appeared in a statutory rendition of Magna Carta in 1354 during the reign of Edward III of England, as follows: "No man of what state or condition he be, shall be put out of his lands or tenements nor taken, nor disinherited, nor put to death, without he be brought to answer by due process of law."[7]

In 1608, the English jurist Edward Coke wrote a treatise in which he discussed the meaning of Magna Carta. Coke explained that no man shall be deprived but by *legem terrae*, the law of the land, "that is, by the common law, statute law, or custom of England.... (that is, to speak it once and for all) by the due course, and process of law.."[8]

Both the clause in Magna Carta and the later statute of 1354 were again explained in 1704 (during the reign of Queen Anne) by the Queen's Bench, in the case of *Regina v. Paty*.[9] In that case, the British House of Commons had deprived John Paty and certain other citizens of the right to vote in an election and committed them to Newgate Prison merely for the offense of pursuing a legal action in the courts.[10] The Queen's Bench, in an opinion by Justice Powys, explained the meaning of "due process of law" as follows:

> [I]t is objected, that by Mag. Chart. c. 29, no man ought to be taken or imprisoned, but by the law of the land. But to this I answer, that lex terrae is not confined to the common law, but takes in all the other laws, which are in force in this realm; as the civil and canon law.... By the 28 Ed. 3, c. 3, there the words lex terrae, which are used in Mag. Char. are explained by the words, due process of law; and the meaning of the statute is, that all commitments must be by a legal authority; and the law of Parliament is as much a law as any, nay, if there be any superiority this is a superior law.[9]

Chief Justice Holt dissented in this case because he believed that the commitment had not in fact been by a legal authority. The House of Commons had purported to legislate unilaterally, without approval of the British House of Lords, ostensibly to regulate the election of its members.[11] Although the Queen's Bench held that the House of Commons had not infringed or overturned due process, John Paty was ultimately freed by Queen Anne when she prorogued Parliament.

## English law and American law diverge

Throughout centuries of British history, many laws and treatises asserted various requirements as being part of "due process" or included in the "law of the land". That view usually held in regards to what was required by existing law, rather than what was intrinsically required by due process itself. As the United States Supreme Court has explained, a due process requirement in Britain was not "essential to the idea of due process of law in the prosecution and punishment of crimes, but was only mentioned as an example and illustration of due process of law as it actually existed in cases in which it was customarily used."[12]

Ultimately, the scattered references to "due process of law" in English law did not limit the power of the government; in the words of American law professor John V. Orth, "the great phrases failed to retain their vitality."[13] Orth points out that this is generally attributed to the rise of the doctrine of parliamentary supremacy in the United Kingdom, which was accompanied by hostility towards judicial review as an undemocratic foreign invention.[14]

Scholars have occasionally interpreted Lord Coke's ruling in *Dr. Bonham's Case* as implying the possibility of judicial review, but by the 1870s, Lord Campbell was dismissing judicial review as "a foolish doctrine alleged to have been laid down extra-judicially in Dr. Bonham's Case..., a conundrum [that] ought to have been laughed at."[15] Lacking the power of judicial review, English courts possessed no means by which to declare government statutes or actions invalid as a violation of due process. In contrast, American legislators and executive branch officers possessed virtually no means by which to overrule judicial invalidation of statutes or actions as due process violations, with the sole exception of proposing a constitutional amendment, which are rarely successful. [16] As a consequence, English law and American law diverged. Unlike their English counterparts, American judges became increasingly assertive about enforcing due process of law. In turn, the legislative and executive branches learned how to avoid such confrontations in the first place, by tailoring statutes and executive actions to the constitutional requirements of due process as elaborated upon by the judiciary.

In 1977, an English political science professor explained the present situation in England for the benefit of American lawyers:

> An American constitutional lawyer might well be surprised by the elusiveness of references to the term 'due process of law' in the general body of English legal writing.... Today one finds no space devoted to due process in Halsbury's *Laws of England*, in Stephen's *Commentaries*, or Anson's *Law and Custom of the Constitution*. The phrase rates no entry in such works as Stroud's *Judicial Dictionary* or Wharton's *Law Lexicon*.[1]

Two similar concepts in contemporary English law are natural justice, which generally applies only to decisions of administrative agencies and some types of private bodies like trade unions, and the British constitutional concept of the rule of law as articulated by A. V. Dicey and others.[1] However, neither concept lines up perfectly with the American conception of due process, which presently contains many implied rights not found in the ancient or modern concepts of due process in England.[2]

## United States

The Fifth and Fourteenth Amendments to the United States Constitution each contain a Due Process Clause. Due process deals with the administration of justice and thus the Due Process Clause acts as a safeguard from arbitrary denial of life, liberty, or property by the government outside the sanction of law.[17] The Supreme Court of the United States interprets the clauses as providing four protections: procedural due process (in civil and criminal proceedings), substantive due process, a prohibition against vague laws, and as the vehicle for the incorporation of the Bill of Rights.

### Others

Various countries recognize some form of due process under customary international law. Although the specifics are often unclear, most nations agree that they should guarantee foreign visitors a basic minimum level of justice and fairness. Some nations have argued that they are bound to grant no more rights to aliens than they do to their own citizens, the doctrine of national treatment, which also means that both would be vulnerable to the same deprivations by the government. With the growth of international human rights law and the frequent use of treaties to govern treatment of foreign nationals abroad, the distinction, in practice, between these two perspectives may be disappearing.

# See also

- Continuance
- Fair procedure
- Fundamental justice
- *Habeas corpus*

- Peremptory norm
- *Subpoena ad testificandum*
- *Subpoena duces tecum*

# Notes

1. Geoffrey Marshall, "Due Process in England", in *Nomos XVIII: Due Process*, eds. J. Roland Pennock & John W. Chapman, 69–92 (New York: New York University Press, 1977), 69.

2. Marshall, 69–70.

3. **"CRS Annotated Constitution: Due Process" (https://www.law.cornell.edu/anncon/html/amdt5bfrag1_user.html)**. Cornell University Law School. Retrieved June 30, 2014.

4. **The Text of Magna Carta (1215) (http://www.fordham.edu/halsall/source/magnacarta.html)**

5. McKechnie, William Sharp (1905). *Magna Carta: A Commentary on the Great Charter of King John* (https://books.google.com/books?id=RCWlAAAAMAAJ). Glasgow: Robert MacLehose and Co., Ltd. pp. 136 –37.: "The question must be considered an open one; but much might be said in favor of the opinion that 'freeman' as used in the Charter is synonymous with 'freeholder'...."

6. **The Text of Magna Carta (1297) (https://www.archives.gov/exhibits/featured_documents/magna_carta/translation.html)**

7. 28 Edw. 3. c. 3

8. **2** *Institutes of the Laws of England* **46 (1608)** (http://www.constitution.org/18th/coke2nd1797/coke2nd1797_051-100.pdf)

To whom it may concern;

I hope this letter reaches you in great spirit and an attentive heart. This comes from the family's desk of Cornel Dawson, Teron Odum, Ulysses Polk, Antwan Davis, Clifton Lemon and Duavon Spears. The six men were recently found guilty of Illinois State RICO law in Cook County. While the city has been known to violate citizen rights, and unlawfully charge/convict men of color; we would like to shed light on a few injustices related to this case (13CR13349) in particular. In the year 2012, Governor Pat Quinn signed the Illinois State RICO law which claimed an enterprise or organization in its structure could face harsh sentences and punishment for the crimes (predicate activity) as a group instead of as individual members. This unlawful legislation denies civil liberties guaranteed to us under the U.S. Constitution, and violates the sixth amendment, ex post facto, and loosely target members of a community. As it relates to this case, the Cook County States Attorney office used illegal, inadmissible wiretap evidence and failed to deliver a fair and speedy trial to say the least. After four and a half years of incarceration, these six men were denied their civil liberties of **due process** which prohibits against vague "blanket" laws such as the Street Gang Racketeering RICO act. It also violated the right to an impartial jury without racial bias and a fair representation of the community. There was a letter sent to the Judge during deliberations, which called out many unjust actions, including 2 biased jurors "who wanted to make an example," 2 jurors who were removed for questioning the jury instructions and its attempt to render one verdict, and the removal of another who posed a question to better understand the conspiracy theory. The judge in this case, Michael B McHale, in several instances displayed bias behavior and on record, failed to handle the above issues, properly. He did not remove the two biased jurors, but did however, remove the other jurors who happen to be people of color. He replaced all of them with alternate jurors, that had already been back into society and exposed to the negative media orchestrated by the State. The term **venires**, is defined in the sixth amendment as jurors must represent a fair cross-section of the community. None of the jurors, were apart of, tied to, or inherently familiar with the East Garfield Park community and this was a clear violation of said amendment. The judge went on record, throughout the duration of the case, proclaiming a guilty verdict, instead of upholding the statutes of innocence until proven guilty. And as noted on November 30th 2017 transcripts show that he excused himself from the bench to personally call in alternate jurors; which is evidence of tampering as those conversations were not made public, nor show proof of what was mentioned during those calls, since it is common law for a clerk to make contact. The many instances of unethical conduct need to be addressed, as well as the lack of evidence to prosecute and convict these men. Crook County has once again, overstepped boundaries and created an unlawful mess to continue their agenda of black male incarceration. We as a family wanted to send you this letter in hopes that we could continue the conversation and educate our community on the illegal practices of our State legislators. We must unite and work together to repeal this law, before they use these "blanket" statutes to tear apart our families and communities.

Please feel free to contact us

PO Box 241225, Chicago IL. 60624

Shira Davis   Phone: 773-816-3122

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

```
 1   STATE OF ILLINOIS  )
                        )  SS.
 2   COUNTY OF COOK     )

 3     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
             COUNTY DEPARTMENT - CRIMINAL DIVISION
 4
     THE PEOPLE OF THE STATE OF  )
 5   ILLINOIS,                   )
                                 )
 6                 Plaintiff,    )
                                 )
 7           vs.                 )
                                 )
 8   CORNEL DAWSON,              )  No. 13 CR 13349
     TERON ODUM,                 )
 9   ANTWAN DAVIS,               )
     ULYSSES POLK,               )
10   CLIFTON LEMON, and          )
     DUAVON SPEARS,              )
11              Defendants.      )

12                    JURY TRIAL
                     A.M. PART 1
13
            REPORT OF PROCEEDINGS had at the trial of
14
     the above-entitled cause, before the HONORABLE
15
     MICHAEL B. MCHALE, one of the judges of said Court, on
16
     the 30th day of November, A.D., 2017.
17
     APPEARANCES:
18      HON. KIMBERLY FOXX,
        State's Attorney of Cook County, by:
19      MR. THOMAS DARMAN,
        MS. ERICA DILLON,
20      MS. YVETTE LOIZON, and
        MR. JOHN MAHER,
21      MS. RIEBANA SACHS,
        MS. MARGARET FLISK,
22      Assistant State's Attorneys,
        appeared on behalf of the People;
23
        MR. GEORGE BECKER and
24      MR. MICHAEL BONAGURO,
        on behalf of Defendant Dawson;
```

1

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

```
 1   APPEARANCES:   (Continued)

 2                       MR. LAWRENCE WOLF LEVIN and
                         MS. MICHELLE TRUESDALE,
 3                       on behalf of Defendant Odum;

 4                       MR. RICHARD DVORAK and
                         MR. CHRISTOPHER TINSLEY,
 5                       on behalf of Defendant Davis;

 6                       MS. DAWN PROJANSKY and
                         MR. GEORGE BECKER,
 7                       On behalf of Defendant Polk;

 8                       MS. SABRA EBERSOLE and
                         MR. JOSEPH VENDITTI,
 9                       On behalf of Defendant Lemon;

10                       MS. AMY P. CAMPANELLI,
                         Public Defender of Cook County, by:
11                       MS. JENNIFER HODEL and
                         MS. KATHRYN LISCO,
12                       Assistant Public Defenders,
                         on behalf of Defendant Spears.

13

14

15

16

17

18

19

20

21

22
     IVY SCHAEFER
23   Official Court Reporter
     CSR: #084-004662
24
```

2

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1      THE COURT: About ten minutes ago, we got a

2    note, and it is 12:10 p.m. I'll read it.  It's

3    lengthy.

4            Dear Judge McHale, after deliberations

5    held on Wednesday and morning of at 26th and

6    California, myself, No. 120; and No. 40 [sic]; and

7    others feel that there is unfairness for the following

8    reasons -- I'm trying not to use names.  Just a moment

9    here.  She is referring to a juror by name, and I'm

10   going to use the number instead.  Juror 28.  I'm going

11   to note that on the -- I'm going to put that on the

12   note in my handwriting, so I can keep track of things.

13   Juror No. 28 stated her father and brothers are

14   members of the black souls.  She referred to another

15   couple of people.  I wasn't prepared to deal with the

16   numbers.

17           Juror No. that I haven't determined what

18   yet is the number and I will when I get a

19   chance stated he is only here to send a message.

20   Juror 143, which we are all familiar with by now, has

21   been racial bullying and has shown male chauvinism.

22   Due to this conclusion, myself and Juror 40 do not

23   foresee a fair verdict being held as individuals

24   charged in this case.  We ask that you take into

3

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1  consideration the time we've all spent doing our civic

2  duty for a fair verdict as we are called to do as

3  citizens.

4          With that being said, we ask that the jury

5  to be polled on jury tampering by Juror No. 28, and

6  racial bullying and chauvinism and racial profiling by

7  the number I've yet to have determined, Juror

8  No. 44 -- that's a different person. Due to the

9  comments of personal statements and this information

10 that has come to light, we feel as though, if not

11 addressed, there will be a hung jury, and we do not

12 want to continue on under these circumstances of bias.

13         I'm just reading it as it is written. It

14 is signed by Juror No. 120, and also Juror No. 140.

15         Sp we have to work through this. This

16 does not say it is a hung jury. This does not say

17 they cannot reach a verdict. This says they need

18 certain things to be addressed, and they will be.

19         So I have received previous notes from

20 Juror 120. My thinking is Juror 120 is the foreperson,

21 and could confirm that with her. Maybe start by

22 questioning her about some of the more specifics. I

23 don't know what "send a message" means, and I don't know

24 what is being referred to as jury tampering, since

4

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1   they're all in the jury.  I don't know if she means

2   there's been any outside influence or not.  It doesn't

3   sound like it.  It sounds like someone in there has not

4   been candid on their juror questionnaire; and then --

5   that's Juror 28 -- if it is true that her father and

6   brothers are members of the Black Souls, then she did not

7   truthfully answer those questions on her juror

8   questionnaire.  And that would be reason for cause to

9   remove her now and replace her with an alternate.

10  As to the other allegations, I think I need more

11  information, and I can start with her.

12        MS. LISCO:  Judge, there is a lot of

13  information in that note.  Can you please read that

14  again?

15        THE COURT:  Yes, I will.

16        MS. TRUESDALE:  Also, Judge, may we have a

17  moment to confer with our other defense counsels

18  before we put anything else on the record?

19        THE COURT:  Sure.  Let me try to find the

20  number of the one that I have not been able to do yet.

21  Give me a second.

22                    (A short break was had.)

23        THE COURT:  I'm going read the note again.  I

24  think I've figured out who the additional juror they

5

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1    were referring to.

2              Dear Judge McHale, after deliberations

3    held on Wednesday and morning of at 26th and

4    California, myself, No. 120; and No. 40; and others

5    feel that there is unfairness for the following

6    reasons:  Juror No. 28 stated her father and brothers

7    are members of the Black Souls.  Juror 215 stated he

8    is only here to send a message.  Juror 143 has been

9    racial bullying and has shown male chauvinism.  Due to

10   this conclusion, myself and Juror No. 40 do not see --

11   do not foresee a fair verdict being held as

12   individuals charged in this case.  We ask that you

13   take into consideration the time we've all spent doing

14   our civic duty for fair verdict as we are called to do

15   as citizens.  With that being said, we ask the jury be

16   polled on jury tampering by Juror No. 28 --

17             Okay.  I missed that.  The last time, I

18   didn't read that right.  Let me repeat that on the

19   last paragraph.

20             With that being said, we ask the jury to

21   be polled on jury tampering by Juror No. 28, racial

22   bullying and chauvinism initial, and racial profiling

23   by Jurors No. 215 and 44.  Due to the comments of

24   personal statements and this information that has come

6

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1    to light, we feel as though, if not addressed, there

2    will be a hung jury, and we do not want to continue on

3    under these circumstances of biassed -- is how it

4    ends.  Signed by Juror 120 and 140.

5              Interestingly, as I read this note, I was

6    handed another note signed by Juror No. 120, which at

7    this point, I'm assuming is the foreperson.  And it

8    reads as follows:

9              Dear Judge, the jurors would like further

10   clarification on Paragraph 4 of the predicate activity

11   of the instructions.  Can a death that occurred in

12   2002 be considered as a predicate activity for

13   racketeering?

14             We can deal with that after we get past

15   the big first one.  To me, the second note indicates

16   that they're still making an effort.  We just need to

17   deal with this jury that is not getting along.  We

18   have six alternates, and we will deal with this issue

19   step by step.

20             Anyone want to say anything for the

21   record?

22        MR. DVORAK:  Judge, can we take a break?

23        THE COURT:  No; we are not going to take a

24   break.  We're going to deal with this right now.

7

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1        MR. DVORAK:  We need to confer with each other.
2        THE COURT:  You guys want to confer?  That's
3  fine.  I didn't realize that is what you meant, but
4  we're talking five minutes.  Confer for five minutes
5  right here.
6        MR. DVORAK:  Judge, this is an extremely
7  complex situation.
8        THE COURT:  You've got five minutes, Dvorak.
9  Do it now.  I'm not messing around.  Talk to your
10  attorneys for five minutes.  That is it.  I'm coming
11  back out.  Don't say another word.
12                    (A short break was had.)
13        THE COURT:  Here is how I intend to proceed:
14  The biggest problem initially is to, in my opinion,
15  find out if Juror No. 28 indeed has been untruthful on
16  her juror questionnaire about having relatives that
17  are members of this gang.  So my intention is to first
18  have her out, and question her as to that issue, and
19  determine whether or not she is suitable to continue
20  on this jury.
21              After that, my suggestion -- my intent is
22  to bring out Juror 120, confirm that she is the
23  foreperson, and I'd like to ask her more clarification
24  about some of the things that are said in this note,

8

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1  since some of them seemed to touch on or just label
2  certain behavior, and I would like to know more about
3  what that is.  Then ask her if she still thinks -- if
4  any adjustments are made, if she believes that she can
5  still be fair.  The other jurors that are mentioned,
6  143, 215 and 44, and then I can also question them
7  based on what she tells me.  And then I will bring the
8  entire jury out to ask them if, based on developments,
9  they can be fair.  If they still feel that they can be
10 fair, if we were to bring in alternates, if that's
11 what was necessary.

12        MS. LOIZON:  Judge, may I?

13        THE COURT:  Yes.

14        MS. LOIZON:  Judge, I believe that under these
15 circumstances, the more appropriate course of action
16 would be first to question the person who sent the
17 note so that we have clarification on what the
18 specific issues are without asking any questions
19 regarding the jury's ability to continue to be fair.
20 I think that we run the risk of invading the province
21 of the jury if we question their mind set.  And in the
22 event that we do have to bring an alternate in, the
23 jury would have to be instructed that they need to
24 start their deliberations from the beginning.

9

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1    THE COURT:  No problem with that.

2    MS. LOIZON:  So their mindset would be of no

3    moment.

4    THE COURT:  Okay.

5    MS. LOIZON:  So it would be our position that

6    the first step in this process would be that we bring

7    in the person who wrote the note, based on the

8    information that we received there, then the next step

9    would potentially be to bring in the person who is

10   being accused of tainting the jury.

11   THE COURT:  Okay.

12   MS. LOIZON:  And then the third step, if we get

13   there, would be to bring in the alternate without

14   questioning the individual jurors about their ability

15   to remain fair.  Because I believe that we need to

16   have them press the reset button and have them start

17   over.

18   THE COURT:  In response to that, I think maybe

19   that is a good point.  We will bring out the person

20   that seems to be the foreperson -- that would be the

21   appropriate thing -- and to ask further clarification

22   and confirmation of what this note says.

23   After that though, yes, I intended to

24   bring out individual jurors to ask them about what

10

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1  this behavior is.  The State is shaking their head.
2  What's up with that?  Why not?
3      MS. LOIZON:  Well, Judge, I believe that if we
4  have information from the person who sent the note,
5  which is then --
6      THE COURT:  Well, let's say it is confirmed as
7  it is written.
8      MS. LOIZON:  Then I don't think we have to
9  bring out individual jurors to ask them.  Because
10  whatever has happened thus far is over, and a new
11  alternate would come in and they would be starting
12  from the beginning.  And that is what they would be
13  instructed to do.
14      THE COURT:  What do you mean "don't do anything
15  else" when you have an allegation here:  The foreman
16  comes out and says, yes, Juror 28 says she has a
17  father and brothers who are members of the Black
18  Souls.  Why would I bring out the whole jury for that
19  before asking that person --
20      MS. LOIZON:  No; you would not, Judge.  You
21  would not, correct.
22      THE COURT:  Okay.  Maybe I misunderstood you.
23      MS. LOIZON:  I'm sorry.  I think we
24  misunderstood each other.

11

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1      THE COURT:  I want to bring out the foreperson

2   and ask about the contents of the note.  If she

3   confirms the contents of the note, then I want the

4   bring out at least the individual juror that

5   apparently has relatives who are Black Souls.

6      MS. LOIZON:  Yes.

7      THE COURT:  If she confirms that, she is off

8   the jury.  Then with respect to the others, depending

9   on what the foreman says, it may be appropriate to

10  also bring out other individual jurors that she has

11  complained of to see if there is any truth to this.  I

12  don't know what racial bullying is, but I can't really

13  suggest just throw in one alternate juror and not

14  avoid -- not address these other concerns.  So I think

15  I have to bring them out -- these other ones out one

16  at a time based on what she has told me.  We have six

17  alternate jurors.  It may be that I remove a number of

18  people right now have based on the note.  I don't know

19  what I'm going to do, but we will find out.

20      But let's say, if we remove a number of

21  people and alternate jurors come in, then we will have

22  to ask the jury if -- no, we will just do that, I

23  guess.  We won't ask the jury -- I don't think we will

24  ask the jury anything.  Make the developments as is

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1  requested in the notes, and then we'll bring in the
2  alternates, and they can start from scratch.  If it is
3  not working, they can tell us.
4           All right.  What does the defense want to
5  say?  One at a time.  Go ahead.
6       MR. WOLF LEVIN:  Judge, on behalf of Teron
7  Odum, we respectfully ask the Court at this time for a
8  mistrial based on the information that has been
9  brought forth on the notes in this particular matter
10 and the allegations that are suggested.
11          Secondly, if the Court is going to
12 question the jury, we believe it invades the province
13 of the jury, even at this time.  Despite the Court's
14 position that somebody may have committed some degree
15 of perjury, it's an allegation.  It hasn't been
16 proven.  For the Court to come out here -- or a juror
17 to come out here and the Court to interrogate that
18 juror will be intimidating in and of its own fact, and
19 then we are going to go through the other jurors?
20          We don't know which way this jury is
21 going, nor is that important.  Judge, the jury took
22 the oath.  They went back.  We sat through the trial.
23 They should be told just to continue deliberating and
24 see where they are going.

13

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1      THE COURT:  That is ridiculous and it's denied.

2  Thank you.

3      MR. WOLF LEVIN:  Well --

4      THE COURT:  I don't need to hear anything else.

5          Mr. Becker, what would you like to say?

6      MR. BECKER:  Judge, the first thing I would ask

7  you to do is -- you're making the assumption that this

8  120 is the foreperson.  I'd ask you to send a note

9  back and say, "Would you please tell me which juror is

10  the foreperson?"  Because if 120 is not the

11  foreperson, these could be two individuals who are

12  just upset about the way the deliberations are going,

13  and it is not going their way, and they are sending

14  this note out to you.  I think that is first and

15  foremost.

16      THE COURT:  Sure we can do that.  I mean, that

17  is no problem.  I'm just going to send a sheriff back

18  to ask who the foreperson is.

19      MR. BECKER:  Then, I agree with Mr. Levin that

20  we can't just start questioning individual jurors.

21  And there's every much in that note that causes me

22  concern.  Yes, you have somebody saying one of these

23  jurors is associated with family members with the

24  Black Souls, but you have somebody else talking about

14

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1   racial bullying, which typically racial bullying is
2   white versus black, not the other way around.  I mean,
3   that --
4        THE COURT:  Well, you are speculating now.
5   That is why I want to get to the bottom of it.  So
6   what's your suggestion?  Mistrial, too?
7        MR. BECKER:  Judge, I agree with Mr. Levin that
8   these people should be told:  Just keep deliberating
9   at this point.  Nothing more.  You are going to
10  highlight stuff and we don't even know if what is in
11  that note is true at this point.
12       THE COURT:  Mr. Becker, with all due respect,
13  that is ridiculous as well.  For the reason it is,
14  because I have an allegation that somebody here has
15  not been truthful about having family members who are
16  in this gang and this trial.  It has to be dealt with.
17  Right now, they are indicating to this Court that they
18  are still working on it.
19            They have already sent another note after
20  this asking about clarification from one of the jury
21  instructions.  But they are telling me, if not
22  addressed, there will be a hung jury.  In other words,
23  address it or it is going to be a hung jury.  But they
24  still seem willing to work on this if we can resolve

15

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1   some of these issues, which are valid issues. For you

2   to suggest -- you or any of the defense to suggest

3   that I simply send back the standard "please continue

4   to deliberate" is utterly ridiculous and I'm not going

5   to do it.

6           Who is the foreperson?

7       MR. DARMAN: May, I Judge? It is the People's

8   position at this point that the person that wrote the

9   note should be voir dired by the Court.

10      THE COURT: That is what I'm going to do.

11      MR. DARMAN: To go in the back and start asking

12  who the foreman is and asking other questions, I think

13  we run a risk.

14      THE COURT: The foreperson is Juror No. 120 in

15  writing. Okay?

16      MS. LISCO: May I?

17      THE COURT: If you can make it brief, Ms.

18  Lisco, you can.

19      MS. LISCO: Yes, Judge. We agree there should

20  be a mistrial in this case. The jury has already been

21  tainted by this entire scenario. There's no fixing it

22  at this juncture, Judge. If they believe or if it is

23  even true that this juror has ties to the Black Souls,

24  they've been tainted.

16

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1    THE COURT:  We don't know that yet.  That's

2  your speculative view.  We will find out.  Thank you.

3    MS. LISCO:  Okay.  Also, Judge, in terms of the

4  questions that they can continue deliberating, that

5  remains to be seen, but that doesn't negate the fact

6  that there is fighting within the jury.  That doesn't

7  necessarily mean that fighting is going to result in a

8  hung jury no matter what they wrote in that note.

9  Because today's moment right now --

10    THE COURT:  So I should ignore what they wrote

11  in the note?

12    MS. LISCO:  What I'm saying to you, Judge, as

13  many as the time that there is fighting in the jury --

14  and the Court is well experienced in this regard.  As

15  many as the time there is fighting in the jury, they

16  ultimately do come to a verdict.  Just because they

17  are saying that at this juncture, there is time ahead

18  of us which will bear out whether that is actually the

19  case.

20    THE COURT:  Sorry.  I disagree with you.  I

21  know what you are asking.  You're asking the same

22  thing they're asking.

23    MS. LISCO:  We are asking for this jury to

24  continue to deliberate.

17

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1       THE COURT:  Bring out 120.  I'm not going to

2   hear anything else.

3       MR. DVORAK:  Your Honor --

4       THE COURT:  No.  No.  120.  Bring out that

5   juror.  Be quiet.

6           I got your notes.  Obviously, there is

7   some difficulties going on.  I wanted to confirm with

8   you some of the things in the note and maybe just ask

9   a couple of follow-up questions.

10      JUROR 120:  Sure.

11      THE COURT:  Just to confirm, you're Juror 120,

12  and you are the foreperson, right?

13      JUROR 120:  Yes, sir.

14      THE COURT:  You indicated that Juror No. 28 --

15  I don't want to use names --

16      JUROR 120:  Sure.

17      THE COURT:  Juror No. 28 stated her father and

18  brothers are members of the Black Souls; is that

19  correct?

20      JUROR 120:  Yes, sir.

21      THE COURT:  Juror 215 stated he is only here to

22  send a message?

23      JUROR 120:  Mm-hmm.

24      THE COURT:  Can you explain that a little bit

18

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1   more, what you mean by that?

2          MS. PROJANSKY:  Objection.

3          MR. VENDITTI:  Objection, Judge.

4          THE COURT:  Okay.

5          MS. LOIZON:  Judge, may I?

6          THE COURT:  Yeah.

7          MS. LOIZON:  At this juncture, Judge, would you

8    consider dealing with the first issue first before we

9    proceed any further?

10         THE COURT:  Yes, I will.

11                I think maybe we will take this step by

12   step.

13         JUROR 120:  Okay.

14         THE COURT:  So let me have you return to the

15   jury.  Please don't discuss what we have said, and we

16   may have you back out and clarify other things.

17         JUROR 120:  Okay.  Sure.

18         THE COURT:  Thank you.

19         JUROR 120:  Thank you.

20         THE COURT:  Please bring out Juror 28.

21         MS. LISCO:  Judge, before we do that, on behalf

22   of Duavon Spears, we would ask the Court inquire of

23   120, whether that information was shared with anyone

24   besides herself regarding the Black Souls.

19

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1   THE COURT:  No.  Number 40 already says it was.
2   She signed the note as well.  Bring out 28.  I'm not
3   dragging this out, folks, as much as you might want
4   to.  I'm not going to do it.
5           Can you remain standing for one moment?
6   Raise your right hand.
7                   (Juror 28 duly sworn.)
8       THE COURT:  Have a seat, please.  It has been
9   brought to our attention that you may have family
10  members who are members of the Black Souls Street
11  Gang; is that correct?
12      JUROR 28:  No.
13      THE COURT:  You do not have family members?
14      JUROR 28:  No.
15      THE COURT:  Your father is not a member of the
16  Black Souls?
17      JUROR 28:  No.
18      THE COURT:  And you don't have brothers who are
19  members of the Black Souls?
20      JUROR 28:  My brothers, no.
21      THE COURT:  Okay.  Do you have any --
22      JUROR 28:  It's from another gang, but not the
23  Black Souls, no.
24      THE COURT:  What member gang is your brother

20

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1    in?

2              JUROR 28:  They are Vice Lords.

3              THE COURT:  Vice Lords?  Okay.  So did you make

4    any statements similar to those in front of anyone?

5              JUROR 28:  I made an example.

6              THE COURT:  Can you let us know what it was?

7              JUROR 28:  Oh, they was asking, like, if we had

8    family members -- well, we'd make an example, like, if

9    you're in a gang with a family member, if -- so I was,

10   like, for example, if my father is a Black Soul, that

11   doesn't make me a Black Soul.  We was just making

12   examples.

13             THE COURT:  Okay.

14             JUROR 28:  Because, basically, they were trying

15   to tie in the family.

16             THE COURT:  Right.  So you were only making it

17   as an example?

18             JUROR 28:  Yeah.

19             THE COURT:  Okay.  So when we asked you on the

20   form, Have you had any experiences -- I'm reading from

21   the jury form -- Have you had any experience

22   observing, living near or dealing with the Black Soul

23   Street Gang in Chicago?  You answered --

24             JUROR 28:  No; not with the Black Souls in

21

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1   Chicago.

2          THE COURT:  All right, ma'am.  Thank you.

3          JUROR 28:  You're welcome.

4          MR. BECKER:  Your Honor, based on that

5   testimony, I would ask for a mistrial.  There's

6   obviously been misrepresentation by the foreperson

7   about what this individual said.  The foreperson is

8   trying to sway the jury by removing somebody who might

9   actually be a little bit defense oriented, at least

10  for one defendant, and there's been a total

11  misrepresentation made.  There's been inquiry made now

12  with this woman.  She has said no.  She has answered

13  the questions under oath.  There is no information

14  otherwise.  This jury is totally tainted now, and

15  there needs to be a mistrial declared immediately.

16         THE COURT:  Hyperbole aside, Mr. Becker, what

17  she described was a possible misunderstanding by using

18  an example that may have been misunderstood.  She also

19  indicated that she does have a family member who is a

20  gang member, and she indicated that was a no on her

21  juror questionnaire.  However, I'm not in a position

22  to remove her at this point.  I don't think that she's

23  -- it's not required to remove her at this point.  It

24  sounds to me like there's been a misunderstanding.  It

22

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1  also sounds to me like this is a jury that just

2  personally doesn't like each other very much.

3          But that aside, I'm not really sure how to

4  proceed next.

5      MR. DARMAN:  Judge, do you have a copy of the

6  questionnaire that we can take a look at for a moment?

7      THE COURT:  Yes.

8      MR. DARMAN:  I mean, a blank one.

9      THE COURT:  I doubt I have a blank one, but I

10  have one with a number that -- you know, you don't

11  have a name on it.  Here, I can give you --

12      MS. LOIZON:  Judge, can I just interject for a

13  second?  Can we -- I know you want to keep moving, but

14  at this point, not only do we need to review the

15  questionnaire, we also need to review her questioning

16  when she came in and was voir dired, I believe, before

17  we can proceed farther.  Because she may have provided

18  information -- I don't recall her voir dire at this

19  time, but I do think to be as diligent as possible and

20  cover all of our bases, we all need an opportunity to

21  review her questionnaire, along with the statements

22  that she made when she was voir dired by the Court.

23  And I know that is going to take a few minutes,

24  Judge --

23

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1      THE COURT:  That's not going to take a few

2  minutes.  That's going to take a few hours.  Does

3  anybody have a transcript of the voir dire?

4      MS. LOIZON:  I believe we were all given daily

5  copy of the voir dire, Judge.

6      THE COURT:  I thought we said not to.  I don't

7  have it.

8      MS. LOIZON:  I think we do.  At least, can we

9  have the opportunity to check and see if we do?

10     THE COURT:  Yes.  But what's the plan, then?

11 To see what she said?  I mean, do you think she said

12 anything different than her questionnaire?  I sure

13 don't.

14     MS. LOIZON:  I don't know, Judge, but I think

15 we need to check.

16     MR. BECKER:  Judge, if we have to look and make

17 a Spanish inquisition about what a juror now said in a

18 questionnaire, this jury is totally tainted.  Because,

19 really, we ought to be looking at what 120 and what 40

20 said because they apparently have misunderstood or

21 made a complete misrepresentation.  They were pretty

22 unequivocal in that note, that they said this woman

23 said she had family who were members of the Black

24 Souls.  That's not a misunderstanding.  That's not a

24

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1    mischaracterization.  That is what the note says in
2    writing.  And she came out here and unequivocally
3    denied it.

4         THE COURT:  All right.

5         MR. BECKER:  This jury --

6         THE COURT:  That is the second time you have
7    made the argument.  I hear you, Mr. Becker, and I'm
8    not going there with you.  Okay?  I disagree.  It is
9    not clear.  It could have been a misunderstanding, and
10   I don't think it is clear as you are stating.

11        MS. LOIZON:  Judge, just for purposes of making
12   this point on the record, the fact that one juror came
13   out here and said she never said it doesn't make her
14   the truthful one and the foreman a liar, which is
15   exactly the conclusion that Mr. Becker is jumping to
16   at this point.

17        THE COURT:  Well, yeah --

18        MS. LOIZON:  We need some time to review the
19   questionnaire.

20        THE COURT:  It's speculation.  But I've got to
21   be honest with you, I don't think the speculation of
22   the voir dire is going to tell you anything different.
23   What we've got here is a person that wrote a note that
24   somebody said their father and brothers are members of

25

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1    the Black Souls.  The juror in question did come out

2    here and say, yes, I said something, like, if my

3    father were a Black Soul.  That's very, very similar.

4    And in the heat of the moment of jury deliberations,

5    there could have been a misunderstanding, which seems

6    the most likely scenario.  I don't know that anybody

7    is living at that point.

8            MS. LOIZON:  Well, Judge --

9            THE COURT:  There's no reason to think so.  And

10   I don't think for one minute voir dire questioning is

11   going to show you jack.

12           MS. LOIZON:  Judge, she certainly lied on her

13   questionnaire.  You pointed that out, that she was

14   asked the question of whether or not she had any

15   family members who were gang members, and she said no.

16   I don't have the questionnaire in front of me.

17           THE COURT:  I do.  I can give it to you guys.

18   What is the questioning going to show?

19           MR. DARMAN:  We don't have the questionnaire in

20   front of us.  I think there were some gang questions.

21           MR. MAHER:  If there's a question that says:

22   Do you have a family member who is in a street gang?

23   If she answered no, she lied, and she should go.

24           THE COURT:  What did she say here?

26

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1          MR. MAHER:  She said her family member is a --

2          MS. LOIZON:  She said she has Vice Lords in her

3    family.

4          MS. PROJANSKY:  Just a brother.

5          THE COURT:  Her brother.

6          MR. MAHER:  We can't recall --

7          THE COURT:  She said her brother was a

8    Vice Lord?

9          MR. MAHER:  Yeah.  She --

10         THE COURT:  Hold on.  Hold on.  I know where

11   you're going.  Question 73:  Do you, a relative --

12   strike that.  That's the wrong question.  Let me find

13   the right one.  74:  Has any member of your immediate

14   family or very close friend ever been involved in a

15   gang?  No.

16         MS. LOIZON:  Judge, she should be gone.  She

17   lied on the questionnaire.

18         MR. VENDITTI:  Judge, if I may clarify?  In the

19   questionnaire, she also confirmed that her brother was

20   in prison.  I don't recall whether or not her brother

21   was in prison at the time of jury voir dire, but,

22   Judge, as you know, when you're prison, sometimes you

23   get ganged up for protection.  So this could be a new

24   circumstance.

27

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1      MS. LOIZON:  It doesn't matter, Judge.  The

2   questionnaire was asked on that specific day.  On that

3   specific day, she was sworn in on it.  It doesn't

4   matter when he became a gang member.  Because between

5   now and the trial, if he became a gang member, then

6   she should have disclosed that.  So that's absolute --

7      MR. VENDITTI:  Judge, there is no jury

8   instruction given:  If something new pops up, let us

9   know.  I'm sorry, Judge.

10     THE COURT:  She's off.  Juror No. 28 is --

11     MS. LISCO:  Judge --

12     THE COURT:  Over the defense's strenuous

13  objection, it is ruled.

14     MR. WOLF LEVIN:  We'd renew the motion for

15  mistrial, then.

16     THE COURT:  Good.  Go ahead.

17     MR. DVORAK:  May I make my record?

18     THE COURT:  Sure.

19     MR. DVORAK:  Judge, throughout these

20  deliberations, there's been many -- not deliberations.

21  When we initially did voir dire, there were many

22  jurors who answered falsely or incorrectly about

23  background, about those questionnaires, and they were

24  not immediately struck from the jury.

28

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1    THE COURT:  I don't recall that.

2    MR. DVORAK:  That absolutely happened.

3    THE COURT:  Sounds like there's something you

4  can put in a motion at a later time, sir.

5    MS. PROJANSKY:  Your Honor, I thought, when she

6  did testify, it was very reluctant, like she said --

7  she said, kind of brother.  I'm not --

8    THE COURT:  She didn't say kind of brother.

9    MS. PROJANSKY:  She --

10    THE COURT:  Just wait.

11         Can you find it?

12    MS. PROJANSKY:  Can you read it back?

13    THE COURT REPORTER:  Sure; if you guys can all

14  stop talking, I can read it back.

15    THE COURT:  Yes; stop talking and let her find

16  it.

17              (Record read as requested.)

18    THE COURT:  She is off.  She is excused.

19    MS. PROJANSKY:  Judge --

20    THE COURT:  Over your objection.  I don't want

21  to hear any more.  Put it in writing.  We're moving

22  forward, folks.

23         The next thing that I'm going to do is

24  bring out 120.  I'm going ask her to clarify what she

29

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1    means by Juror 215 here to send a message.  Please
2    bring out 120.

3        MR. DVORAK:  Objection, for the record, to any
4    questioning.

5        THE COURT:  Okay.

6        MS. LOIZON:  Before that juror comes out, can
7    we just address one point?

8        THE COURT:  Yeah.  Let's hold him off for one
9    second.

10       MS. LOIZON:  I think that with this particular
11   line of questioning, it's very important that the
12   question asked is extremely precise so that we are not
13   evading the province of the jury.  I think that the
14   juror can be asked what exact words were used that led
15   her to believe the conclusion that she drew in that
16   letter, but I don't think she should be permitted to
17   have a discussion about her interpretation or anything
18   else --

19       THE COURT:  What exact words he used?

20       MS. LOIZON:  Please.

21       THE COURT:  All right.

22       MR. BECKER:  Judge, one thing before you bring
23   the juror out.  I would ask that they be told right
24   now, if you are removing the one juror, to stop

30

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1   deliberating because you have to bring the 12th juror
2   here.
3       THE COURT:  Okay.
4       MR. BECKER:  To start --
5       MS. LOIZON:  Judge, we would agree.
6       THE COURT:  Okay.  Let me send that message
7   right now.
8           Let the record reflect that I'm writing
9   the following note:  Juror No. 28 has been excused.
10  Please stop deliberating until we can sort through the
11  rest of this situation.  Thank you, Judge McHale.
12          That is being delivered now.  It is 12:55.
13          After that has been delivered and they
14  have read it, could we have please bring out No. 120?
15      THE SHERIFF:  Yes, Judge.
16      THE COURT:  Ma'am, can you raise your right
17  hand.
18              (Juror 120 duly sworn.)
19      THE COURT:  Please be seated.
20          We are doing this step by step.  The next
21  thing of your note, you write the following:  Juror
22  No. 215 stated he is only here to send a message.
23          What I would like you to do is just tell
24  me if you can remember the exact words that he used

31

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1    when you are referring to this.  Do you recall what
2    exact words he used?
3            JUROR 120:  Well, we were just discussing --
4            MS. LOIZON:  No objection, Judge.
5            THE COURT:  Yeah.  Can you recall the exact
6    words that he used?
7            JUROR 120:  Just that he was going to send a
8    message.
9            THE COURT:  Did he say anything of a -- strike
10   that.
11              Okay.  Those are the only exact words that
12   you can recall that he said?
13           JUROR 120:  That I'm allowed to say, I guess.
14           THE COURT:  All right.  Okay.  Yeah, we don't
15   want you to interpret it, necessarily.  We just want
16   to know the exact words.  Okay.  Thank you.  We will
17   let you know if we need you again.  We may.  Thank
18   you.
19           JUROR 120:  Sure.
20           THE COURT:  Well, I suggest that we bring him
21   out.
22           MS. LOIZON:  We would object.  I think, at this
23   point, we have another alternate coming in.  You are
24   going to have to re-swear the jury.  You are going to

32

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1   have to reinstruct them.  You can read to them from

2   1.01 at that time, and I believe that that would be

3   the proper course at this time.

4                          (Whereupon, the following further

5                           proceedings were transcribed by

6                           Official Court Reporter Ellen

7                           Dusza.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

[!** DAILY COPY ** NOT FOR APPEAL PURPOSES **]

1   STATE OF ILLINOIS.    )
                          )  SS.
2   COUNTY OF COOK.       )

3

4        I, Ivy Schaefer, an Official Court Reporter

5   within and for the Circuit Court of Cook County,

6   Criminal Division, do hereby certify that I have

7   reported in shorthand in the report of proceedings had

8   at the trial of the above-entitled cause; that I

9   thereafter caused the foregoing to be transcribed into

10  typewriting electronically, which I hereby certify is

11  a true and accurate transcription of my stenographic

12  notes and contains all the matters of the proceedings

13  so taken as aforesaid before the Honorable

14  MICHAEL B. MCHALE, Judge of said court.

15

16

17                           *Ivy Schaefer*

18        _____
                             Official Shorthand Reporter
19                           Circuit Court of Cook County
                             County Department - Criminal
20                           Division
                             Certification No. 084-004662
21

22

23
    Dated this 1st day of
24
    December, 2017.


                            34

1    STATE OF ILLINOIS   )

2                    ) SS:

3    COUNTY OF C O O K   )

4

5       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

6         COUNTY DEPARTMENT - CRIMINAL DIVISION

7

8    THE PEOPLE OF THE       )

9    STATE OF ILLINOIS,     )

10          Plaintiff,    )

11             vs.       )

12    CORNEL DAWSON,        ) No. 13 CR 13349-01
       TERON ODUM,          ) No. 13 CR 13349-02

13    ANTWAN DAVIS,        ) No. 13 CR 13349-03
       ULYSSES POLK,        ) No. 13 CR 13349-04

14    CLIFTON LEMON, SR.,   ) No. 13 CR 13349-05
       DUAVON SPEARS,      ) No. 13 CR 13349-07

15          Defendants.   )

16

17                JURY TRIAL
                A.M. PART 2

18         REPORT OF PROCEEDINGS had before the

19    HONORABLE MICHAEL B. McHALE, on the 30th day of November,

20    2017, in Chicago, Illinois.

21

22

23

24    ELLEN DUSZA, CSR No. 84-3386
       Official Court Reporter
       773-674-6065

```
 1   APPEARANCES:
             HON. KIMBERLY M. FOXX,
 2           State's Attorney of Cook County, by:
             MR. THOMAS DARMAN,
 3           MS. YVETTE LOIZON,
             MS. ERICA DILLON,
 4           MS. MARGARET FLISK,
             MS. RIEBANA SACHS,
 5           MS. NINA KELLY,
             Assistant State's Attorneys,
 6           on behalf of the People;

 7           MR. GEORGE BECKER
             on behalf of Defendant Cornel Dawson;
 8
             MR. LAWRENCE WOLF LEVIN and
 9           MS. MICHELLE TRUESDALE,
             on behalf of Defendant Teron Odum;
10
             MR. RICHARD DVORAK,
11           on behalf of Defendant Antwan Davis;

12           MR. GEORGE BECKER and
             MS. DAWN PROJANSKY,
13           on behalf of Defendant Ulysses Polk;

14           MS. SABRA EBERSOLE and
             MR. JOSEPH VENDITTI,
15           on behalf of Defendant Clifton Lemon, Sr.;

16           MRS. AMY P. CAMPANELLI,
             Public Defender of Cook County, by:
17           MS. JENNIFER HODEL and
             MS. KATHRYN LISCO,
18           Assistant Public Defenders,
             on behalf of Defendant Duavon Spears.
19

20

21

22

23

24
```

2

1      THE COURT:  I have other allegations of racial

2    bullying I should ask 120 about and male chauvinist from

3    143.

4      MR. DARMAN:  I guess the point to the request is

5    Instruction 1.01 covers those issues.  Once the jury is

6    re-impaneled and re-sworn, they can be read 1.01 and

7    hopefully that will take care of any issues.  To go into

8    tit any further --

9      THE COURT:  I see your point.  Further questioning

10   really runs the risk of tainting the jury.  This just

11   could be a situation where tempers are flaring because

12   it's no fun to be a juror stuck in a hotel with no

13   television.

14     MR. BECKER:  Judge, if I could --

15     THE COURT:  1.01 does cover that.

16     MR. BECKER:  My problem, again, is the note used

17   racial profiling.  The comment from the juror was nothing

18   along that line.  Just like the first juror, the comment

19   was my brother and father are members of the Black Souls.

20   That didn't come out, nothing of that kind.

21     THE COURT:  No, something of that kind did come out.

22     MR. BECKER:  No, not Black Souls.

23     THE COURT:  She did say it.  She said, "I said if my

24   father were a Black Soul doesn't make me a Black Soul."

3

1　　Those words were very similar to what was written in the
2　　letter.
3　　　　　　The bottom line is I don't have to deal with
4　　that anymore, Mr. Becker, because she lied on her juror
5　　questionnaire.  That's why she's gone.
6　　　　MR. BECKER:  My point is the foreperson is bending
7　　and choosing with the language.  There was nothing in the
8　　comments that she made was anywhere close to racial
9　　profiling, yet the note said --
10　　　　THE COURT:  That has nothing to do with it.
11　　　　MR. BECKER:  Because racial profiling deals with
12　　these men.  I have never heard of anybody racially
13　　profiling against a white person.
14　　　　THE COURT:  You are going off the chart Mr. Becker.
15　　You are.  We're talking about one thing and you're
16　　talking about something completely different.  The first
17　　person No. 28 didn't even deal with racial profiling, so
18　　I don't know why you're going down that road.
19　　　　MR. BECKER:  Because the note deals with the three
20　　different things.
21　　　　THE COURT:  You are speculating now that the
22　　foreperson is making stuff up.
23　　　　MR. BECKER:  I'm not speculating, it's in the note.
24　　　　THE COURT:  No, you are speculating.

4

1       MR. DVORAK:  May I make a record, your Honor.  It is

2   a legal argument, your Honor.

3       THE COURT:  Briefly.

4       MR. DVORAK:  This year the U.S. Supreme Court has

5   decided for the first time ever that juror bias is the

6   one and only time that you can impeach the verdict.  So

7   what we are dealing with here is a situation where on the

8   one hand we are sort of compelled to find out about the

9   racial bias.  Okay?  On the other hand, that is going to

10  involve this Court making credibility determinations

11  about which juror is telling the truth.

12       It is irrevocable that you are going to be able

13  to resolve this.  However, my alternative argument is

14  because I think this should just stop right now, but

15  obviously, your Honor disagrees.

16       My alternative argument is I think all these

17  jurors should be -- I didn't believe 28 should be struck,

18  but to the extent you are striking jurors, you are

19  essentially choosing which ones to believe.  I think the

20  juror foreperson who wrote the note should be struck

21  because we now know that she didn't -- well, according to

22  the other jurors, she didn't tell the truth about what

23  happened.

24       THE COURT:  I disagree.

5

```
 1          MR. DVORAK:  The person who is alleged to have
 2     racial bias in this case should be stricken.  All the
 3     people mentioned in that note should be stricken.
 4     Alternatively to my initial argument is that this is a
 5     mess that cannot be resolved.
 6          Thank you.
 7          THE COURT:  Okay.
 8          MS. LISCO:  Judge, and if I may, on behalf of
 9     Mr. Spears.
10          As far as Juror No. 215, I think if the Court
11     has struck 28, to be consistent, we must strike 215.
12     215 has indicated to this foreperson, if you believe her,
13     that he is just here to send a message.  I think those
14     were her exact words as she was describing his exact
15     words or her exact words.
16          215 wanting to send a message has no bearing on
17     evaluating the evidence that was heard in this courtroom
18     and is improper.  It is improper to consider sending a
19     message when you are deliberating on evidence, real
20     evidence, and there were 800 exhibits and
21     100-and-some-odd witnesses, when those things are the
22     things you are supposed to be considering.  Irrelevant is
23     to send a message.  You need to evaluate evidence.  He
24     can't be fair or she, and we are asking that he be
```

6

1    stricken.

2         THE COURT:  We don't know that.  We don't know

3    whether or not, yet, he can be fair.

4         MS. LOIZON:  Judge, can we just make it clear for

5    the record one more time, however, that Juror 28 was

6    struck because she told a lie that was substantiated in

7    her own handwriting on a juror questionnaire that she

8    swore before this Court she would tell the truth on.

9    That's a far cry from someone making an offhand comment

10   during jury deliberations, and it is not comparable.

11        THE COURT:  I agree.

12        MS. LISCO:  And, Judge, had we been allowed to make

13   this record earlier, we would have said we don't know

14   what she said in her testimony when she was actually

15   being questioned on voir dire by all counsels.

16        THE COURT:  Doesn't matter.

17        MS. LISCO:  She may have clarified that issue.

18        THE COURT:  No, she said "No."

19        MR. VENDITTI:  Judge, during voir dire several

20   people --

21        THE COURT:  Find it and show it to me, then, because

22   I don't think so.

23        MR. BECKER:  Judge, when you have a witness that

24   says that they can be fair and impartial during

7

1   questioning and now they're saying they just want to send

2   a message, that have lied on the jury form, too, and they

3   lied in the questioning.

4       THE COURT:  We're done.  I've ruled.  I don't want

5   to hear anything else about 28.  You want to talk about

6   it, put it in writing.  I have ruled.  We are moving on.

7       MR. DVORAK:  Could I clarify?

8       THE COURT:  No.  Put it in writing.

9       MR. DVORAK:  I can't --

10      THE COURT:  Yes, you can.

11      MR. DVORAK:  -- it will be way too late.

12      THE COURT:  No.  I've ruled.  I'm not hearing any

13  more argument about it.  I've ruled.

14          I will be back.

15              (WHEREUPON, a recess was had.)

16      THE COURT:  Please bring out Juror No. 215.

17          I'm going to ask him exactly what he said.  I'm

18  not really looking for input at this point, folks.

19          Sir, could you have a seat right there.  If you

20  can remain standing for one moment, just raise your right

21  hand for me.

22              (Juror duly sworn.)

23      THE COURT:  Please be seated.

24          Obviously, this is a difficult situation.  I

8

1    want to ask you a few questions.  I'm looking for short

2    answers.  I'm trying to protect the integrity of the

3    whole process.  If I want to ask a follow-up, I will, so

4    if you can try to give me short answers.

5              Do you recall saying anything about sending a

6    message during the deliberations?

7         JUROR 215:  Yes.

8         THE COURT:  Given that statement, can you still

9    apply the evidence in this case to the law and in that

10   way decide the case and be fair to both sides?

11        JUROR 215:  Yes.

12        THE COURT:  Thank you.  That's all I have.

13             All right.  I need Juror 120 again, please.

14             Ma'am have a seat.

15             I'm just reminding you you are still under

16   oath.

17             Moving through the note, you have also

18   indicated that Juror 143 has been racial bullying and has

19   shown male chauvinism, correct?

20        JUROR 143:  Yes, sir.

21        THE COURT:  In the same manner starting with racial

22   bullying, could you tell me exact words.  Don't expand.

23   Just tell me exact words that you recall.

24        JUROR 143:  I can't recall exact words.  I'm sorry.

1   It has been over the course of yesterday and this

2   morning.  We kind of wanted to see how this morning went,

3   and it has not gotten better.

4        THE COURT:  The male chauvinism, is there anything

5   that you can recall exactly as to what he said regarding

6   that?

7        JUROR 143:  Like exact words?

8        THE COURT:  Yes.

9        JUROR 143:  I'm sorry.

10       THE COURT:  If you can't, you can't.

11            It seemed to me the answer you gave was

12  something -- you said you wanted to see if it had gotten

13  better and it hasn't.  Do you mean that specifically with

14  regards to him?

15       JUROR 143:  Yes.  Especially with the racial

16  profiling.

17       THE COURT:  So he has consistently been making

18  racial comments throughout the --

19       JUROR 143:  Yes.

20       THE COURT:  And has he also been making consistently

21  chauvinistic-type comments?

22       JUROR 143:  Not as much, but the racial profiling.

23       THE COURT:  More so?

24       JUROR 143:  Yes, sir.

10

1    THE COURT:  Would you say that was directed at other

2    jurors or the defendants or both?

3    JUROR 143:  Both.

4    THE COURT:  Okay.  Thank you, ma'am.  That's all I

5    have.

6         Juror No. 143 will be excused.  I'm not taking

7    any chances.  I believe her testimony was truthful.  Her

8    demeanor indicated she was truthful.

9         The second notation in this note regarding 215

10   was true about sending a message.  I did not excuse him

11   because he still indicated he could be fair.  I don't

12   think at this point given the history we have had with

13   Juror 143, he has been a terribly high-maintenance juror,

14   it's very clear he doesn't want to be here.  I'm not

15   going to -- I would expect just mere denials from him and

16   I'm not going to believe him at this point based on what

17   I've just heard from this foreman, and he's excused.

18        Let's have 120 out one last time, please.

19        I'm sorry.  While she is here, please have 143

20   removed and placed in the room in there after she is out.

21        Sorry.  It's a process.  Have a seat.

22        The only other person that you mentioned in the

23   note is toward the end of the note.  That is Juror 44.

24   I'm not sure if you know who I'm referring to.  It would

11

```
1   be the only other person.  Do you want to see the note?
2   I just don't want to say the name in court.
3        JUROR 120:  I understand.
4        THE COURT:  With respect to this person, do you
5   remember any exact words that he used?
6        JUROR 120:  No, not exactly.  I'm sorry.
7        THE COURT:  Was it on the same level as the last
8   person you told me about or less?  Like did he do it as
9   often or did he do it less?
10       JUROR 120:  The last person?
11       THE COURT:  143, you said consistently he was making
12   racial comments and chauvinistic comments yesterday and
13   today.  We were talking about 143 last time.  Do you
14   recall?  It was the last time you were here.
15       JUROR 120:  I'm sorry.
16       THE COURT:  I'm going to show the foreman her note
17   so we can clarify this and protect the integrity of the
18   names of the jurors.
19            So we have clarified that the only other person
20   on the note is Juror 44, and having shown you the note,
21   you know who I'm talking about, right?
22       JUROR 120:  Yes.
23       THE COURT:  Can you indicate regarding 44 what your
24   concerns were there?  Very short answer.  What did that
```

12

1    person do that gives you concern?

2         JUROR 120:  Basically insinuating the same goal in

3    trying to send a message, not --

4         THE COURT:  Very good.  Not racial.

5         JUROR 120:  Correct.  Not racial.

6         THE COURT:  That is what I needed.  Okay.  Thank

7    you.

8         JUROR 120:  Thank you.

9         THE COURT:  I think wish done with you.

10        JUROR 120:  Okay.

11        THE COURT:  I know it has been hard.

12        JUROR 120:  Okay.  Thanks.

13        THE COURT:  Now I need 44.

14             Good afternoon, sir.  Step right in there.

15   Remain standing and raise your right hand for me.

16                  (Juror duly sworn.)

17        THE COURT:  Please be seated.

18             I understand this is a very difficult

19   situation.  I'm just trying to get through it along with

20   you and all the others.

21             I'm going to ask you some questions.  I'm

22   looking for very short answers because I'm trying to

23   protect the integrity of the whole process.  If I want to

24   ask a follow-up, I will.  Keep your answers very short,

```
 1    if you could.
 2              Do you recall saying anything during
 3    deliberations about sending a message?
 4         JUROR 44:  I did not.
 5         THE COURT:  Sir, can you apply the evidence in this
 6    case to the law and in that way decide the case and be
 7    fair to both sides?
 8         JUROR 44:  Yes.
 9         THE COURT:  Okay.  Thank you very much, sir.
10              I will call the next two alternates.  Those are
11    Nos. 226 and 230.  Tell them that we need to get here
12    right away.
13         MR. WOLF LEVIN:  May we make a record as to the last
14    juror?
15         THE COURT:  Yes.
16         MR. WOLD LEVIN:  The fact that you now have a
17    conflict between the foreman and one of the jurors
18    because one of them obviously can't be telling the truth.
19              So my request of the Court is based on if the
20    Court believes the veracity of the foreman in this
21    matter, that this person be excused.
22         THE COURT:  Denied.
23         MS. LISCO:  Judge, one more thing on behalf of
24    Mr. Spears.
```

14

```
 1              There can be no fairness in this jury at this
 2    juncture.  This woman has now demonstrated to the jury
 3    back there that she has the ultimate power of getting rid
 4    of them if they don't vote her way.
 5         THE COURT:  That's not true.  Two people stayed and
 6    two people left.  Not true at all.  I'm off the bench.
 7    I'm going to call the alternates.  We need to move
 8    forward.
 9                   (WHEREUPON, a recess was had.)
10         THE COURT:  We are on the record.  All the
11    defendants and attorneys present?  Looks like they are.
12              I have called the two alternate jurors, and
13    they are in route.
14              Did the State want to say something?
15         MS. LOIZON:  Yes.  We just wanted to address some
16    procedural matters with the Court.
17         THE COURT:  Yes.
18         MS. LOIZON:  At this juncture, because the jury is
19    going to have to be re-sworn and start all over again, we
20    would request that the jury instructions and the
21    transcripts that were sent back to this particular jury
22    be removed from the jury room.
23         THE COURT:  I believe that has already been done.  I
24    will confirm.
```

15

1     MS. LOIZON:  If it hasn't, can we confirm that and

2  just put it on the record.

3     THE COURT:  Yes.

4     MS. LOIZON:  Also, so the record is clear, the

5  individuals who were excused, that their notes and

6  binders were also removed from the jury room.

7     THE COURT:  Okay.

8     MS. LOIZON:  Then just looking ahead, when the

9  alternates who are now going to become part of the jury

10  are brought in, we would ask that they are voir dired

11  about whether or not they have had any exposure to

12  anything that they should not be seeing as regular

13  jurors.

14     THE COURT:  Ultimately, if they read an article or

15  saw an article, the ultimate question would be, despite

16  that, can you still be fair to both sides.

17     MS. LOIZON:  Correct.  We just want to make sure

18  that they are voir dired.  When the jury is re-sworn, we

19  would request that all the instructions be reread to that

20  jury and that one set of jury instructions be sent back

21  unless if they ask for additional ones, as they

22  previously have done.

23     THE COURT:  Why?  Why would you want one back there?

24     MS. LOIZON:  It's a newly constituted jury.  Judge,

16

1    we didn't send individual jury instructions back until

2    they requested them.  I do believe that they all -- the

3    jury instructions should orally be reread to the jury

4    since it is a newly constituted jury.

5         THE COURT:  No, I'm not going to do that.  I read

6    all of them while the alternates were sitting here.  All

7    of the alternates heard the jury instructions.  I'm not

8    going to do that again.  I think there is no problem with

9    them having 12 sets of jury instructions.  It makes

10   sense.  It was asked for by the majority of the jury, and

11   they should have 12 sets of instructions, just like this

12   jury initially asked for.  That last request is denied.

13        MS. LOIZON:  That would be all we have.

14        MR. BECKER:  On behalf of Mr. Dawson --

15        THE COURT:  Mr. Becker, can I ask you?  Do you

16   remember what your last argument was before we broke?  If

17   you don't, it's okay, but I --

18        MR. BECKER:  I made several today, so I'm not

19   exactly sure.

20        THE COURT:  Go ahead.

21        MR. BECKER:  If I go backwards, the one thing I

22   would ask is if you are going to leave 12 sets of jury

23   instructions back there, there be at least two clean

24   copies given, because there is two jurors who may or may

17

1    not have written on theirs that you have let go.

2          THE COURT:   Let me just say I did ask the jurors to

3    mark their jury instructions with the number on the top,

4    I believe.  Didn't I?

5          MR. MAHER:   Yes.

6          THE COURT:   We will make an effort to remove those

7    and get clean sets.

8          MR. MAHER:   Can I address that?

9             What we're seeking is all of them come back and

10   all of the notes, because those were notes taken during

11   this deliberation --

12         THE COURT:   All of the jurors' notes come back?

13         MR. MAHER:   Yes, Judge, from the deliberation.  And

14   the copies they have of the jury instructions because --

15   hear me out please.  Those notes would reflect portions

16   or their notes from the deliberations from the previous

17   jury, and so we want to remove those, give them new

18   instructions as the Court said, and then any notes they

19   take down will be part of the deliberations of this fresh

20   reconstituted jury.

21         MS. HODEL:   We would concur, Judge, as to Spears.

22         THE COURT:   I want to make sure I understand what

23   you are saying.

24            The notes they had during trial, they can keep?

18

1    MR. MAHER:  Yes.

2    THE COURT:  And somehow, any notes that were taken

3    during deliberations will have to be -- how would you

4    suggest that happens?  Ask each individual juror which is

5    which?

6    MR. MAHER:  Well, the instructions they have with

7    their numbers on it --

8    THE COURT:  The instructions are fine.

9    MR. MAHER:  All of the jurors give all of their

10   notes.  They go.  Because those are notes from

11   deliberations with members who are no longer part of the

12   jury.  They are going to have to start over in the

13   deliberations, so they should start with fresh notepads,

14   fresh instructions, and start over.

15   THE COURT:  Were they given fresh notepads for

16   deliberations?  No, they were not.  I think many of them

17   are using the same books they had for the two-and-a-half

18   months of trial.  So if you're suggesting by ripping out

19   the pages -- there is no way to do that.  That's not

20   practical.  The jury instructions, yeah, sure.

21   MR. MAHER:  That's what we're talking about.

22   MS. LOIZON:  We're talking about the jury

23   instructions that they were individually given and any

24   notes that they wrote on those particular jury

19

1    instructions.

2              So we made copies of -- every juror got their

3    own set of jury instructions.  We are asking you to have

4    all of those returned back to the Court.

5         THE COURT:  What is the theory there?  I mean they

6    certainly -- some of them have made progress at least in

7    terms of their understanding of the jury instructions.

8         MS. LOIZON:  Judge, they have to start over.  They

9    have to start over.  It is a newly constituted jury.

10        THE COURT:  They will start over.

11        MR. BECKER:  Judge, I haven't agreed with the State

12   a lot in this, but thinking it through, I agree with

13   them.

14        THE COURT:  Fine.  Fine.  Make 12 more sets of jury

15   instructions.  Just do that.  We'll do it since both

16   sides agree.

17        MS. LOIZON:  Thank you, Judge.

18        MR. BECKER:  Judge, as we stand here at this

19   juncture, several things.  If, in fact, these two new

20   jurors -- or alternates are going to be brought in, I

21   don't think you can simply just say would you be

22   prejudiced if you have read something?  If they indicate

23   they've read or heard something, they have to be excused.

24        THE COURT:  Can we just take it as it comes, please?

1     MR. BECKER:  The reason I'm going to tell you why on

2     that is as we sit here, this jury has been sequestered.

3     I'm already concerned the sequestering of the jury has

4     been broken by being brought out here and questioned.

5     Just like I am concerned, and I know it was touched on by

6     co-counsel toward the end.  One of two things is going to

7     happen with this woman who is the foreperson.  She is

8     either totally empowered now or she is going to have zero

9     power, because either she is -- they are going to have to

10    reelect a new foreperson, but they know that she wrote a

11    note that got at least two jurors removed.

12        THE COURT:  It wasn't just her, by the way, it was

13    another juror.  And she said -- the note says, "Myself,

14    Juror No. 40, and others," was what the note said.

15        MR. BECKER:  I understand that.  But it shows the

16    power that she has to those people back there.

17        THE COURT:  It may or may not, Mr. Becker.

18        MR. BECKER:  Based on that, Judge, I just don't

19    believe at this juncture we can go forward.  I think the

20    jury is totally tainted.  There needs to be a mistrial

21    declared.  I don't think it can be resolved at this point

22    by bringing in two fresh jurors.

23        THE COURT:  I do, so we will.

24        MS. LOIZON:  Can I clarify one point?

21

1          THE COURT:  Yes.

2          MS. LOIZON:  With respect to what we're requesting

3     that the jury send back out of the jury room, we would

4     also ask that the transcripts that were provided them for

5     Lawrence Hale and Learies Brown also be sent back out,

6     because this is a newly constituted jury.  If they want

7     to request transcripts, they should do that fresh as

8     opposed to taking what was left over from what the other

9     jury requested.

10         THE COURT:  Okay.  If you're being consistent and

11    you're all agreeing that all the jury instructions come

12    out and be replaced, then I guess that's what we'll do.

13    If they want to ask for them again, it's a simple

14    question of sending a note and we'll send them back.

15         MS. LOIZON:  Correct.

16              Judge, one other thing that we want to be clear

17    on, because again, this is a newly constituted jury, we

18    would expect that they would be instructed to choose a

19    foreman.

20         THE COURT:  Yes.  Sounds like both sides agree to

21    that, right?  Okay.

22              I will explain to them when the two jurors

23    arrive to bring them out.  I'll explain to them that

24    under the circumstances, the law requires that they now

22

1    begin their deliberations again and that they should

2    select a foreperson in the same manner that they did

3    before by electing one and begin their deliberations

4    anew.

5              All right.  That's what we'll do.

6         MR. DVORAK:  Judge, now that we are making records,

7    since before I was not allowed to.

8         THE COURT:  Yes, I know.  You are now.

9         MR. DVORAK:  I'm not sure if it was clear before,

10   but I want to make the record clear that I was initially

11   asking for a mistrial.  Alternatively, I think before the

12   questioning of those two jurors who both said that

13   they -- one denied saying he was going to send a message

14   and the other one admitted it.  I think both of them

15   should have been stricken from the jury.  I think your

16   Honor credited the foreperson when she said that the one

17   person was racist without even asking that person whether

18   he was racist.  I don't have a problem with getting rid

19   of him, obviously, but then when the other person denied

20   that he said those things, we are not crediting what she

21   said.

22             Either way, saying, "I'm here to send a

23   message" would be improper if a prosecutor said it in

24   closing argument, yet we are going to allow two jurors to

1    be -- we're okay with two jurors saying we want to send a

2    message?

3              Your Honor asked him, "Can you be fair?"  Your

4    Honor didn't ask that about Juror 28.

5         THE COURT:  I didn't have to.  She lied on her jury

6    questionnaire.  Stop it.  We already dealt with 28.  I'm

7    not going there again.  I made it very clear.  I don't

8    want another attorney to say a word about Juror 28.  If

9    you want to say something, you put it in writing.  I'm

10   done with that.

11        MR. DVORAK:  I'm not allowed to make a record on

12   that?

13        THE COURT:  No, you're not.  You're done.

14        MR. DVORAK:  Thank you.

15        MS. LOIZON:  May we respond to counsel's argument?

16        THE COURT:  Yes.

17        MS. LOIZON:  In this particular case, I find it

18   absolutely astounding that this argument is coming from

19   Mr. Dvorak in light of the fact that he stood in front of

20   this jury and argued for nullification in violation of

21   your court order.

22        MR. WOLF LEVIN:  Objection.

23        THE COURT:  Overruled.  Just let her finish making

24   the argument.

1    MR. WOLF LEVIN:  Not as to the characterization,

2    Judge.

3    THE COURT:  You can respond later, Mr. Levin, if you

4    want to.

5        Go.

6    MS. LOIZON:  Comments like "I'm trying to send a

7    message" or anything related to that are opinions that

8    jurors are allowed to have during deliberations.

9    Frankly, Judge, it is not a stretch to note that that can

10   be commentary resulting from the arguments that were made

11   by the Defense attorneys themselves about sending a

12   message to the Chicago Police Department and the State's

13   Attorney's Office about our alleged conspiracy.

14       So to the extent that we're going to make an

15   assumption that that's sending a message to the

16   defendant, I think there's no basis for that.  In fact, I

17   would argue that you can make that assumption on the

18   other side based on the flagrant and inflammatory

19   arguments that were made before this jury.

20       And I think that's something that absolutely

21   needs to be pointed out for the record.

22   THE COURT:  Very well.

23   MR. DVORAK:  Am I allowed to respond to that?

24   THE COURT:  Anything else, Ms. Loizon?

25

1     MS. LOIZON:  No, Judge.  That's plenty.

2     THE COURT:  Sure, Mr. Dvorak.  Go ahead.

3     MR. DVORAK:  The idea that I asked for a jury

4  nullification on a case where I pointed out the vast

5  insufficiency of the evidence as it applies to the law is

6  just preposterous.

7     THE COURT:  Okay.  The record will bear out whatever

8  you said.

9     MR. DVORAK:  Second of all, with regard to that same

10  juror, Juror No. 28, during voir dire --

11     THE COURT:  We are not going down 28.  We are done

12  with 28.

13     MR. DVORAK:  May I please make a record on that?

14     THE COURT:  No.  No.  We have already gone over

15  this.  We are done with 28.  That ruling stands.  Put in

16  a motion to reconsider or something.  We're done.

17     MR. DVORAK:  Thank you, your Honor.

18     THE COURT:  I will go make sure that all of the

19  things we agreed on were taken care of.  I'll make sure

20  that all of the evidence has been removed, all of the

21  notes have been removed, that all of the jury

22  instructions have been removed, and that the two that

23  were excused, that they be set aside so that there is no

24  risk they go back.

26

1    MS. LISCO:  Your Honor, the easel should be wiped

2    clean so that they can continue to start fresh.

3        THE COURT:  Okay.  Okay.

4        MR. BECKER:  I just want to know one thing for

5    clarification.  The jurors have been told right now --

6    are instructed not deliberate?

7        THE COURT:  Yes, I sent them a note.  Mr. Becker, at

8    the point that you said it, a note was written right

9    away -- I believe I put that on the record -- and then we

10   sent it back.

11       MR. BECKER:  I'm sorry, my blood pressure was up.

12       THE COURT:  That's okay.  I'm sure all of our blood

13   pressure is up today.

14                (WHEREUPON, a recess was had.)

15       THE COURT:  There have been more developments in

16   this rather unusual jury trial.

17            Juror No. 34 is being taken by ambulance to the

18   hospital.  She lost consciousness.  Her eyes rolled back

19   in her head.  She appears to be having a very difficult

20   time breathing.  I have excused her.  The other

21   alternate, 263 has been called, and he is en route.

22       MR. DVORAK:  I make a motion for a mistrial.

23       THE COURT:  Sure.  Denied.

24            That is not it.  We have another note.  Just a

27

1    second.

2              The note reads as follows -- we got this at

3    2:45, it's about 3:00 now.

4              "Hello, Judge McHale.  Juror No. 40 would like

5    to know your response on her request of being removed

6    from the jury.  Thank you, Juror 120 and Juror 40."

7              There has been no request for her to be removed

8    from the jury.  No such request has been made, and that's

9    what I intend to respond.  I don't know what that's going

10   to bring next, but there has not been a request for her

11   to be removed.

12        MS. LISCO:  Judge, I would object to that and would

13   ask --

14        THE COURT:  Louder.

15        MS. LISCO:  I object to that and would ask the Court

16   not respond to that question in that there has been no --

17   as the Court pointed out, there has been no indication

18   that anybody wants to remove 40.  I don't think that that

19   answer needs to be given.

20        THE COURT:  What do you think is going to happen

21   when she gets no response from the Court?

22        MR. WOLF LEVIN:  If you don't respond, Judge, you're

23   going to get another note and they'll want to know why.

24   Subsequently, on behalf of Mr. Odom, I would indicate to

1     the Court that we would just ask a response be given in

2     whatever manner and form.

3          THE COURT:  That's my concern.  I think a

4     nonresponse is a slap in the face.  She's asking a

5     question, she deserves an answer, even though there has

6     been no request.  I think not to respond would be

7     inappropriate.

8               My proposed response is the Court is -- there

9     has been no request.

10         MR. DVORAK:  I would agree with that.

11         MR. MAHER:  How about is unaware of any such

12    request, in case they -- I don't know.

13         MR. WOLF LEVIN:  If I may, Judge, I think the

14    suggestion would be that there has been no such request.

15    That's sufficient on its face.

16         THE COURT:  There has been no such request.  That's

17    what I'm going to say.

18         MR. DARMAN:  There's going to be another note.

19         THE COURT:  There's going to be another note either

20    way.

21         MR. BECKER:  Although this may be a bad time to ask

22    you, is it possible to get daily copy of today's

23    transcript?

24         THE COURT:  No.  What is it going to lead to?  No.

```
 1          MR. BECKER:  All right.

 2                  (WHEREUPON, a recess was had.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

30

1        MS. LISCO:  Can we request, please, that you reread

2    that note, because it doesn't make so much sense --

3        THE COURT:  The note already went back.  I already

4    wrote the response I indicated on the record, and it is

5    already in the back.  I don't have it.

6        MS. LISCO:  Can we have the court reporter read it

7    back.

8        THE COURT:  At this time, no.  We've already talked

9    about it.  No one disagreed with the response.  The

10   response got sent back.

11       MS. LISCO:  It's just that it doesn't make sense.

12       THE COURT:  Well, it's a little late to be saying

13   that, Ms. Lisco.  We've already made our decision.  We've

14   done what we've done.

15           I want the State to go grab your 12 copies of

16   instructions and make sure they are in order because the

17   clean copies you gave me are not in order.  They are on

18   the chair.  Go grab them.  The verdict forms are not in

19   order.

20       MR. DARMAN:  Was it just the verdict forms?

21       THE COURT:  On my copies, it's just the verdict

22   forms.

23       MR. DARMAN:  Okay.

24       THE COURT:  I'm correcting them putting them in

31

1    order.

2           Here is the note we all expected.  This is

3    really interesting.  Reminding everybody that the long

4    note earlier from today was from Juror 120 and Juror 140.

5    So now this says:  "Hello, Judge McHale.  Juror 40 [sic]

6    and 120 would like to be removed due to a letter received

7    earlier today."  I think they mean their letter received.

8    Sent?  I'm not sure.  "With the instructions given to us

9    in part of completing our civic duty, we personally feel

10   the instructions are structured in a style to come to one

11   verdict, and we can't complete our civic duty due to

12   that."

13          Let me just highlight the words that I think

14   are important here.  "The instructions," jury

15   instructions, "are structured in a style to come to one

16   verdict, and we can't complete our civic duty."

17          I think it's obvious to this Court that what

18   they are saying is we cannot follow the law.  And they're

19   off.  You can make any objections you want.  120, 140 are

20   off.  I'll call the other alternates, and we're going

21   from there.

22      MS. LISCO:  Judge, we're asking that they be voir

23   dired at least.

24      THE COURT:  No.

1    MR. DVORAK:  Can we make a record?

2    THE COURT:  Later.

3              (WHEREUPON, a recess was had.)

4    THE COURT:  I broke to call the next two alternate

5    jurors.  I assume somebody wants to make a record.

6    Anybody?

7    MS. LISCO:  Judge --

8    MS. LOIZON:  Judge --

9    THE COURT:  Let's start with the State and then

10   we'll go with the defense.

11   MS. LOIZON:  Judge, with respect to the two jurors

12   who sent the most recent note, it would be the People's

13   position that excusing them without further questioning

14   is imprudent and I would call this Court's attention to

15   two cases.  People versus Runkey (phonetic), which is

16   234 Ill.2d 68, and People versus Nelson, which is

17   235 Ill.2d 386.  I think both of those cases --

18   THE COURT:  Hold on.

19              (WHEREUPON, there was a short

20              interruption.)

21   THE COURT:  Excuse me for leaving the bench.  That

22   was an alternate juror, and I had to make arrangements.

23   I also may have to leave the bench as they are coming

24   back to the courthouse.  I know everyone wants to make a

33

1    record.  We'll eventually get to all of you.

2          If you can give me minute to go through these

3    jury instructions, I was just collating them, and then I

4    will let everybody make a record.

5          State I believe you were mid argument when I

6    had to leave to take the phone call from the alternate

7    juror.  Do you wish to continue?

8      MS. LOIZON:  Judge, to recap, I think at this

9    juncture, excusing jurors based on commentary in a note

10   would be imprudent.  I think the case law regarding

11   impanelling alternate jurors does suggest that some

12   questioning is certainly warranted.  Based on the

13   circumstances of that note and, you know, what has

14   frankly gone on this whole day, I would urge you to ask

15   some questions before you dismiss those jurors.

16         Actually, one question, namely whether advising

17   them that the jury instructions are the law that they are

18   required to follow and whether or not they can do it.

19     THE COURT:  I appreciate your comments, and your

20   request is denied.

21         Does any other Defense want to make any

22   comments?

23     MR. DVORAK:  I would agree with the State.

24     MS. LISCO:  We agree with the State.

1      THE COURT:  So noted.

2      MR. DVORAK:  I also want to make a motion for

3  mistrial and object --

4      THE COURT:  Of course you do.  Denied.

5          We'll see you when the alternate jurors get

6  here.  I believe all the arrangements have been made.

7          Did you check the jury instructions, State?

8      MR. DARMAN:  We will.

9      THE COURT:  Let me know when you've got them.  I

10 have the originals here.

11              (WHEREUPON, a recess was had.)

12              (Whereupon, the reporter was relieved and

13              the following proceedings were reported by

14              Court Reporter Kristen Parrilli.)

15

16

17

18

19

20

21

22

23

24

```
1    STATE OF ILLINOIS    )
2                         ) SS:
3    COUNTY OF C O O K    )
4         IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
5             COUNTY DEPARTMENT - CRIMINAL DIVISION
6
7         I, Ellen Dusza, Official Court Reporter of the
8    Circuit Court of Cook County, County Department, Criminal
9    Division, do hereby certify that I reported in shorthand
10   the proceedings had on the hearing in the aforementioned
11   cause; that I thereafter caused the foregoing to be
12   transcribed into typewriting, which I hereby certify to
13   be a true and accurate transcript of the Report of
14   Proceedings had before the HONORABLE MICHAEL B. McHALE,
15   Judge of said court.
16
17                         _____
18                         Official Court Reporter
19                         Ellen Dusza, CSR 84-3386
20                         Circuit Court of Cook County
21
22
23
24   Date:   December 1, 2017
```

36

**Injustice Watch** | (https://www.injusticewatch.org/news/2018/defense-attorneys-contend-cook-county-judge-seeking-retention-michael-mchale-showed-bias/)

## News

# Defense attorneys contend Cook County judge seeking retention showed bias

By **Jeanne Kuang**, **Caroline Riordan** and **Duohao Xu** | September 20, 2018

Cook County Circuit Court Judge Michael McHale, a candidate to retain his seat in November, had improper contacts with prosecutors during a murder trial last year, four defense attorneys allege in filings.

The misconduct allegations involve the way McHale handled the murder trial involving the October 2012 shooting of a South Shore man, 74-year-old William Thomas.

The case was among several controversial actions by McHale, identified as part of an *Injustice Watch* review of the record of all 60 judges who will be on the ballot in November for new six-year terms.

✉ johnsmith@example.com          **Sign me up**

McHale, a former veteran prosecutor, has enjoyed a good reputation. In 2005, he was inducted into the Chicago LGBT Hall of Fame for his "political activism, neighborhood organizing, and professional achievement" as an openly gay assistant state's attorney.

He joined the bench in 2006 and has received favorable evaluations from the bar associations; in 2012, the Chicago Council of Lawyers reported he was considered "fair and honest" and was "considered to have an outstanding temperament, remarkable patience and an excellent work ethic."



*cookcountyjudges.org*

*Cook County Circuit Court Judge Michael McHale*

But the *Injustice Watch* review of McHale's most recent six years on the bench revealed a contrasting picture.

The review identified 12 times in the past six years in which McHale's decisions were overturned by a higher court, including repeated instances of convictions reversed because McHale improperly prevented the defense from challenging the police version of arrests. He sentenced one defendant to prison for more than a decade for stealing less than $50 in loose change from a vending machine. He convicted another defendant on drug charges based on drugs that were found in a house, but it was never proven that it was the defendant's house.

And in a landmark gang conspiracy trial now on appeal, defense attorneys contend that McHale was wrong in his handling of allegations of racial bias during deliberations

"This man is unfit to sit in the criminal division," said defense attorney Ronald Draper.

McHale failed to respond to repeated messages. His office referred questions to a spokeswoman for the Committee for Retention of Judges in Cook County, who also did not respond to a request for comment.

Draper represented Malcolm Terry, one of four defendants charged in the death of Thomas. Terry was accused of providing the murder weapon and serving as a lookout; he went on trial in 2017 along with the accused gunman, Akeem Simmons. The other two defendants had their trials delayed, and were called as witnesses against Terry and Simmons; both were promised limited immunity that ensured what they truthfully testified in court could not be used against them.

When the two refused to testify even under limited immunity, McHale held the two in contempt of court and ordered them held in solitary confinement at the Cook County jail.

Terry's aunt, Leah Thigpen, would later submit an affidavit stating that she had overheard McHale discuss the case during jury selection with Cook County Assistant State's Attorney C. Thor Martin without Terry or his attorney present.

Thigpen stated she heard McHale referring in a loud voice to "this code of silence bullshit I'm sick of," and also heard the judge saying, "this won't matter at sentencing." Thigpen also wrote in her statement that the prosecutor and judge discussed Terry's failure to come to court over an incident that occurred between Terry and a guard. The prosecutor told the judge, according to Thigpen's affidavit, that he did not believe the defendant, and McHale responded, "I don't believe him either."

Martin, who prosecuted all four defendants' cases, declined to comment on the case through the State's Attorney's office.

Legal ethics experts interviewed by *Injustice Watch* said the discussion, as described by Thigpen, appeared improper. "There should be no pre-formed opinion of the case, of the outcome of the case, of the sentence, before trial has even begun," said Rebecca Roiphe of the New York Law School.

After the two refused to testify, McHale granted the prosecutors a delay in the trial to introduce new evidence. That Friday, Martin filed a motion to introduce notes that Terry was said to have received in jail, which Martin contended showed Terry influencing co-defendants and potential witnesses.

Then on Saturday, Martin sent an email that included another motion, seeking to introduce evidence of four recordings of conversations Terry had while in jail. The email also included audio files of the recordings.

McHale responded by email that Sunday stating that he listened to the calls and found the prosecutors' descriptions accurate, but could not find an additional recording that Martin cited in his motion. The email exchange included Terry's attorney, Draper, but not the attorneys for the other defendants.

Richard Painter, an expert on legal ethics at the University of Minnesota Law School, called the prosecutors' direct email communications with McHale, rather than through filings with the clerk, "unusual."

The communications were included among defense attorneys' complaints about the trial.

In his May response to a motion for a new trial, prosecutor Martin denied all of Terry's "many boilerplate allegations and some more specific allegations of error" without addressing the communications specifically.

Draper said in an interview McHale prevented him from putting on a proper defense.

Following their convictions, Terry was sentenced to 50 years in prison for murder, and Simmons to 65. Their convictions are being appealed.

This February, as co-defendants Aramis McKinzie and Garlin Minor faced their own trials, both filed motions asking that McHale be removed from the case, contending that the judge's alleged comments about defendants who do not testify showed, as the assistant Cook County public defender Caroline Glennon wrote, "actual bias."

The state offered McKinzie and Minor a deal before the motion was ever heard. The motions were withdrawn two days after they were filed. McKinzie and Minor both pleaded guilty to the reduced charge of conspiracy to commit murder, and were sentenced to 10 years each in prison.

**Record of reversals**

McHale's decisions have been overturned in part or fully reversed 12 times in the last six years. In three cases, the appellate courts reversed convictions because McHale improperly restricted the defense's ability to contest the police account of events.

In two of them, the court ruled, McHale was wrong to bar the defense in drug prosecutions from learning the precise location of the officer who observed the alleged transactions. In a gun case, McHale erred in permitting the state to introduce an affidavit from an officer stating the defendant did not have the gun registered, rather than calling a witness who could be

*Cook County Criminal Courthouse*

questioned by the defense.

In 2016, an Illinois panel overturned the sentence of Henry Busse, whom McHale sentenced to 12 years in prison for burglary from a school, after he was found with $44 in quarters taken from a vending machine in a University of Illinois building.

Hoping to deter a "career thief," McHale told Busse that since "nothing up to this point has made an impression upon you, maybe my twelve-year sentence will make an impression on you."

By a 2-1 vote an Illinois appellate court panel called the decision "anomalous and absurd" and "grossly disproportionate" to the crime, noting that Busse's crimes were neither violent nor serious.

"A paltry crime for a paltry sum does not warrant the unpaltry sentence of 12 years," wrote Justice Michael B. Hyman, finding McHale had abused his judicial discretion. The appellate panel reduced the sentence to 6 years, the minimum sentence.

**A contentious jury**

Last year McHale presided over a ten-week high-profile trial. Six men were tried under the state's new anti-racketeering law, accused of running a violent criminal enterprise on Chicago's West Side as leaders of the Black Souls gang.

The jurors were anonymous, their names kept from the attorneys to avoid any possible pressure. They were sequestered – ordered to stay together, and away from outsiders – as they were sent to deliberate.

Tensions in the jury room quickly became apparent. The jury forewoman and a second juror sent a note complaining of racist and sexist comments.

McHale questioned jurors and dismissed two members but permitted two others to remain.

The jurors went back to deliberating, but then came another note: the forewoman and the second juror believed the jury instructions were "structured in a style to come to one verdict, and we can't complete our civic duty due to that."

Without questioning them, McHale ordered the two dismissed: "I think it's obvious to this Court that what they are saying is we cannot follow the law."

The judge refused to grant a mistrial. And after the jury had convicted the defendants on racketeering conspiracy and drug conspiracy charges, McHale refused to allow defense attorneys to send investigators to interview the dismissed jurors, who remained anonymous, defense attorneys said. "I had never seen a case where the judge was so disinterested in finding out the truth about what occurred in his jury," Dvorak said.

Not all defense counsel agree. One, Lawrence Levin, said the case was complicated, and that McHale had done "a good job with a very, very difficult situation."

The dismissed juror, Zerlina Smith, who joined the forewoman in her concerns, was not done. Smith, a West Side activist, spoke to the sister of Dvorak's client, Antwan Davis. Davis's sister prepared an affidavit, detailing racist comments that Smith said had taken place in the jury room.

*Jeanne Kuang / Injustice Watch*

*Zerlina Smith, pictured in her West Side neighborhood, speaks with reporters about her allegations of racism in the jury room in a murder trial before Judge Michael McHale*

McHale again refused to let attorneys speak to Smith, who later showed up for a hearing prepared to detail her concerns in court. McHale again did not allow her to speak.

In May he sentenced all six men to life in prison. The case is being appealed.

In a recent interview with *Injustice Watch,* Smith described a chaotic jury deliberation in which, she said, jurors threw chairs and used racist slurs in an effort to persuade her to vote to convict. "It was a one-sided paper, it was a setup for guilty," Smith said.

She added of McHale: "The judge already had his mind made up from day one."

# Petition to U.S. Supreme Court for Writ of Mandamus

IN THE
SUPREME COURT OF THE UNITED STATES

Case No. ___12-6561___

*In re* DR. LINDA LORINCZ SHELTON, *Petitioner*

DR. LINDA LORINCZ SHELTON,
*Defendant - Petitioner,*

v.

UNITED STATES SUPREME COURT CLERK,
ILLINOIS SUPREME COURT,
ILLINOIS APPELLATE COURT FIRST DISTRICT,
CIRCUIT COURT OF COOK COUNTY
AND JUDGE MICHAEL MCHALE,
*Plaintiff - Respondent.*

## MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS*

The Petitioner has previously been granted leave to proceed in forma pauperis in the following court regarding this case: The Circuit Court of Cook County

Petitioner's affidavit or declaration in support of this motion is attached hereto.

*Dr. Linda Lorincz Shelton*

Dr. Linda Lorincz Shelton

# Petition to U.S. Supreme Court for Writ of Mandamus

IN THE
SUPREME COURT OF THE UNITED STATES

---

*Case No.* _____

---

*In re* DR. LINDA LORINCZ SHELTON, *Petitioner*

---

DR. LINDA LORINCZ SHELTON,
*Defendant - Petitioner,*

v.

UNITED STATES SUPREME COURT CLERK,
ILLINOIS SUPREME COURT,
ILLINOIS APPELLATE COURT FIRST DISTRICT,
CIRCUIT COURT OF COOK COUNTY
AND JUDGE MICHAEL MCHALE,
*Plaintiff - Respondent.*

---

## Petition for Writ of Mandamus

---

LINDA LORINCZ SHELTON
9905 S. Kilbourn Ave
Oak Lawn, IL 60453-3539
(708) 422-9040

*Petitioner, Pro Se*

0

## QUESTIONS PRESENTED FOR REVIEW

1.  May the United States Supreme Court Clerk refuse a habeas petitioner the right
    to file a Petition for Certiorari to review a denial by the Cook County Circuit
    Court of a Petition for Writ of habeas Corpus, allegedly for failure to exhaust
    state remedies, despite the fact that the Illinois Supreme Court illegally barred
    her from filing any documents (thus waiving the State of Illinois' right to insist
    on exhaustion of state remedies), that the Illinois Appellate Court dismissed
    direct appeal due to failure to pay fees, after denying petition for in forma
    pauperis status of indigent defendant without explanation in defiance of Illinois
    Supreme Court [indigency] Rule 298 and previous United States Supreme Court
    holdings in *Smith v. Bennett* and *Marshall v. Bennett,* 365 U.S. 708, 81 S.Ct. 895
    (1961), and that this refusal is in violation of the United States' Supreme Court
    holdings and dicta in the following line of cases, which stated that, in Illinois
    due to there being no method to appeal a denial of a Petition for Writ of Habeas
    Corpus by a local County Court [appeal to Illinois Supreme Court is not
    available] that the only possible direct appeal lies with the United States
    Supreme Court: *Young v. Ragen,* 337 U.S. 235, 69 S.Ct. 1073 (1949), *People v.
    Loftus,* 400 Ill. 432, 81 N.E.2d 495 (1948), in response to order of Court in *Loftus
    v. People of State of Illinois,* 334 U.S. 804, 68 S.Ct 1212 (1948); *Woods v.
    Niersheimer,* 328 U.S. 211, 66 S.Ct. 996 (1946); *White v. Ragen* and *Lutz v. Same,*
    324 U.S. 760, 65 S.Ct. 978 (1945)?

2.  May the Illinois Supreme Court bar an indigent, disabled, criminal defendant
    from filing in their court any Petition or Motion (including complaint for
    supervisory order, habeas petition, or mandamus) because she did not pay three
    previous fees in petitions for supervisory orders, for which she applied for in
    forma pauperis status as an indigent, disabled, person, on government approved
    SSI, and was denied in forma pauperis status without explanation in each case
    and the Illinois Appellate Court dismissed direct appeal due to failure to pay
    fees, after denying petition for in forma pauperis status of indigent defendant
    without explanation, in violation of *Smith v. Bennett* and *Marshall v. Bennett,*
    365 U.S. 708, 81 S.Ct. 895 (1961) and Illinois Supreme Court [indigency] Rule
    298, as well as the due process clause under the Fourteenth Amendment?

3.  May the Illinois Appellate Court dismiss a criminal appeal because the indigent,
    disabled, defendant, on government SSI, did not pay filing fees, after the Illinois
    Appellate Court denied application for in forma pauperis status, without
    explanation, in is this a violation of *Smith v. Bennett* and *Marshall v. Bennett,*
    365 U.S. 708, 81 S.Ct. 895 (1961) and Illinois Supreme Court [indigency] Rule
    298 as well as the due process clause of the Fourteenth Amendment?

4.  Does the fact that there is no statute or rule in Illinois allowing direct appeal of
    denial of a petition for writ of habeas corpus from county court require that the

only appeal available goes directly to the U.S. Supreme Court as per previous U.S. Supreme Court holdings in line of cases *Niersheimer, Regan, and Loftus*[1]?

5. May the Circuit Court of Cook County find a person in criminal contempt of court because they filed a next-friend habeas petition as a **non-attorney** or is this a violation of the suspension clause, Illinois Habeas Statutes, 735 ILCS Article X, and United States Supreme Court holdings and dicta in *Boumediene v. Bush*, 553 U.S. 723, 128 S.Ct 2229 (2008) and *U.S. ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct 1 (1955), as well as the due process clause under the Fourteenth Amendment?

6. May the Circuit Court of Cook County find a person in criminal contempt of court because the Defendant vigorously verbally defended her filing of a next-friend habeas petition by stating that the judge's decision that such filing is illegal is an act of treason per *U.S. v. Will*, 449 U.S. 200 (1980) which affirmed the statement of Chief Justice Marshall in *Cohens v. Virginia*, 6 Wheat. 264, 5 L.Ed 257 (1821) that it is "treason on the constitution" when a judge "usurps [the jurisdiction] that which is not given" – referring to acting outside the law or violating the law including statutes and higher court holdings; and that it is a "war on the constitution" when a judge violates his oath of office to support it [including supporting statutes of a state due process], *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401(1958) or is this vigorous defense allowed under the Court's holding in *Sacher v United States*, 343 U.S.1 (1952)?

7. May the Circuit Court of Cook County summarily sentence a defendant to 16 months in jail as a result of consecutive sentences on three separate "cases" [defendant alleges "counts"] of criminal contempt, brought during one extended hearing, with one sentence being imposed on a day other than the day of alleged contempt, summarily without notice, representation by counsel, or any opportunity for a trial with full due process rights in violation of United States Supreme Court holdings *Bloom v. Illinois*, 391 U.S. 194 (1968) and in violation of Illinois sentencing statutes requiring concurrent sentences for the same conduct or acts occurring during the same state of mind, 720 ILCS 5/3-3, as well as in violation of the Fourteenth Amendment Due Process Clause?

8. May the Circuit Court of Cook County at summary sentencing order denial of statutory good time jail credits, 730 ILCS 130, on a finding of criminal contempt, when this statute gives the Cook County Jail Administrators authority to remove good time jail credits in a due process evidentiary hearing and not the judge or is this a violation of Illinois case law, *Kaeding v. Collins*, 281 Ill.App.3d 919 (1996) and due process under the Fourteenth Amendment?

---

[1] *Young v. Ragen*, 337 U.S. 235, 69 S.Ct. 1073 (1949); *People v. Loftus*, 400 Ill. 432, 81 N.E.2d 495 (1948), in response to order of Court in *Loftus v. People of State of Illinois*, 334 U.S. 804, 68 S.Ct 1212 (1948); *Woods v. Niersheimer*, 328 U.S. 211, 66 S.Ct. 996 (1946); *White v. Ragen* and *Lutz v. Same*, 324 U.S. 760, 65 S.Ct. 978 (1945)

9. May a judge who is embroiled in controversy with litigant refuse to recuse himself to be replaced by another judge in a contempt case or is this a violation holding in *Mayberry v. Pennsylvania,* 400 U.S. 455 (1971) and of due process under the Fourteenth Amendment?

10. Is it constitutional to sentence an alleged contemnor for more than one count of contempt representing same motive or state of mind during one trial or case, or is this a violation of holding in *People v Brown,* 235 Ill.App.3d 945 (1992), a due process violation under the Fourteenth Amendment?

11. Is it constitutional to make a finding of criminal contempt on one day and summarily sentence the contemnor on another day without a due process trial or is this a violation of Illinois Supreme Court decision *In re Marriage of Betts,* 200 Ill. App. 3d 26 (1990) and therefore a violation of due process rights under the Fourteenth Amendment?

12. Are a judge's order void *ab initio* and subsequently when he violates State statutes regarding substitution of judge as a right, 735 ILCS 5/2-1001(a)(2), as well as *Jiffy Lube International, Inc., V. Agarwal,* 277 Ill.App.3d 722, 214 Ill.Dec. 609, 661 N.E.2d 463 (1996), making this also a violation of the due process clause of the Fourteenth Amendment?

13. Are a judge's orders void when the orders are made without jurisdiction as per holding in *United States v. United Mine Workers of America,* 330 U.S. 258 (1947), as well as a due process violation under the Fourteenth Amendment?

## PARTIES

[X] All parties **do not** appear in the caption of the case on the cover page A list of
all parties to the proceeding in the court whose judgment is the subject of the
petition, not appearing on cover is as follows:

The Honorable Judges of the Illinois Supreme Court
Supreme Court Building
200 E. Capitol Avenue
Springfield, IL 62701
  Respondent

The Honorable Judges of the First District Illinois Appellate Court
160 N. LaSalle, 14th Floor
Chicago, IL 60601
- Respondent

Honorable Judge Michael McHale, Acting Presiding Criminal Court Judge Circuit
Court of Cook County
2600 S. California Ave., Courtroom 101
Chicago, IL 60608
- Respondent

Honorable Judge Timothy Evans, Acting as CEO of the Circuit Court of Cook
County
50 W. Washington, Rm 2600
Chicago, IL 60602
-Respondent


Illinois Attorney General Lisa Madigan, State of Illinois
100 W. Randolph
Chicago, IL 60601- Counsel for Respondents

## TABLE OF CONTENTS

| | |
|---|---|
| QUESTION PRESENTED FOR REVIEW | i |
| PARTIES | iv |
| TABLE OF CONTENTS | v |
| TABLE OF AUTHORITIES | vi |
| PRIOR OPINIONS | ix |
| JURISDICTION | x |
| STATUTE, CODE, or RULES INVOLVED | xvi |
| CONSTITUTIONAL PROVISIONS | xxxviii |
| STATEMENT OF THE CASE | 1 |
| INTRODUCTION | 1 |
| FACTS | 3 |
| ARGUMENT | 32 |
| REASONS FOR GRANTING PETITION | 33 |
| CONCLUSIONS AND RELIEF SOUGHT | 36 |
| CERTIFICATE | 37 39 |
| INDEX TO APPENDIX | 38 40 |

## TABLE OF AUTHORITIES

| Case | Page |
|---|---|
| 12 Moore's Federal Practice § 60.44[c] | xiv |
| *Bloom v. Illinois*, 391 U.S. 194 (1968) | ii, 30 |
| *Boumediene v. Bush*, 553 U.S. 723, 128 S.Ct 2229 (2008) | ii, 5, 18, 25, 33 |
| *Codispoti v. Pennsylvania* 418 U.S. 506 (1974) | 26, 30, 31, 34 |
| *Cohens v. Virginia*, 6 Wheat. 264, 5 L.Ed 257 (1821) | 11, 13, 14, 18, 26, 34 |
| *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401(1958) | ii, 8, 25, 34 |
| *Crosby v. The Bradstreet Co., 312 F.2d 483, 485 (2d Cir.1963)* | xiv |
| *Cunningham v. California*, 127 S. Ct. 856 (2007) | xiii |
| *Curtis v. Lofy*, 394 Ill.App.3d 170, 176 (2009) | 7 |
| *Dupuy v. Samuels*, 397 F. 3d 493 (7th Cir. 2005) | 12 |
| *Elliot v. Piersol*, 1 Pet. 328, 340, 26 U.S. 328, 340 (1828) | 14 |
| *Henning v. Chandler*, 229 Ill.2d 18 (2008) | 29 |
| *In re Adoption of E.L.*, 733 N.E.2d 846, (Ill. App. 1 Dist. 2000) | xiv |
| *In Re Estate of Steinfield, 630 N.E.2d 801* | xiv |
| *In re Marriage of Bartlett*, 305 Ill.App.3d 28 (1999) | 19 |
| *In re Marriage Betts*, 200 Ill.App.3d 26 (1990) | iii, 15, 30, 34 |
| *Jiffy Lube International, Inc., V. Agarwal*, 277 Ill.App.3d 722, 214 Ill.Dec. 609, 661 N.E.2d 463 (1996) | iii, 24, 29 |
| *Kaeding v. Collins*, 281 Ill.App.3d 919 (1996) | ii, 15 |
| *Long v. Shorebank Development Corp., 182 F.3d 548 (C.A. 7 Ill. 1999)* | xiv |

*Loftus v. People of State of Illinois*, 334 U.S. 804, 68 S.Ct 1212 (1948)     i, x, xi, xiii, 2, 32, 33

*Mayberry v. Pennsylvania*, 400 U.S. 455 (1971)     iii

*McLearn v. Cowen & Co., 660 F.2d 845, 848 (2d Cir.1981)*     xiv

*People v Brown*, 235 Ill.App.3d 945 (1992)     iii

*People v. Collins* 57 Ill.App.3d at 934     30

*People v. Coulter*, 228 Ill.App.3d 1014 (1992)     19

*People v. Griffith*, 247 Ill.App.3d 21 (1993)     19

*People v. Griffin*, 178 Ill.2d 65, 79 227 Ill.Dec. 338, 687 N.E.2d 820 (1997)     11

*People v. Loftus*, 400 Ill. 432, 81 N.E.2d 495 (1948)     i, x, xi, xiii, 2, 32, 33

*People v. Meyers*, 352 Ill.App.3d 790 (2004)     17, 18

*People v. Miller*. 51 Ill.2d 76, 21 N.E.2d 292 (1972)     19

*People v. Pearson*, 98 Ill.App.2d 203, 240 N.E.2d 337 (1968)     19

*People v. Rolland*, 581 N.E.2d 907 (Ill.App. 4 Dist. 1991)     xiv

*People v. Sales*, 551 N.E.2d 1359 (Ill.App. 2 Dist. 1990)     xiv

*People v. Sheahan*, 150 Ill.App.3d 572 (1986)     17

*People v. Simak*, 161 Ill.2d at 297     30

*People v Simmons*, 256 Ill.App.3d 651     25

*People v. Wilson*, 302 Ill.App.3d 1004, 1006 (1999)     17, 18

*Sacher v United States*, 343 U.S.1 (1952)     ii

*Sibron v. New York*, 392 U.S. 40 at 52, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)     21

*Smith v. Bennett and Marshall v. Bennett*, 365 U.S. 708, 81 S.Ct. 895 (1961)     i, x, 31, 32

*Steinfeld v. Hoddick,* 513 U.S. 809 (Ill. 1994)                                    xiv

*St. Pierre v. United States,* 319 U.S. 41, 63 S.Ct. 910, 87    21, 22
L.Ed. 1199 (1943)

*United States v. United Mine Workers of America,* 330    iii
U.S. 258 (1947)

*U.S. ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S.Ct 1 (1955)    ii, 33

*U.S. v. Will,* 449 U.S. 200 (1980)                                    8, 9, 11, 13, 14, 18, 25,
                                                                                          34

*Von Kettler et.al. v. Johnson,* 57 Ill. 109 (1870)              14

*White v. Ragen and Lutz v. Same,* 324 U.S. 760, 65 S.Ct.    i, x, xi, xiii, 2, 32, 33
978 (1945)

*Winning Moves, Inc., v. Hi! Baby, Inc.* 238 Ill.App.3d 834    15
(1992)

*Woods v. Niersheimer,* 328 U.S. 211, 66 S.Ct. 996 (1946)    i, ii, x, xi, xiii, 2, 32,
                                                                                          33

*Young v. Ragen,* 337 U.S. 235, 69 S.Ct. 1073 (1949)          i, ii, x, xi, xiii, 2, 32

## PRIOR OPINIONS

The decisions of the Clerk of the United States Supreme Court refusing to file the Petition for Writ of Certiorari are SCA[2] AAA1-2. The orders of the Illinois Supreme Court banning filing of any documents are SCA MM1-3. The order of the Illinois Appellate Court denying leave to appeal in forma pauperis and banning filing any papers until fees are paid is SCA LL. The order of the United States Seventh Circuit Court of Appeals banning any filing in forma pauperis is SCA TT. The order and opinion of the Federal District Court dismissing Petition for Writ of Habeas Corpus is SCA SS. The orders finding Shelton in contempt of court and sentencing orders from Judge McHale are SCA B, E, F, G, and DD. Review of all of these decisions, orders and opinions is sought. The orders denying first and second petition for writ of habeas corpus by Judges Porter and McHale respectively are SCA A and SCA DD (Transcript is SCA CC7-9). None of these opinions are published to the best of Shelton's knowledge and belief.

---

[2] SCA – Supreme Court Appendix

## JURISDICTION

Petitioner seeks this Court's review as supervisor of all courts in the land under the United States Constitution Article II (regarding federal rights for due process under the Fifth and Fourteenth Amendments) and under 28 U.S.C. § 1651(a) of orders:

1) by the Clerk of the U.S. Supreme Court, **erroneously** entered on August 17 & October 8, 2010, under U.S. Supreme Court Rule 1.1(SCA AAA) refusing to file her Petition for Writ of Certiorari twice **in violation of the U.S. Supreme Court holdings** in *Niersheimer, Regan,* and *Loftus (supra in Question 1),*

2) by the Illinois Appellate Court, entered on January 20, 2011 denying Petition for Indigency in criminal appeal thus impairing appeal and **in violation of this Honorable Court's orders, regarding waiving fees due to indigency in criminal appeals,** in *Smith v. Bennett and Marshall v. Bennett,* 365 U.S. 708, 81 S.Ct. 895 (1961) and Illinois Supreme Court [indigency] Rule 298 (SCA LL),

3) executed by the Clerk of the Illinois Supreme Court on April 15, 2010 – based on standing orders of the Illinois Supreme Court entered on May 23, 1991 denying Shelton's right to file for leave to appeal again **in violation of this Honorable Court's orders** in *Smith v. Bennett and Marshall v. Bennett,* 365 U.S. 708, 81 S.Ct. 895 (1961) and Illinois Supreme Court's own [indigency] Rule 298 (SCA MM),

4) by the Circuit Court of Cook County entered on May 11, 2010 and June 10, 2010, modified on October 1, 2010 finding Petitioner ("Shelton") in criminal contempt of court three times (three "cases") during one continued court hearing on next-friend habeas petition which the court has two years later still refused to hear, and **then summarily**

x

sentencing Shelton to 16 months in jail, in violation of numerous U.S. Supreme Court holdings described in this pleading (SCA B, E, F, G, SCA CC7-9 and DD ),

5) by the Federal District Court for the Northern District of Illinois entered on September 28, 2010 (SCA SS) refusing to hear a petition for writ of habeas corpus [actually one handwritten filing that Shelton wrote from jail to cover all cases civil and criminal and habeas due to the fact that Shelton was denied access to any more paper, pen, mailing supplies – i.e. access to the court] because Shelton did not exhaust state remedies (a false statement in violation of facts and *Niersheimer, Regan,* and *Loftus* (*supro*)) per 28 U.S.C. § 2241 and 1331

6) by the United States Seventh Circuit Court of Appeals

a) entered on August 9, 2006 [by a three judge panel without any due process evidentiary hearing in violation of the Fifth Amendment based on hearsay and defamation of Shelton's character, as well as false statements about Shelton's pleadings] fining Shelton $2400 as an indigent person and barring her from filing any pleadings in forma pauperis despite her indigent status on SSI (SCA TT), and

b) March 31, 2010 and April 8, 2010 illegal purported "Executive Committee" orders (<u>actually ex parte orders solely by Judge Holderman without any due process hearing in violation of the Fifth Amendment or meeting of the Executive Committee or 7th Circuit Council whatsoever</u>)

i) barring Shelton from communicating with the Clerk of the court by phone or in writing (SCA TT5, last paragraph),

xi

ii) barring Shelton from the Dirksen federal building or using the library or ANY services in the building except for the 27th floor 7th Circuit Court (SCA TT3-6),

iii) barring Shelton from filing any federal suits, complaints or petitions (SCA TT3-6), and

iv) making the **FALSE** and **DEFAMATORY** statements that above orders are warranted as Shelton is disruptive (false) and a "litigant who was convicted and served time in prison for the felony of aggravated battery of a correctional officer" (SCA TT 3, 7, 8, 10, 12, 17) [although this is true, **Shelton's wrongful and malicious conviction is legally void *ab initio* due to a fatally flawed indictment and perjury by the only state witness**, that has not yet been acknowledged by any court due to judicial misconduct and for which a Petition for Writ of Mandamus is being prepared to be presented to this Hon. Court[3], as well as **a felony conviction is not a legal basis for barring someone from filing in federal court or using services in a federal building such as a law library**, and

v) making the **FALSE** and **DEFAMATORY** statements that Shelton "was diagnosed, as reported by her personal psychiatrist, as having a 'psychiatric condition' resulting in an 'altered mental state' and in her 'misconception of ongoing events,'" as the basis for barring her from filing in federal court or using services in the federal building such as the law library. Shelton's "mental illness" consists of non-violent flashbacks due to post-traumatic-stress-disorder due to Shelton being beaten by police and illegally

---

[3] See Appendix YY for details

drugged causing her to go into a respiratory arrest, then beaten again where the officer, Sgt. Salemi then falsified his records, committed perjury and thereby caused the above mentioned wrongful conviction for "aggravated battery of an officer" for allegedly "bumping" an officer with Shelton's wheelchair, causing abrasions and resulting in a two year sentence in violation of the U.S. Supreme Court holdings in *Cunningham v. California*, 127 S. Ct. 856 (2007). (see letter by Dr. Galatzer-Levy SCA UU, [purportedly quoted by Judge Holderman in his orders, SCA TT] who treated Shelton for PTSD which affirms Shelton's above statement and eviscerates Judge Holderman's false and defamatory statements which he used to make the above illegal ex parte orders.)

This petition is timely filed because the original Petition for Writ of Certiorari (SCA BBB) was timely filed with the U.S. Supreme Court Clerk as it was filed within 90 days of orders of Judges Porter and McHale on June 9, 2010 and October 1, 2010 respectively, but was illegally rejected in violation of this Hon. Court's holdings in *Niersheimer, Regan* and *Loftus*[4] by the U.S. Supreme Court Clerk twice on August 17 and October 8, 2010. Therefore, a mandamus petition is appropriate to correct this Hon. Court Clerk's error, as well as to uphold the Constitution and the United States' rules of law by this Hon. Court reviewing the above.

---

[4] *Young v. Ragen,* 337 U.S. 235, 69 S.Ct. 1073 (1949); *People v. Loftus,* 400 Ill. 432, 81 N.E.2d 495 (1948), in response to order of Court in *Loftus v. People of State of Illinois,* 334 U.S. 804, 68 S.Ct 1212 (1948); *Woods v. Niersheimer,* 328 U.S. 211, 66 S.Ct. 996 (1946); *White v. Ragen* and *Lutz v. Same,* 324 U.S. 760, 65 S.Ct. 978 (1945)

In addition this petition is timely because void orders (including the U.S. Supreme Court Clerk's "orders" illegally refusing to file the Petition for Writ of Certiorari, the unconstitutional Illinois Appellate and Supreme Courts' decisions to refuse to allow direct criminal appeal until fees are paid by an indigent person, and the erroneous Federal District Court Decision that State remedies have not been exhausted, as well as the lawless 7th Circuit Court decisions done in acts of false statements, defamation of character, and denial of due process), can be appealed at any time in any court directly or collaterally [5] as this is well-settled law. (*In Re Estate of Steinfield*, 630 N.E.2d 801, certiorari denied, See also *Steinfeld v. Hoddick*, 513 U.S. 809 (Ill. 1994), *Long v. Shorebank Development Corp.*, 182 F.3d 548 (C.A. 7 Ill. 1999), 12 Moore's Federal Practice § 60.44[c]; and *People v. Sales*, 551 N.E.2d 1359 (Ill.App. 2 Dist. 1990), *People v. Rolland*, 581 N.E.2d 907 (Ill.App. 4 Dist. 1991), *In re Adoption of E.L.*, 733 N.E.2d 846, (Ill. App. 1 Dist. 2000)).

**Also, plenary power of this Honorable Court allows it to extend the time to hear Petitions regarding void orders due to actual innocence** regarding these three (3) criminal contempt convictions, claimed by Shelton and

---

[5] Courts have been exceedingly lenient in defining the term "reasonable time," with regard to voidness challenges. In fact, it has been oft-stated that, for all intents and purposes, a motion to vacate a default judgment as void "may be made at any time." 12 Moore's Federal Practice § 60.44[c]; *McLearn v. Cowen & Co.*, 660 F.2d 845, 848 (2d Cir.1981); *Crosby v. The Bradstreet Co.*, 312 F.2d 483, 485 (2d Cir.1963) (judgment vacated as void thirty years after entry).

<u>**due to extraordinary circumstances and impossibility of obtaining relief**</u> in any other court in this land as described in detail in this pleading (U.S. Supreme Court Rules 20(4)(a) re: §1651 and §2241).

Therefore, this Petition for Writ of Mandamus is appropriate.

Jurisdictional basis in regards to appeal:

1) for Illinois Appellate Court is Illinois Supreme Court Rule 602-609 (direct appeal procedure) and Illinois Constitution Article VI, Section 6,

2) for the Illinois Supreme Court is Illinois Supreme Court Rule 315, and Illinois Constitution, Article VI, Section 4,

3) for the Seventh Circuit is 28 U.S.C. § 1651(a) and Fed. R. App. P. 21(a), and

4) for the District Court is 28 U.S.C. § 2241 and 1331.

| Statute, Code, or Rule | Page |
|---|---|

**720 ILCS 5/1-3**                                                                      30
    Sec. 1-3. Applicability of common law. No conduct constitutes an
offense unless it is described as an offense in this Code or in another
statute of this State. However, this provision does not affect the power of
a court to punish for contempt or to employ any sanction authorized by
law for the enforcement of an order or civil judgment.

**720 ILCS 5/3-3**                                                                      26
    Sec. 3-3. **Multiple prosecutions for same act.** [emphasis added]
    (a) When the same conduct of a defendant may establish the
commission of more than one offense, the defendant may be prosecuted
for each such offense.
    (b) If the several offenses are known to the proper prosecuting officer
at the time of commencing the prosecution and are within the jurisdiction
of a single court, they must be prosecuted in a single prosecution, except
as provided in Subsection (c), if they are based on the same act.
    (c) When 2 or more offenses are charged as required by Subsection (b),
the court in the interest of justice may order that one or more of such
charges shall be tried separately.

**720 ILCS 5/14-2**
Sec. 14-2. Elements of the offense; affirmative defense.                                 3
(a) A person commits eavesdropping when he:
(1) Knowingly and intentionally uses an eavesdropping
device for the purpose of hearing or recording all or any part of any
conversation or intercepts, retains, or transcribes electronic
communication unless he does so (A) with the consent of all of the parties
to such conversation or electronic communication or (B) in accordance
with Article 108A or Article 108B of the "Code of Criminal Procedure of
1963", approved August 14, 1963, as amended; or
. . . .
(3) Uses or divulges, except as authorized by this
Article or by Article 108A or 108B of the "Code of Criminal Procedure of
1963", approved August 14, 1963, as amended, any information which he
knows or reasonably should know was obtained through the use of an
eavesdropping device.
. . . .
**720 ILCS 5/14-3**
Sec. 14-3. Exemptions. The following activities shall be exempt from the
provisions of this Article:
. . . .
(i) Recording of a conversation made by or at the request of a person, not
a law enforcement officer or agent of a law enforcement officer, who is a
party to the conversation, under reasonable suspicion that another party

to the conversation is committing, is about to commit, or has committed a criminal offense against the person or a member of his or her immediate household, and there is reason to believe that evidence of the criminal offense may be obtained by the recording;

### 725 ILCS 5/104-10

Sec. 104-10. Presumption of Fitness; Fitness Standard.) A defendant is presumed to be fit to stand trial or to plead, and be sentenced. A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense.

### 725 ILCS 5/104-11

Sec. 104 11. Raising Issue; Burden; Fitness Motions.) (a) The issue of the defendant's fitness for trial, to plead, or to be sentenced may be raised by the defense, the State or the Court at any appropriate time before a plea is entered or before, during, or after trial. When a bonafide doubt of the defendant's fitness is raised, the court shall order a determination of the issue before proceeding further.

(b) Upon request of the defendant that a qualified expert be appointed to examine him or her to determine prior to trial if a bonafide doubt as to his or her fitness to stand trial may be raised, the court, in its discretion, may order an appropriate examination. However, no order entered pursuant to this subsection shall prevent further proceedings in the case. An expert so appointed shall examine the defendant and make a report as provided in Section 104-15. Upon the filing with the court of a verified statement of services rendered, the court shall enter an order on the county board to pay such expert a reasonable fee stated in the order.

(c) When a bonafide doubt of the defendant's fitness has been raised, the burden of proving that the defendant is fit by a preponderance of the evidence and the burden of going forward with the evidence are on the State. However, the court may call its own witnesses and conduct its own inquiry.

(d) Following a finding of unfitness, the court may hear and rule on any pretrial motion or motions if the defendant's presence is not essential to a fair determination of the issues. A motion may be reheard upon a showing that evidence is available which was not available, due to the defendant's unfitness, when the motion was first decided.

### 725 ILCS 5/104-12

Sec. 104-12. Right to Jury. The issue of the defendant's fitness may be determined in the first instance by the court or by a jury. The defense or the State may demand a jury or the court on its own motion may order a jury. However, when the issue is raised after trial has begun or after conviction but before sentencing, or when the issue is to be redetermined under Section 104-20 or 104-27, the issue shall be determined by the

court.

725 ILCS 5/104-13                                                    22

Sec. 104-13. Fitness Examination.

(a) When the issue of fitness involves the defendant's mental condition, the court shall order an examination of the defendant by one or more licensed physicians, clinical psychologists, or psychiatrists chosen by the court. No physician, clinical psychologist or psychiatrist employed by the Department of Human Services shall be ordered to perform, in his official capacity, an examination under this Section.

(b) If the issue of fitness involves the defendant's physical condition, the court shall appoint one or more physicians and in addition, such other experts as it may deem appropriate to examine the defendant and to report to the court regarding the defendant's condition.

(c) An examination ordered under this Section shall be given at the place designated by the person who will conduct the examination, except that if the defendant is being held in custody, the examination shall take place at such location as the court directs. No examinations under this Section shall be ordered to take place at mental health or developmental disabilities facilities operated by the Department of Human Services. If the defendant fails to keep appointments without reasonable cause or if the person conducting the examination reports to the court that diagnosis requires hospitalization or extended observation, the court may order the defendant admitted to an appropriate facility for an examination, other than a screening examination, for not more than 7 days. The court may, upon a showing of good cause, grant an additional 7 days to complete the examination.

(d) Release on bail or on recognizance shall not be revoked and an application therefor shall not be denied on the grounds that an examination has been ordered.

(e) Upon request by the defense and if the defendant is indigent, the court may appoint, in addition to the expert or experts chosen pursuant to subsection (a) of this Section, a qualified expert selected by the defendant to examine him and to make a report as provided in Section 104-15. Upon the filing with the court of a verified statement of services rendered, the court shall enter an order on the county board to pay such expert a reasonable fee stated in the order.

725 ILCS 5/104-14

Sec. 104-14. Use of Statements Made During Examination or Treatment.) (a) Statements made by the defendant and information gathered in the course of any examination or treatment ordered under Section 104-13, 104-17 or 104-20 shall not be admissible against the defendant unless he raises the defense of insanity or the defense of drugged or intoxicated condition, in which case they shall be admissible only on the issue of whether he was insane, drugged, or intoxicated. The

Title:   Cook County State's Attorney

Place of Employment:   69 West Washington Chicago, Illinois 60602

(If you have more than three defendants, then all additional defendants must be listed according to the above format on a separate sheet of paper.)

2

Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**Page 3**

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**III. List ALL lawsuits you (and your co-plaintiffs, if any) have filed in any state or federal court in the United States:**

A.   Name of case and docket number:                              N/A

B.   Approximate date of filing lawsuit:                          N/A

C.   List all plaintiffs (if you had co-plaintiffs), including any aliases:

                                        N/A

D.   List all defendants:                              N/A

E.   Court in which the lawsuit was filed (if federal court, name the district; if state court, name the county):                              N/A

F.   Name of judge to whom case was assigned:                              N/A

G.   Basic claim made:                              N/A

H.   Disposition of this case (for example: Was the case dismissed? Was it appealed? Is it still pending?):

N/A

I.    Approximate date of disposition:        N/A

**IF YOU HAVE FILED MORE THAN ONE LAWSUIT, THEN YOU MUST DESCRIBE THE
ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THIS SAME
FORMAT. REGARDLESS OF HOW MANY CASES YOU HAVE PREVIOUSLY FILED,
YOU WILL NOT BE EXCUSED FROM FILLING OUT THIS SECTION COMPLETELY,
AND FAILURE TO DO SO MAY RESULT IN DISMISSAL OF YOUR CASE. CO-
PLAINTIFFS MUST ALSO LIST ALL CASES THEY HAVE FILED.**

3                                                Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**Page 4**

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

### IV. Statement of Claim:

State here as briefly as possible the facts of your case. Describe how each defendant is
involved, including names, dates, and places. **Do not give any legal arguments or cite any
cases or statutes.** If you intend to allege a number of related claims, number and set forth
each claim in a separate paragraph. (Use as much space as you need. Attach extra sheets
if necessary.)

Now comes Plaintiffs Cornel Dawson, Teron Odum, Clifton Lemon, Ulysses Polk, Antwan Davis, Duavon Spears, Gwendolyn

Lemon, Delores Lemon, Janice Lemon, Patricia Lemon, Sharon Lemon, Cornesha Dawson, Camyrn Dawson, Sheronda

Odum, Shanela Aaron, Trequan Odum, Nya Lewis, Ulisha Polk, Kalisha Polk, Ivory Griffin, Nyana Polk, Unylah Polk, Antwan

Davis Jr, Natosha Benbow, Armani Johnson-Spears, Anira Spears, Duavon Spears Jr. Indivdually, hereby file this claim

against the above named defendants and in support thereof states as follows: During a criminal conviction case, the named

defendants each played a viable role in violation of constitutional rights, judicial misconduct, failure to acknowledge and

address racial bias, impartial jurors, which led to malicious prosecution by Cook County Circuit court. As stated by Chief

Justice John Roberts, cited in Washington Post, "Judges are supposed to be impartial-as boring as umpires." However, in

Illinois case NO. 13 CR 13349, Judge Michael B McHale continuously inserted his personal biases and failed to uphold the

integrity and independence of judiciary (Ethics of judicial conduct). Based on transcripts dated November 30, 2017; Judge

McHale was quoted on several occasions interjecting comments like " I think it's obvious to this court that what they are

saying is we can't follow the law. And they're off " (CSR No. 84-3386). Referring to two minority jurors who questioned

unfair jury instructions. Judge McHale failed to allow either juror to clarify their concerns and removed them in protest. In

addition to the removal of black juror for being dishonest on the juror questionnaire; McHale allowed 2 male jurors not of color

to remain after one confessed to "wanting to send a message." As documented by U.S Supreme Court case Pena-

Rodriguez v. Colorado in which the "no impeachment rule" must give way when it is alleged that a juror made explicit state-

ments indicating ethnic or racial animus was a motivating factor to convict ( Pena-Rodriguez, 2017). In this case, juror No.215

who later became the foreperson and juror No. 44 were not stricken for making such comments under oath, undermining

4                                                         Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

---

**Page 5**

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

the rights of impartiality. While McHale disagreed with the above findings, the U.S Supreme Court and Appellate courts ruling

set precedent for cases heard in lower courts, thus he has violated the Judicial code of conduct and should be reprimanded

similar to his improper handling of the other 12 cases currently being overturned. One of the jurors that were responsible for

alerting the judge of all the racist and bias comments being made by jurors during deliberations, came forward to testify at

a hearing after trial, and was then "deemed incredible by the courts." Another point of inconsistency and contradiction by the

Courts, because previous evidence shows that this same juror brought forth concerns that removed other bias jurors.                 Judge

McHale allowed jurors to spew racial slurs and throw chairs at black jurors; but failed to bring forth criminal assault or hate

crime charges.           On the date in question, June 11, 2012 Former Governor Patrick Quinn signed the first Illinois statue bill HB1907

(Illinois Street Gang Racketeer Influenced Corrupt Organizations Law) which holds Pat Quinn responsible for the negative

downpour such unconstitutional law created. Former Cook County State's Attorney Anita Alvarez failed to sign and request

authorization to obtain recordings that were used in a criminal conviction of six of the named plaintiffs; although similar

recordings were deemed inadmissible by the Second District Appellate Court. Six of the above named plaintiffs are victims

of a wrongful conviction case in Cook County Circuit court and suffered lost of freedom, years apart from families, housed

in dilapidated prisons with deplorable conditions, and targeted by Cook County as " Test Subjects" for the newly drafted

Illinois RICO law. All named defendants are being named in this complaint for their direct or foreseen participation in the

construct of lawful practices that negatively affect the Black Communities of Illinois. It is a violation of due process to subject

a defendant to trial in an atmosphere of mob action or racial motivation. Newspaper articles from 2013 until current day has

depicted plaintiffs in a negative light, caused pain and suffering over a long length of time, and hindered the upward mobility

of those parties and their respective families. The extensive cost of legal counsel for each individual listed, in addition to the

irreplaceable moments that will never be given back; the exact same constitutional rights granted to us as citizens has been

the catalyst to destroy the democracy for Blacks. The demanded relief of damages are for those victims and families in

need of justice reform; to ensure the system in which this country was built upon, works for all mankind.

5

Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

## V.    Relief:

State briefly exactly what you want the court to do for you. Make no legal arguments. Cite
no cases or statutes.

Based on the trauma and harsh sentence of cruel and usual punishment in which some plaintiffs were sentenced 888 years
without the potential of parole, along with the separation of families; plaintiffs are entitled to relief for a number of reasons.
Private communications, jury tampering, or the creation of imminent danger is not to be condoned, per the Sixth Amendment.
The number of individuals affected by the Cook County Judicial System, and named defendants have caused financial hard-
ships that will outweigh time lost, memories unforeseen, broken families, generational destitution, lost wages, medical
expenses, and humiliation. Thus the plaintiffs named above, are seeking $600 million dollars to compensate for the defamation
of character, attorney fees and legal costs, pain and suffering, and judicial reform.

VI. The plaintiff demands that the case be tried by a jury. $9$ YES $9$ NO

CERTIFICATION

By signing
the complaint are true to the best of my knowledge, information and
belief. I understand that if this certification is not correct, I may be
I certify
subject to sanctions by the Court.
that the
facts stated

Signed this _____ day of _____, 20_____

(Signature of plaintiff or plaintiffs)

(Print name)

(I.D. Number)

(Address)

6
[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Revised 9/2007